## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN (DETROIT)

In Re:

Dailey Law Firm PC            Case No. 23-45970-mlo
                                     Chapter 11
       Debtor.                Hon. Maria L. Oxholm

_____/

## MOTION AND INCORPORATED BRIEF IN SUPPORT BY COURT APPOINTED RECEIVER JOHN POLDERMAN, ESQ. (i) TO DISMISS OR SUSPEND THE BANKRUPTCY CASE, UNDER SECTIONS 1112(b) or 305(a) OF THE BANKRUPTCY CODE; OR (ii) EXCUSE TURNOVER UNDER SECTION 543(d) OF THE BANKRUPTCY CODE

John Polderman, Esq., as pre-petition Receiver of the assets of Dailey Law Firm PC ("DLF" or "Debtor") (the "Receiver"), by and through the undersigned counsel, hereby moves (the "Motion") this Court pursuant to sections 1112(b), 305(a), and 543(c) and (d) of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.)* ("the Bankruptcy Code") for (i) an order dismissing this case ("the Case") under Bankruptcy Code § 1112(b) based on lack of good faith and for cause shown; and/or (ii) an order dismissing or suspending the proceedings in this Case under Bankruptcy Code § 305(a), as the interests of the creditors and debtor would be better served by dismissal or suspension; or in the alternative, (iii) an order (a) excusing the Receiver from complying with any turnover under Bankruptcy Code § 543(d), and/or (b) protecting the property held by the Receiver and for payment of the Receiver's reasonable costs and expenses under Bankruptcy Code § 543 (c).

## PRELIMINARY STATEMENT

This Case is a classic example of a chapter 11 filed in bad faith for the improper purpose of halting an ongoing state court action where:

- Debtor has only one asset of value – accounts receivable;

- Debtor's schedule of largest unsecured creditors consists chiefly of former clients and third parties who have asserted claims of fraud, defalcation or mishandling of their funds ("Defrauded Parties");

- Debtor has one secured creditor;

- Debtor filed this Case shortly after the state court demanded turnover of funds that were to be held in trust and appointed the Receiver;

- The essential controversy here is a two party dispute between Debtor, on the one hand, and the Defrauded Parties on the other hand, over payment of settlement proceeds, and Debtor's efforts to use this Court to avoid compliance with state court orders;

- Debtor engaged in substantial pre-petition misconduct and its principal and manager is the subject of a pending complaint from the State Bar of Michigan; and

- Debtor has habitually failed to file tax returns or remit trust fund taxes to the appropriate taxing authorities.

As set forth below, the Debtor's chapter 11 case was filed for the sole purpose of delaying the pending interpleader action in the Wayne County Circuit Court ("State Court"), frustrating the receivership in that proceeding, and ultimately, subverting the orders of the State Court. It is beyond peradventure that the use of the bankruptcy process for these purposes is improper. Even if the Court were to excuse these extreme deficiencies, however, abstention is warranted under 11

U.S.C. § 305. The matter involves an interpleader action currently being litigated in the State Court and which involves issues of state law.  That is the proper forum to determine property rights and DLF's actions as a fiduciary (or lack thereof) rather than this Court.

In the alternative, the Receiver is entitled to relief under Bankruptcy Code § 543(d), because leaving the Debtor's assets in the hands of the Receiver is in the best interests of the creditors - as opposed to the conflicted interests of Debtor, who holds claims against its manager and shareholder, and have shown a penchant to disregard basic fiduciary duties.

## FACTUAL AND PROCEDURAL BACKGROUND
### The Wayne County Circuit Court Case

1.      The Receiver was appointed over the assets of the Debtor as well as the owner and sole shareholder of the Debtor, Brian Dailey (See **Exhibit A**, Order Appointing Receiver).

2.      The Receiver's appointment arose out of an interpleader action filed in the Wayne County Circuit Court in 2021 (See **Exhibit B**, Complaint).

3.      The Dailey Law Firm claimed to be holding no-fault insurance and disability proceeds in the amount of $166,135.40 in its client trust account for payment to various medical providers.

4.      However, as the initial settlement amount was $600,000, the interpleader defendants asked for an accounting of the settlement proceeds.

5.      The initial accounting from The Dailey Law Firm revealed a number

3

of problems (See **Exhibit C**, Debtor's Accounting):

a.  Under relevant personal injury protection law, Brian Dailey and the Dailey Law Firm cannot take a 1/3 fee on amounts the insurer voluntarily pays to providers. Thus, the Dailey Law Firm's fees should have been calculated by taking the $600,000, subtracting $2,404.68 in case expenses (unproven but plausible) and taking 33% of the rest. That would have been $199,198.44 in fees + $2,404.68 in expenses = $201,603.12 to the Debtor.

b.  Instead, the Debtor calculated its fee based on an extra $97,146.45 that was never paid by the insurer-- an extra $32,382.15. This is wrong.

c.  Next, the Debtor allegedly paid two of the medical providers $51,500 but ignored all the other providers. Normally, if there isn't going to be enough to pay all providers there is a motion filed under MCL 500.3112 to have the trial court allocate the settlement among the providers, the attorney, and the client. Brian Dailey and the Debtor didn't do this.

d.  Next, instead of paying the providers (so as to protect the client from collections), he paid himself for alleged litigation over a disability insurance dispute. Brian Dailey claimed to have had $11,000 in expenses (not documented) and paid himself that plus $148,379.33 for

4

a total payment of $159,379.33. But his fee, if warranted at all, was not calculated correctly. He paid himself 1/3 of the present value of all his client's future disability payments. But those payments were reduced when his client received Social Security Disability, and pursuant to applicable law (42 USC 406, Section 206(a)(1)), he can't take more than a $7,200 fee on getting such benefits (if he had anything to do with that at all).

    e. In sum, Brian Dailey and the Debtor paid themselves too much and they took it from a fund that was only there because they didn't pay the providers as they should have.

6. After numerous machinations, the Wayne County Circuit Court ordered the Debtor to pay pack the $600,000 settlement and the funds to be placed in escrow (See **Exhibit D**, Order).

7. Brian Dailey and The Dailey Law Firm refused to return the $600,000, and claimed that at most, only $155,000 of the original $600,000 existed in the IOLTA trust account (See **Exhibit E**, Hearing Transcript).

8. As a result, the Wayne County Circuit Court appointed the Receiver to investigate and recover the $600,000 in missing client funds.

9. After the Receiver's appointment, Brian Dailey and the Debtor were obligated under the Order Appointing Receiver, and relevant statutes, to promptly

turn over financial information to the Receiver so as to allow the Receiver to investigate the finances of the Debtor.

10. Brian Dailey and the Debtor failed and refused to do so, prompting the Receiver to file a *Verified Motion for Order To Show Cause* (See **Exhibit F**, Motion).

11. Before a hearing could be held on the contempt motion, Brian Dailey personally filed Ch. 13 bankruptcy proceedings.

## The Additional Mishandling of Funds While Acting as A Fiduciary

12. Unfortunately this is not Brian Dailey and the Debtor's first instance of mishandling of client funds.

13. In 2019, The Dailey Law Firm was found liable for conversion of client funds. This judgment was upheld on appeal (See **Exhibit G**, Michigan Court of Appeals Decision).

14. Shortly, thereafter, numerous other clients of The Dailey Law Firm stepped forward and raised similar, troubling, allegations about the mishandling and misappropriation of their settlement proceeds.

15. As a result of these complaints, the State of Michigan, Attorney Discipline Board has initiated a 49 page formal complaint against Brian Dailey seeking disciplinary action against Brian Dailey (See **Exhibit H**, Complaint).

16. The allegations include 11 instances of mishandling of settlement

proceeds, two instances of failure to pay wages to employees as well as a count for failure of Brian Dailey and the Dailey Law Firm to provide documents to the State Bar of Michigan.

17. These proceedings are ongoing, with testimony being provided by various injured parties. The most recent hearing is set for August 8, 2023 (See **Exhibit I**, Hearing Subpoena).

18. Based on the foregoing allegations, as well as his actions in the Wayne County Circuit Court case, Brian Dailey and the Dailey Law Firm have engaged in a pattern of dishonesty, fraud and deceit.

19. Despite conceding in the State Court interpleader action that the interpleader Defendants are entitled to $155,000, the Debtor has failed and refused to turn those funds over to the clerk of the State Court or the Receiver.

20. Accordingly, the Debtor is in active violation of the Michigan Rules of Professional Conduct sections 1.15(c) and (d) which provide that:

> (c) When two or more persons (one of whom may be the lawyer) claim interest in the property, it shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall promptly distribute all portions of the property as to which the interests are not in dispute.

> (d) A lawyer shall hold property of clients or third persons in connection with a representation separate from the lawyer's own property. All client or third person funds shall be deposited in an IOLTA or non-IOLTA account. Other property shall be identified as such and appropriately safeguarded.

21. Brian Dailey and The Dailey Law Firm now seek to use, and abuse, this Court and the bankruptcy process to cover and enable continued fraud and

7

avoidance of the consequences of their actions in mishandling client funds.

### The Intentionally Vague Schedules Regarding Payments to Insiders and $1 Million Dollar Proof of Claim for Trust Fund Taxes

22.    Debtor is obligated in its Statement of Financial Affairs to list all payments or transfers of property to insiders. Despite this obligation, Debtor has failed to disclose payments it has made and instead claimed that the will "amend" the schedules at some later to be determined date (Docket No. 43, Pages 19-27):



4. Payments or other transfers of property made within 1 year before filing this case that benefited any insider
List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. Insiders include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None.

| Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
| --- | --- | --- | --- |
| 4.1. DEBTOR IS REVIEWING AND WILL AMEND | | $0.00 | |



30. Payments, distributions, or withdrawals credited or given to insiders
Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☐ No
■ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
| --- | --- | --- | --- |
| 30.1 Brian Dailey<br>C/O Attorney | Debtor is reconciling records and will supplement answer | | |
| Relationship to debtor<br>President | | | |

23.    The fact that Debtor is "reconciling" its records and has no idea what it has transferred to its insider, Brian Dailey, and in light of its prior mishandling of money, leads to the conclusion is that the Debtor's accounting system is non-existent or in shambles, or Brian Dailey simply does not want to disclose transfers he has taken.

8

24.     This apparent self-dealing leaves the Debtor hopelessly compromised and unable to fulfill its fiduciary duties to the estate, and raises issues of fraud, dishonesty, incompetence or gross mismanagement.

25.     These claims would ordinarily be a valuable asset of the Debtor. Yet, through this Case, Debtor seeks to eviscerate this asset and prevent the Receiver or creditors from pursuing same.

26.     Debtor's conduct can be explained only by a bad faith motive: to preserve a benefit to insiders and prevent claims against them.

27.     Indeed, a neutral third party, such as the Receiver in the State Court Action, is the only reasonable alternative to ensure an impartial review of the Debtors' finances and pre-petition conduct.

28.     Finally, based upon the recent proof of claim filed by the Internal Revenue Service, the Debtor has failed to properly withhold trust fund taxes due and owing the United States.  Rather these have accrued since 2014 and are evidence of yet another breach of basic fiduciary duties of the Debtor to withhold and remit trust fund taxes.

29.      Given the Debtor's misconduct in the form of: (1) conversion of client funds; (2) failure to timely pay wages to employees and corresponding trust fund taxes; (3) failure to  properly disburse settlement proceeds subject to the claims of third parties; (4) failure to comply with the State Bar of Michigan requests for

9

information; (5) failure to comply with the Court Appointed Receiver; (6) failure to comply with his ethical obligations and tender funds which are the subject of the interpleader complaint in the State Court; (7) failure to disclose payments to himself; and (8) charging of fees in violation of federal law, dismissal or suspension of the case is warranted.

## I.   THIS CASE SHOULD BE DISMISSED UNDER SECTION 1112(b) OF THE BANKRUPTCY CODE

26.    Bankruptcy Code § 1112(b) provides that, upon motion of any party in interest, "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate," upon a showing of "cause." 11 U.S.C. § 1112(b).

27.    Although Bankruptcy Code § 1112(b)(4) provides a list of certain acts or defaults by the debtor which amount to grounds for dismissal for "cause," "these examples are not exhaustive" and a case may be dismissed for any number of reasons, such as where: (i) it is shown that the petition was not filed in "good faith" *(In re Charfoos,* 979 F.2d 390, 392 (6th Cir. 1992)); or (ii) the petition is "solely designed to attack" or circumvent a judgment or order of a state court collaterally *In re Trident Associates Ltd. P'ship*, 52 F.3d 127, 131 (6th Cir. 1995).

28.    The test for "good faith" is fact-specific and turns on the evaluation of multiple factors, resulting in what has been termed a "smell test." *In re Zick*, 931

F.2d 1124, 1127-28 (6th Cir. 1991).

**A.**    **The Petition in this Case Was Filed in Bad Faith**

29.    As stated above, dismissal of a bankruptcy case is warranted where it is shown that the petition was not filed in "good faith."

30.    In deciding whether to dismiss a case based upon a debtor's "bad faith," the bankruptcy court examines several factors, including whether:

i)    the debtor has one asset;

ii)    that asset is encumbered by liens of secured creditors;

iii)    the pre-petition conduct of the debtor has been improper;

iv)    there are generally no employees except for principals;

v)    there is little or no cash flow;

vi)    there are no available sources of income to sustain a plan of reorganization;

vii)    there are few if any unsecured creditors;

viii)    the property has been posted for foreclosure;

ix)    the debtor and one creditor have come to a standstill in state court litigation and the debtor has lost or has been required to post a bond which it cannot afford; and

x)    the filing of the petition effectively allows the debtor to evade court orders.

- *In re Trident Associates Ltd. P'ship*, 52 F.3d 127, 131 (6th Cir. 1995).

31.    Further, courts will not hesitate to dismiss a case where it is being used

merely to avoid negative results in separate litigation. *In re Mickler*, 324 B.R. 613, 618 (Bankr. W.D. Ky. 2005), citing *In re Wally Findlay Galleries (New York), Inc*., 36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984).

32.     For example, in *In re Wally Findlay Galleries*, a debtor commenced a Chapter 11 case only after a state court issued a judgment against its owner. The filing of the Chapter 11 case brought to a halt a related state court proceeding for ejectment of real property operated by Debtor.

33.     The United States Bankruptcy Court for the Southern District of New York dismissed the case, holding:

> It is clear that the debtor did not file its petition to reorganize, but rather as a litigating tactic. ... The petition was filed the same day that judgments ... were entered in the state court. Neither the debtor [nor its owner] has sufficient assets to post a bond in order to stay these judgments pending appeal. The debtor filed its petition herein to avoid the consequences of adverse state court decisions while it continues litigating. *In re Wally Findlay Galleries,* 36B.R. at 851.

see also *In re 698 Flushing Realty Corp.,* 335 B.R. 17, 20 (Bankr. E.D.N.Y. 2005) (dismissing the case as "a two-party dispute between the debtor, on the one hand, and the movants, on the other" where there was no possibility of reorganizing); *In re Purpura,* 170 B.R. 202, 207 (Bankr. E.D.N.Y. 1994) (dismissing a Chapter 11 case filed only after a divorce decree was issued against the debtor because the "debtor's Chapter 11 effort involves essentially a two party dispute based on state law, and the filing for relief represented a litigation

tactic to stall and impede the enforcement of legal rights against the debtor").

34. Once an issue is raised concerning whether the petition was filed in good faith, the burden shifts to the debtor to demonstrate that the petition was filed in good faith.

35. This Case is nothing more than a transparent attempt by the Debtor to forum shop and avoid the consequences of the State Court orders. Specifically, Debtor is attempting to avoid turnover of the $600,000 ordered by the State Court. The Debtor is further attempting to avoid production of documentation substantiating the basis for its disbursement of almost $450,000 in client funds which are subject to the liens and claims of third parties and medical providers.

36. Furthermore, the State Court provides a forum for the adjudication of the rights of the Debtor and the various lien claimants.

37. Rather than seeking a bona fide reorganization, the Debtor seeks to use the stay and turnover provisions to prevent the enforcement of the receivership order and adjudication of the property rights of third parties as against the Debtor and insiders of the Debtor (Brian Dailey).

38. The Debtor cannot provide a single valid reason for filing bankruptcy.

39. According to its petition, the reason for filing was that an employee embezzled $600,000 from the Debtor.

40. However a review of the Complaint filed by the Debtor, reveals that

the purported embezzlement is actually a fee sharing dispute between the Debtor and a former employee, and in the amount of $116,583.33 (See **Exhibit J**, First Amended Complaint).

41.     Given Debtor's yearly revenue of $2 million plus, this disputed amount is approximately 5% of its gross revenue.

42.     The only purpose of this bankruptcy is an impermissible one: to allow the Debtor to evade State Court orders, including the Receivership Order, to prevent turnover of documents, and to prevent the State Court from adjudicating the property rights of the parties with respect to funds that were to be held in trust by the Debtor for the benefit of third parties and lien claimants.

43.     Accordingly, dismissal based on bad faith is warranted (See also *In re Brandon Farmer's Market, Inc.*, 34 BR 148, (1983, MD Fla) holding that a chapter 11 petition is not filed in good faith, is not an authorized filing, and should be dismissed where institution of Chapter 11 proceeding was done only to evoke automatic stay in order to prevent pending state court proceeding which sought liquidation of corporation, injunction and appointment of receiver and where there is nothing to intimate that it was a legitimate corporate reorganization case; while Bankruptcy Code does not require initial showing of good faith, presence of good faith is implicit, and it would be abuse of jurisdiction to permit debtor to seek relief for sole purpose of achieving purpose which was not proper legitimate purpose).

44.    In applying the *Trident* factors:

| *Trident* Factors | Relevant Facts of this Case |
|---|---|
| The debtor has one asset | Debtor list accounts receivable as its main asset, along with some office furniture and supplies of deminimus value. A claim of unknown value against Ms. Sitto is also listed. |
| The asset is encumbered by liens of secured creditors | Debtor lists one secured creditor. There is no indication that Debtor was or is behind on payments to the secured creditor. The IRS has filed a proof of claim for $1 million dollars for unpaid trust fund taxes and have filed liens. |
| The pre-petition conduct of the debtor has been improper | The Debtor's conduct has been grossly improper and unethical, and as a result is facing a 49 page ethics complaint from the State Bar of Michigan. |
| There are generally no employees except for principals | The Debtor does have employees. |
| There is little or no cash flow | The Debtor does have cash flow. |
| There are no available sources of income to sustain a plan of reorganization | The Debtor's only source of income is its account receivables generated from referrals or providing legal services. It is unclear how or why Debtor needs to reorganize. |
| There are few if any unsecured creditors | Debtor has listed unsecured creditors, as per its schedules. |
| The property has been posted for foreclosure | Does not apply. However, Debtor's assets were subject to a receiver with the purposes of ferreting out the debtor's unethical treatment of client funds. |
| The debtor and one creditor have come to a standstill in state court litigation and the debtor has lost or has been required to post a bond which it cannot afford | The Debtor and the Defrauded Parties have pending state court litigation over who has claims to funds held in the Debtor's trust account as well as the disposition of funds that should be in the trust account but are not. |

45. In sum, the Debtor cannot meet its burden of showing that this Case was commenced in good faith as a number of the elements set forth for determining a bad faith filing have been met. This Case is nothing more than a litigation tactic to avoid the effect of State Court orders which authorize the Receiver to account for funds that were to be held by the Debtor in its trust account. Therefore, the Case should be dismissed.

## B. The Debtor Lacked Authority to File the Petition

46. A bankruptcy case filed by someone purportedly acting on behalf of an entity, but without authority to do so as determined under state law, is improper and dismissable. *In re ComScape Telecomms*., Inc, 423 B.R. 816, 829-830 (Bankr. S.D. Ohio 2010); *In re Real Homes, LLC*, 352 B.R. 221, 225 (Bankr. D. Idaho 2005); *Price v. Gurney*, 324 U.S. 100, 106, 65 S. Ct. 513, 89 L. Ed. 776 (1945).

47. "State law includes the decisions of state courts." *Tenneco West, Inc. v. Marathon Oil Co*., 756 F.2d 769, 771 (9th Cir. 1985).

48. A receiver stands in the shoes of the debtor and has the right to assert and exercise all of the debtor's rights, claims and interests. *Stram v. Jackson*, 248 Mich. 171, 183, 226 N.W. 888, 892 (1929).

49. Federal Rule of Bankruptcy Procedure 9001(5) defines "Debtor," stating: "When any act is required by these rules to be performed by a debtor . . . and the debtor is not a natural person: (A) if the debtor is a corporation, 'debtor' includes,

if designated by the court . . . any person in control."

50. In this case, the Receiver was appointed over both Brian Dailey and the Debtor.

51. Accordingly, the undersigned, as Receiver of Brian Dailey, was the only person in control that had authority to sign the petition which initiated this Case.

52. The Receiver is aware of numerous cases that stand for the proposition that the pendency of receivership proceedings over a corporate debtor do not prevent that debtor from filing bankruptcy. See, e.g., *Struthers Furnace Co. v. Grant*, 30 F.2d 576, 577 (6th Cir. 1929); *In re Greater Apartment Hunter's Guide, Inc*., 40 B.R. 29, 31 (Bankr. N.D. Ga. 1984) ("a state court receivership cannot operate to deny a corporate debtor access to this nation's federal Bankruptcy Courts"); *In re Donaldson Ford, Inc*., 19 B.R. 425, 430 (Bankr. N.D. Ohio 1982) (restraint of ability to file due to state court receivership would be an unconstitutional deprivation of the right to federal bankruptcy relief).

53. However, the Receiver is not making that argument. If the Receiver were only appointed over the Debtor and not Brian Dailey, then arguably Brian Dailey had authority to sign the petition in this Case.

54. However, at the time of signing the Petition, Brian Dailey was in Receivership, and under state law, the Receiver "stood in his shoes" and held all his rights and authority.

55.     The Receiver did not authorize the signing of this petition or the initiation of this Case.

56.     The undersigned is unaware of any reported decision in which an individual in receivership has been found to be authorized to sign a petition on behalf of a corporate entity.

## II.     THE COURT SHOULD DISMISS OR SUSPEND THE PROCEEDINGS UNDER SECTION 305(a) OF THE BANKRUPTCY CODE

57.     Even if the Court does not dismiss the Case under Bankruptcy Code § 1112(b), the Court should exercise its discretion to abstain from the proceedings under Bankruptcy Code § 305(a).

58.     Section 305(a)(1) of the Bankruptcy Code "permits a bankruptcy court to dismiss any bankruptcy case where "'the interests of creditors and the debtor would be better served by such dismissal ....' 11 U.S.C. § 305(a)(1)).

59.     In determining whether abstention is proper under Section 305(a)(1), courts generally examine the following factors:

> (1) the effect or lack of effect on the efficient administration of the estate if a court abstains;
>
> (2) the extent to which state law issues predominate over bankruptcy issues;
>
> (3) the difficulty or unsettled nature of the applicable state law;
>
> (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court;

18

(5) the jurisdictional basis, if any, other than 28 U.S.C. 1334;

(6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case;

(7) the substance rather than form of an asserted "core" proceeding;

(8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(9) the burden of this court's docket;

(10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(11) the existence of a right to a jury trial;

(12) the presence in the proceeding of nondebtor parties; and

(13) any unusual or other significant factors. *Kmart Creditor Trust v. Conaway* (*In re Kmart Corp.*), 307 B.R. 586, 596-97 (Bankr. E.D. Mich. 2004) (J. McIvor)

Based on these factors, courts have dismissed a case under Section 305 where:

another forum would be better suited to the issues presented *(see, e.g., In re TPG Troy,*492 B.R. at 160) (dismissing a case under Section 305(a) where "the primary claims at issue are based on state law and ... can be adequately determined in the state court proceedings.");

*or*

where keeping the case in the federal forum would amount to a waste of time and resources because of the existence of an equitable receivership *(see, e.g., In re Michael S. Starbuck, Inc.,* 14 B.R. 134, 135 (Bankr. S.D.N.Y. 1981) (finding "the best interests [of the creditors] will be served by the continued administration of the equity receivership");

*or*

where Chapter 11 was filed on same date that state court affirmed

appointment of temporary receiver, during which proceeding many of issues now being litigated before Bankruptcy Court were raised, involving a classic 2-party dispute, involving state-law issues that are currently pending before state court, relationship of these parties, vis-a-vis their mortgagor-mortgagee status, must be resolved before any reorganization is possible, and although debtor argues that, without Bankruptcy Court intervention, it will probably be dispossessed of its real estate before litigating merits of dispute, it may seek injunctive relief in state court pending outcome of litigation there. *In re Silver Spring Ctr.* (1995, BC DC RI) 177 BR 759, 26 BCD 887.

*or*

where the case was brought for an improper purpose *(see, e.g., In re Trina Assocs.,* 128 B.R. 858, 868 (Bankr. E.D.N.Y. 1991) (dismissing a case where it was determined that it was brought by "a general partner maneuvering to minimize his personal liability for partnership debt")).

*or*

debtor's bankruptcy petition was filed to thwart pending state receivership proceedings rather than to reorganize debtor, tracing and possible recovery of improperly invested trust funds involved application of state law, and state regulatory agency had significant interests in enforcement of state regulations and attempting to obtain relief under prepaid contracts. *In re Forest Hill Funeral Home & Mem. Park - East, LLC* (2007, Bankr. ED Okla) 364 BR 808, 48 BCD 11.

*or*

debtor's bankruptcy petition was filed by a majority member of a law firm embroiled in state court litigation over ownership of its stock. *In re Law Offices of T. Robert Hill, P.C.*, No. 17-10597, 2017 Bankr. LEXIS 4621, at 19 (Bankr. W.D. Tenn. June 20, 2017).

60.    "Section 305 of the Bankruptcy Code recognizes that there are situations under title 11 where it would be proper for the Bankruptcy Court to decline jurisdiction. ... [T]he decision to abstain lies solely within the discretion of the Court." *In re Fitzgerald Grp.,* 38 B.R. 16, 17 (Bankr. S.D.N.Y. 1983)

61.    Dismissal or suspension of the Case is warranted here. The Debtor is presently a party to state court litigation relative to rights and obligations with respect to funds it held in its client trust account. Those interests can be adequately

protected in and through the State Court.

62.    Furthermore, it is unclear what the Debtors hope to achieve in this case that could not be achieved in the State Court and through the receivership.

63.    Specifically under Michigan law, including the provisions of Mich. Comp. Laws §§ 554-1101-554.1040, effective May 7, 2018.    The Debtor can accomplish the following:

(a) seeking and obtaining a judicial determination of the correct amount of their debts and challenges to same; see, e.g., Mich. Comp. Laws Ann. § 554.1030 (claims process in the receivership action, and requirement in §§ 554.1030(5) and 554.1030(7) that secured and unsecured claims must be allowed, and distributions must be made, according to and under "law of this state other than this act");

(b) seeking and obtaining a judicial determination of any challenge to the validity and/or extent of the claimed liens; *Id*.;

(c) seeking to protect the Debtor's claimed value in its assets, through a fair market value sale of those assets, either through a Section 363-type sale under the 2018 Receivership Act, see, e.g., Mich. Comp. Laws Ann. § 554.1026

64.    To the extent the Debtor claims that the Receiver is in any way not acting properly or quickly enough with respect to the Debtor's assets, the Debtor can seek and obtain relief for that from the state court in the State Court Action See, e.g., Mich. Comp. Laws Ann. § 554.1015(2).

65.    In sum, it is unclear what the Debtor hopes to achieve in a reorganization plan that could not be achieved in state court through the Receivership proceedings.

66.    Furthermore, the Debtor's Case merely raises issues of state law

21

concerning the propriety of the Receivership Order and the effectuation of other State Court orders. These issues are best handled by the State Court, as it was the State Court that issued the Receivership Order and other orders in related proceedings. The State Court is also the judicial body most familiar with these parties and Debtor's alleged sole asset, its accounts receivable, and the various proceedings in which the Debtor and its insiders have participated for over nearly two years.

67.    Basic principles of comity and judicial efficiency further support a dismissal, as this Case requires this Court to revisit issues already determined by the State Court.

68.    Moreover, as discussed above, this Case has all the indicia of a proceeding commenced in bad faith which demonstrate that the petition does not seek a bona fide reorganization.

69.    In sum, with respect to the relevant factors:

(a)    there are already pending State Court proceedings - the State Court action - in which the interests of the Debtor can be protected;

(b)    administering this Case would be inefficient and uneconomical, as this Court will be required to become familiar with, and make - and often, remake - decisions on various issues already before the State Court in the State Court action;

(c)    federal proceedings are not necessary to reach a just and equitable solution, because the only issues relevant here are state law issues that were already determined in the State Court action; to the extent any of those issues could be revisited, they should be addressed only by the State Court in those proceedings;

(d)    the State Court has authority to, and could, provide alternative means of achieving an equitable distribution of assets, which would be more efficient than re-litigating issues already raised in the State Court action before this Court; and

(e)    the purpose for which bankruptcy jurisdiction has been sought is to stay the activities of the State Court Receiver, including an accounting of funds held in trust

70.    The receiver further submits that this Case is factually similar to *In Re Forest Hill*, supra, given the issues of abuse of client funds.

71.    That case concerned a cemetery and funeral home business that sold "preneed" funeral services and cemetery plots. Customers' funds were to be held in trust pending their death. Certain funds were also required to be set aside to maintain the grave sites.

72.    An audit by a third party found 22 deficiencies in the financial management of Forest Hill. Included in those findings were determinations that the investments made by the debtor violated the Tennessee prudent investment rule, and that Forest Hill had failed to fully fund some of the trust accounts as required under Tennessee law.

73.    The state court appointed a receiver of Forest Hill and Forest Hill filed for bankruptcy protection. The Bankruptcy Court found cause for dismissal and abstention and noted that tracing and recovery of trust funds involve the application of state law, and the state court and its receiver were best positioned to do so.

74.    Given the foregoing, to protect the interests of Debtor's creditors and satisfy basic principles of economy and efficiency, the Court should exercise its discretion to dismiss the Case pursuant to Bankruptcy Code § 305(a).

## III. ALTERNATIVELY, IF THE CASE IS NOT DISMISSED OR SUSPENDED, THE RECEIVER IS ENTITLED TO THE PROTECTIONS OF SECTIONS 543(c) AND (d) OF THE BANKRUPTCY CODE

75.    Even if this Case is not dismissed or suspended, under Bankruptcy Code §543(d) the Receiver should be excused from turning over property, and, in any event, the Receiver is entitled to the protection of Bankruptcy Code § 543 (c) and the automatic stay should be lifted as to any and all actions by the receiver and Lender.

### A. The Receiver Should Be Permitted to Maintain Control Over the Debtor's Property Under Section 543(d) of the Bankruptcy Code

76.    While Sections 543(a) and (b) of the Bankruptcy Code generally require a custodian, such as a state court receiver, "to turn over to the bankruptcy trustee or debtor-in- possession any property of the debtor that is in the possession, custody or control of the ... custodian," Bankruptcy Code § 543(d)(1) provides an exception to this requirement. *In re Packard Square LLC*, 575 B.R. 768, (Bankr. E.D. Mich. 2017); *In re Dill,* 163 B.R. 221, 225 (E.D.N.Y. 1994);

77.    Section 543(d)(1) of the Bankruptcy Code states: "After notice and hearing, the bankruptcy court. . . may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors ... would be better served by permitting a custodian to continue in possession, custody, or control of such property."

78.    "Section 543(d)(1) is a modified abstention provision that reinforces the policies set forth in [Section] 305" of the Bankruptcy Code, *supra. In re 245*

24

*Assocs., LLC,* 188 B.R. at 749. When determining whether to excuse the custodian from turning over assets, the Court examines the following factors:

> (i) whether there will be sufficient income to fund a successful reorganization;
> (ii) whether the debtor will use the turnover property for the benefit of the creditors;
> (iii) whether there has been mismanagement by the debtor;
> (iv) whether or not there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate; and
> (v) the fact that the bankruptcy automatic stay has deactivated the state court receivership action.

*In re Dill*, 163 B.R. at 225; see also *In re Constable Plaza Assocs.*, L.P., 125 B.R. 98, 103 (Bankr. S.D.N.Y. 1991) *In re Packard Square LLC*, 575 B.R. 768, 780 (Bankr. E.D. Mich. 2017) (discussing similar factors).

79.    "The interests of the debtor . . . are not part of the criteria considered when applying section 543(d)(1)." *In re Dill,* 163 B.R. at 225. Moreover, a court will not deny a receiver the protections of Section 543(d)(1) merely because there is an automatic stay, for to do otherwise would "read out of the Bankruptcy Code the operative effect of section 543(d)(1)." *Id.* at 226; *see also In re CCN Realty Corp.,* 19 B.R. 526, 529 (Bankr. S.D.N.Y. 1982) (excusing a receiver from complying with turnover where the debtor lacked incentive to collect rents on the subject premises).

80.    As summarized in *In re Lizeric Realty Corp.*, 188 B.R. 499, 507 (Bankr. S.D.N.Y. 1995) courts have routinely excused turnover upon a finding of

mismanagement by the debtor. *Matter of Plantation Inn Partners*, 142 B.R. 561, 563 (Bankr. S.D.Ga.1992) (receiver excused from turnover where court found that debtor had defaulted on mortgage payments, failed to pay taxes, failed to report revenues and pay franchise fees to its franchisor, failed to place casualty and liability insurance on the property, allowed flood insurance to lapse, hired an unqualified manager for the hotel, failed to maintain current accounting records, failed to account for approximately $20,000.00 drawn on counter checks of the business, and paid over $50,000.00 to debtor's principal or his affiliated companies for "management services" without documentation or justification); *Matter of WPAS, Inc.*, 6 B.R. 40, 44 (Bankr.M.D.Fla.1980) (**court permitted receiver to remain in possession and control of assets where debtor disregarded its obligation to file payroll tax returns and pay FICA taxes** and drew checks on accounts without determining the sufficiency of funds). (emphasis added).

81.     The Receiver should be excused from turning over the assets or any other property in this Case. As discussed above, Debtor does not seek a bona fide reorganization. The conduct of Debtor has demonstrated thus far that the Debtor will not use its assets to benefit the creditors in this Case. Quite the opposite: the Debtor has sought at every turn of the state court action to avoid payment of any sums due or provide any meaningful transparency with respect to its diversion of almost $450,000.

82.    In sum, with respect to the relevant factors:

-    Given the proof of claim of the IRS, there are no assets available for unsecured creditors, so the turnover property could not benefit any creditors other than the secured creditors; rather, the Debtor is using this Case to prevent an investigation into is use and abuse of trust funds;

-    With respect to management of the Debtor's affairs, the Debtor has engaged in mismanagement of funds which were to be held in trust by diverting it to their own use and benefit

83.    Finally, as explained in *In re Dill,* 163 B.R. at 225, the fact that there may be an automatic stay under Bankruptcy Code § 362 is not dispositive on an application for relief from turnover pursuant to Section 543(d)(1). Here, the availability of the stay should be of no moment because Debtor filed this Case *only* as a litigation tactic to stay the proceedings in the State Court Action and prevent further investigation and scrutiny of its pre-petition actions.

84.    Section 543(d)(1) factors strongly weigh in favor of excusing the Receiver from complying with any turnover of the property of the estate, and the Receiver respectfully requests that the Court exercise its discretion to permit the Receiver to continue to manage the Debtor.

**B.    The Receiver Should Be Accorded the Protections of Bankruptcy Code § 543(c)(1) and Provided with Its Reasonable Compensation, <u>Costs and Expenses Pursuant to Bankruptcy Code § 543(c)(2)</u>**

85.    Section 543(c)(1) of the Bankruptcy Code provides: "The court, after notice and a hearing, shall ... protect all entities to which a custodian has become

obligated with respect to such property or proceeds, product, offspring, rents, or profits of such property." Pursuant to this Section, "[w]hen turnover occurs, the Bankruptcy Court is required to protect the persons to whom the custodian is indebted." *In re 400Madison Ave. Ltd. P'ship,* 213 B.R. 888, 898 (Bankr. S.D.N.Y. 1997). In this regard, a custodian, including a receiver, is entitled to payment of all of [its] unpaid bills, including those of his counsel, subject only to a determination of reasonableness. *Id.; see also In re Euro-Am. Lodging Corp.,* 357 B.R. 700, 718 (Bankr. S.D.N.Y. 2007) ("[s]ince the receiver may owe debts that he lacks the wherewithal to pay, § 543(c)(1) provides a mechanism for the bankruptcy court to 'protect' the receiver's creditor.").

86.     Moreover, Section 543(c)(2) states that, after notice and hearing, the Court "shall ... provide for the payment of reasonable compensation for services rendered and costs and expenses incurred by such custodian." The section allows the custodian to apply, "[a]fter being superseded . . . for reasonable compensation for services rendered and costs and expenses incurred, including legal fees reasonably incurred in connection with the custodian's services." *In re Snergy Props., Inc.,* 130 B.R. 700, 705 (Bankr. S.D.N.Y. 1991). "The receiver is entitled to compensation for properly incurred expenses notwithstanding that there was no previous authorization by the [bankruptcy court] because 11 U.S.C. § 543(c)(2) do[es] not require such prior authorization." *Id.* Moreover, the court need not wait

until the end of the case before awarding the receiver its compensation, fees and expenses. *See, e.g., In re Marichal-Agosto, Inc.,* 12B.R. 891, 893 (Bankr. S.D.N.Y. 1981).

87.    Even if the Court requires the Receiver to turn over the assets and/or any other property, Section 543(c)(1) requires that the Receiver be accorded protection by permitting the Receiver to obtain funds from the Debtor's property in order to pay its unpaid bills, including its attorneys' fees. Moreover, Section 543(c)(2) similarly requires that, if a turnover occurs, the Receiver receive its reasonable compensation and expenses.

88.    Accordingly, if this Case is not dismissed or suspended, and the Receiver is also required to turn over the assets and/or any other property, the Receiver respectfully invokes the full protections of Section 543(c)(1) and (2).

## IV.    **CONCLUSION**

WHEREFORE the Receiver respectfully requests that an Order be entered (i) dismissing the Case under Bankruptcy Code §1112(b) based on lack of good faith and for cause shown; and/or (ii) dismissing or suspending the proceedings in this Case under Bankruptcy Code §305(a), as the interests of the creditors and debtor would be better served by dismissal or suspension or in the alternative, (iii) excusing the Receiver from complying with any turnover under Bankruptcy Code § 543 (d) and protecting the property held by the Receiver and for payment of the Receiver's

reasonable costs and expenses under Bankruptcy Code § 543(c); and for such other relief as the Court deems just and proper.

<div style="margin-left: 40%;">

Respectfully submitted,

**SIMON PLC ATTORNEYS & COUNSELORS**

/s/ *John Polderman*
John Polderman (P65720)
*Court Appointed Receiver*
363 W. Big Beaver Road, Suite 410
Troy, MI 48084
Phone: 248-720-0290
jpolderman@simonattys.com

</div>

Dated: August 1, 2023

# EXHIBIT "A"

Deborah Royal    6/26/2023 2:34 PM    WAYNE COUNTY CLERK    Cathy M. Garrett    21-007081-CZ FILED IN MY OFFICE

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

DAILEY LAW FIRM, PC,

     Plaintiff/Counter-Defendant

v.

MICHIGAN SPINE AND PAIN,                 Case No. 21-007081-CZ
     Defendant/Counter-Plaintiff

                                         Hon. Adel Harb

AND

JODY INGRAM; INTEGRATED COUNSELING
SERVICES; SUMMIT PSYCHIATRIC SERVICES;
CAPS CONSULTINC, L.L.C.; TOTAL TOXICOLOGY;
MED TRUST L.L.C.; OPEN MRI OF LIVONIA;
AMERICAN SPECIALTY PHARMACY D/B/A ASP
CARES; MI IMAGING; PAIN ASSOCIATES OF
MICHIGAN; CRAIG PEPPLER, D.O.; HENRY FORD
HEALTH SYSTEM; BLUE CROSS BLUE SHIELD
OF MICHIGAN; HEALHCARE IMAGING PARTNERS;
KRANS REHAB, L.L.C.; SPECTRUM REHABILITATION;
ASSOCIATED ORTHOPEDICS OF DETROIT; MICHIGAN
SPINE AND PAIN; MICHIGAN NEURO OPTHALMOLOGY;
BINSON'S HOME HEALTHCARE; LABCORP;
PERFORMANCE ORTHO; METRO DETROIT
ENDOCRINOLOGY; MICHIGAN CRNAS STAFFING,
LLC; SUSAN NELSON; ATI PHYSICAL THERAPY,

     Defendants

AND


MICHIGAN SPINE AND PAIN, a DBA of
MICHIGAN REHABILITATION PHYSICIANS, PLC,

     Counter/Third Party Plaintiff
v.

BRIAN T. DAILEY,

     Third Party Defendant

Brian T Dailey (39945)
Eric C Hoort (P84656)
William D Savage (P82146)
**THE DAILEY LAW FIRM, PC**
*Attorneys for Plaintiff*
36700 Woodward Ave., Suite 107 Bloomfield Hills, MI 48304
P: 313-640-1111 | F: 313-640-9999

**STARK REAGAN**
By: Peter L. Arvant (P52809)
*Attorney for Defendant Total Toxicology*
1111 W. Long Lake Avenue Suite 202
Troy, MI 48098
T: 248-641-9955
F: 248-641-9921

Elizabeth Downey
**ELIZABETH A. DOWNEY, PLLC**
*For CRAIG PEPPLER, DO*
30445 Northwestern Highway, Suite 250
Farmington Hills, MI 48334
248-539-7407

Robert S. Drazin (P23707)
**DRAZIN & ASSOCIATES**
*Attorney for Jody Ingram*
23855 Northwestern Highway
Southfield, MI 48075
248-948-9696

Jonathan A. Green (P51461)
**GREEN & GREEN, PLLC**
*Attorneys for Michigan Spine & Pain* 30300
Northwestern Highway, Suite 250
Farmington Hills, MI 48334-3475
248-932-0500

Ziyad Ihsan Hermiz (P72236)
**VARNUM, LLP**
*Attorney for M1 Imaging*
260 Brown Street, Suite 160
Birmingham, MI 48009-6222
248-567-7800

Amerique Philyaw Dockery (P79496)
**ASSISTANT GENERAL COUNSEL BCBS MICHIGAN**

600 Lafayette Blvd., Mail Code 1925
Detroit, MI 48221
313 653 7006

Phillip A Jaffe (P25997)
*Attorney for Open MRI of Livonia*
P.O. BOX 25092
West Bloomfield, MI 48325-0902
248 224 1463

Bruce K. Panzer (P39913)
**BRUCE K. PAZNER, PC**
*Attorney for Michigan Neuro*
15200 E. Jefferson Ave, Suite 104
Grosse Pointe Park, MI 48230-2055
313 822 6097

Tim Sulolli (P58798)
**GOODMAN ACKER, P.C.**
*Attorney for Krans Rehab*
17000 W. 10 Mile Road, 2nd Floor
Southfield, MI 48075
(248) 483-5000

_____/

## ORDER APPOINTING COURT APPOINTED RECEIVER

At a session of said Court held on __6/26/2023_____,
in the County of Wayne, State of Michigan

Present: Hon. Adel Harb


This matter having come before the Court pursuant to Defendant Ingram's Motion

for Entry of Order compelling Plaintiff Dailey Law Firm, PC and Third party Defendant

Brian Dailey, individually to show cause why they should not be held in contempt of Court

for failure to comply with Court orders dated February 27, 2023, and May 12, 2023, both

of which require Dailey and the Dailey Law firm to interplead the sum of Six Hundred

Thousand Dollars ($600,000.00) into an escrow account created by Robert S. Drazin,

said account to be under the control of the Court (hereinafter referred to as "the Court's

Orders"); Dailey and the Daily Law firm having failed to comply with this Court's orders

3

regarding the same, by failing to interplead any funds; a request having been made by Defendants in this matter for the appointment of a Receiver for purposes of gaining compliance with this Court's orders, and the Court being otherwise informed as to the premises:

IT IS HEREBY ORDERED that JOHN W. POLDERMAN, ESQ., 363 West Big Beaver Rd., #410, Troy MI 48084 ("Receiver"), is hereby authorized to act with full powers over the interests in personal, real, mixed and business assets ("assets") of Brian T. Dailey, Individually, and the Dailey Law Firm, PC. wherever said assets are situated, for purposes of enforcement of this Court's Orders of February 27, 2023 and May 12, 2023.

<u>AUTHORITY OF RECEIVER</u>

IT IS HEREBY FURTHER ORDERED that the Receiver is hereby granted all powers and authority conferred by statutes and case law, including but not limited to MCL 554.1011 et. seq., to control, sell, encumber, take possession of, lease or liquidate said personal, real, mixed and business assets of Brian T. Dailey, Individually, and the Dailey Law Firm, PC in order to gain compliance with the Court's orders of February 27, 2023 and May 12, 2023.

IT IS HEREBY FURTHER ORDERED that the Receiver shall deposit into a fiduciary checking account any and all monies, cash, funds, etc. from the liquidation of the personal and interests in business assets of Brian T. Dailey, Individually, and the Dailey Law Firm, PC, and that the Receiver shall not disburse said without an Order of this Court.

IT IS HEREBY FURTHER ORDERED that the Register of Deeds shall accept a certified copy of this Order for recording, against any real property in which the Receiver

4

determines that Brian T. Dailey, Individually, and the Dailey Law Firm, PC has an interest in.

IT IS HEREBY FURTHER ORDERED that responsibility for the Receiver's costs and fees are solely the responsibility of Brian T. Dailey, Individually, and the Dailey Law Firm, PC.

IT IS HEREBY FURTHER ORDERED that the Receiver, while exercising his duties, is deemed a ministerial officer of this Court whose jurisdiction over the assets named in this Order shall be the same as the Court itself. *See Cohen v Bologna,* 52 Mich App 149; 216 NW2d 586 (1974). No action, suit, proceeding, claim, or demand arising from, in connection with, or relating to any of the assets and/or in the course of acting in such court-appointed capacity shall be pursued against the Receiver by any party or non-party without an allegation that the Receiver has acted in bad faith and without first obtaining leave of this Court. *See In re Motion to Sue Receiver of Venus Plaza Shopping Center,* 228 Mich App 357; 579 NW2d 99 (1998).

THE RECEIVERSHIP ESTATE

IT IS HEREBY FURTHER ORDERED that the Receiver shall be empowered, but not obligated to:

(a)     Preserve, hold, and manage all receivership assets, and perform all acts necessary to preserve the value of those assets, to prevent any loss, damage, or injury;

(b)     Prevent the withdrawal or misapplication of funds;

(c)     Initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings in state, federal, or foreign court necessary to preserve or increase the assets of either party or to carry out her duties pursuant to this Order;

5

(d)     Choose, engage, and employ realtors, attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

(e)     Issue subpoenas to obtain documents and records pertaining to the receivership, and conduct discovery in this action on behalf of the receivership estate; and

(f)     Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of this Court, or exercising the authority granted by this Order.

## RESTRAINT ON TRANSFER OF PROPERTY

IT IS HEREBY FURTHER ORDERED that except as otherwise ordered by this Court, the Brian T. Dailey, Individually, and the Dailey Law Firm, PC and any and all persons acting in concert with him or on his behalf, are restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, dissipating, converting, withdrawing, or otherwise disposing of the assets, except as otherwise ordered by this Court. This includes disbursement of any settlement fund proceeds for any ongoing litigation for cases being handled by the Brian T. Dailey, Individually, and the Dailey Law Firm, PC, excepting the client's share and/or any lienholders.

IT IS HEREBY FURTHER ORDERED that Brian T. Dailey, Individually, and the Dailey Law Firm, PC and all persons or entities who receive notice of this Order by personal service or otherwise, are restrained and enjoined from directly or indirectly destroying, mutilating, erasing, altering, concealing, or disposing of, in any manner,

6

directly or indirectly, any documents that relate to the business practices or business or personal finances of Brian T. Dailey, Individually, and the Dailey Law Firm, PC

## BOND OF RECEIVER

IT IS HEREBY FURTHER ORDERED that pursuant to MCR 2.622(C)(1) and (G), bond shall be a personal bond based upon consideration of the following, but not limited to, the following:

1.      The value of the receivership estate, if known;

2.      The amount of cash or cash equivalents expected to be received into the receivership estate;

3.      The amount of assets in the receivership estate on deposit in insured financial institutions or invested in US treasury obligations;

4.      Whether the assets in the receivership estate cannot be sold without further order of the Court;

5.      If the Receiver is an entity, whether the Receiver has sufficient assets or acceptable errors and omissions insurance to cover any potential losses or liabilities of the receivership estate;

6.      The extent to which any secured creditor is under-secured;

7.      Whether the receivership estate is a single parcel of real estate involving few trade creditors; and

8.      Whether parties have agreed to a nominal bond.

## RECEIVER'S LIEN

IT IS HEREBY FURTHER ORDERED that the Receiver shall be authorized to record a claim of interest against any real and/or personal property in which Brian T. Dailey, Individually, and the Dailey Law Firm, PC retains a fee simple interest in and the

7

recordation of the Receiver's claim of interest shall constitute notice of the Receiver's lien for any of the Receiver's unpaid fees and costs.

<u>RETENTION OF JURISDICTION</u>

IT IS HEREBY FURTHER ORDERED that the balance of any Judgment or orders of this Court previously entered shall remain in full force and effect and this Court retains jurisdiction of this matter for all purposes.

IT IS SO ORDERED.

/s/ Adel A. Harb    6/26/2023
CIRCUIT COURT JUDGE

8

# EXHIBIT "B"

DAILEY LAW FIRM, PC.

           Plaintiff,

                                       Case No.: 21         CZ
                                         Honorable:

vs.

JODY INGRAM; INTEGRATED COUNSELING
SERVICES,; SUMMIT PSYCHIATRIC SERVICES;
CAPS CONSULTING, L.C.C.; TOTAL
TOXICOLOGY ;MED TRUST L.L.C.;
OPEN MRI OF LIVONIA; AMERICAN
SPECIALTY PHARMACY D/B/A ASP CARES;
M1 IMAGING; PAIN ASSOCIATES OF
MICHIGAN; CRAIG PEPPLER, D.O.
HENRY FORD HEALTH SYSTEM;
BLUE CROSS BLUE SHIELD OF MICHIGAN;
HEALTHCARE IMAGING; HEALTHCARE
IMAGING PARTNERS; KRANS REHAB, L.L.C.;
SPECTRUM REHABILITATION; ASSOCIATED
ORTHOPEDICS OF DETROIT; MICHIGAN
SPINE AND PAIN; MICHIGAN NEURO
OPTHALMOLOGY; BINSON'S HOME
HEALTHCARE; LABCORP; PERFORMANCE
ORTHO; METRO DETROIT ENDOCRINOLOGY;
MICHIGAN CRNAS STAFFING, LLC;
SUSAN NELSON; ATI PHYSICAL THERAPY

                          Defendants.

---

DAILEY LAW FIRM, PC
Brian T. Dailey (P39945)
Eric C. Hoort (P84656)
Attorneys for Plaintiff
63 Kercheval Avenue, Suite 215
Grosse Pointe Farms, Michigan 48236
T: (313) 640-1111
F: (313) 640-9999
Brian@DaileyLawyers.com
Eric@daileylawyers.com

---

Document received by the MI Wayne 3rd Circuit Court.

*There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge.*

*/s/ Brian Thomas Dailey (P39945*
Brian Thomas Dailey (P39945)

## COMPLAINT

## GENERAL ALLEGATIONS PARTIES JURISDICTION AND VENUE

NOW COMES Plaintiff, **DAILEY LAW FIRM, PC,** and for its complaint states:

1. Dailey Law Firm, PC is a Michigan Law Firm organized under the laws of the State of Michigan as a Professional Corporation with its principal place of business in the City of Grosse Pointe Farms, County of Wayne, and State of Michigan.

2. That each and every one of the Defendants, not including Jody Ingram (Ingram), or Susan Nelson (Nelson) are business organizations which have done business in the City of Detroit County of Wayne State of Michigan and claim to have provided medical, transportation and/or financial services to or for the benefit of Ingram for her care recovery and rehabilitation from injuries sustained in an auto collision.

3. That Ingram at all times relevant was and is still believed to be a resident of the county of County of Oakland and State of Michigan whose last known address is 2068 Orpington Drive, Troy, MI 48083.

4. That Nelson, at all times relevant, was and continues to be a resident of the County of Wayne and State of Michigan whose last known address is 650 Light Tower Drive, Bellville, MI 48111

5. That this Honorable Court has subject matter jurisdiction of this case since the amount in controversy is in excess of $25,000.00.

Document received by the MI Wayne 3rd Circuit Court.

6. That this honorable Court has personal jurisdiction over the parties to this action as all of them either reside or do business in the City of Detroit, County of Wayne and State of Michigan.

## COUNT I

## FACTUAL ALLEGATIONS

7. Plaintiff restates all allegations contained in paragraphs 1 – 6 above as though fully stated herein.

8. That on April 29, 2016 Ingram was in a vehicle travelling eastbound on Big Beaver Road when she collided with a car stopped at light ahead of her causing significant collision damage to both vehicles.

9. That Ingram sustained injury as result of the collision that included a severe and debilitating traumatic brain injury.

10. That defendants listed above claim to have provided services to Ingram for her care recovery and rehabilitation from her injuries from the collision.

11. That FRANKENMUTH MUTUAL INSURANCE COMPANY was the no fault insurance carrier in the nearest priority and thus was required to provide no fault benefits to Ingram including allowable expenses, work loss reimbursement and replacement services.

12. That FRANKENMUTH MUTUAL INSURANCE COMPANY did not readily nor timely make payments of Ingram's no-fault benefits so Ingram Retained Plaintiff, Dailey Law Firm, PC to pursue FRANKENMUTH MUTUAL INSURANCE COMPANY to compel payment of the no fault benefits at issue and to pursue CIGNA to enforce and compel

Document received by the MI Wayne 3rd Circuit Court.

payment of long-term disability benefits that had been cut off by CIGNA wrongfully and without Justification.

13. That Plaintiff filed a complaint on behalf of Ingram against FRANKENMUTH MUTUAL INSURANCE COMPANY in the Wayne County Circuit Court bearing Wayne County Circuit Court Case No. in 17-003226-NF and assigned to the Honorable Patricia Perez Fresard.

14. That June 21, 2018 the parties reached a settlement of the no fault claims.

15. That on or about August 14, 2020, Cigna capitulated to the demands by Counsel undersigned base upon the evidence presented by Counsel undersigned and reversed the earlier cut off of benefits and then reinstated benefits.

16. That after deduction expenses incurred by and Attorney Fees earned by Dailey Law Firm, PC in both matters i.e. No Fault (Frankenmuth) and LTD (CIGNA) incurred by Dailey Law Firm, PC there remains the sum of $166,135.40 in the Dailey Law Firm PC IOLTA for distribution as the Court may see fit and just.

17. That presently the amount of funds remaining for distribution is not enough to cover all claims in full.

18. It is believed that the outstanding claims are more than $275,000.00 and that the remaining funds should return approximately 50% payment for the outstanding bills, assuming that all bills have been revealed.

## COUNT II – DISTRIBUTION PURSUANT TO MCL 500.3112

19. Plaintiff restates all allegations contained in paragraphs 1 – 18 above as though fully stated herein.

Document received by the MI Wayne 3rd Circuit Court.

20. That there is substantial doubt about the proper person to receive the benefits or the proper apportionment among the persons entitled to the benefits.

21. Pursuant to MCL 500.3112 this Honorable Court has authority to designate the payees and make an equitable apportionment, taking into account the relationship of the payees to the injured person and other factors as the court considers appropriate.

## COUNT III – PETITION FOR INTERPLEADER

22. Plaintiff restates all allegations contained in paragraphs 1 – 21 above as though fully stated herein.

23. That MCR 3.603(A) (1) states in relevant part as follows: Persons having claims against the Plaintiff may be joined as Defendants and required to interplead when their claims are such that the Plaintiff is or may be exposed to double or multiple liability. It is not a ground for objection to the joinder that the claims of the several claimants or the titles on which their claims depend do not have a common origin or are not identical, but are adverse to and independent of one another, or that the plaintiff denies liability to any or all of the claimants in whole or in part.

24. That Dailey Law Firm, PC has expended time and money in filing this action for interpleader and will continue to expend additional time and money in litigating this interpleader action to its natural conclusion and Dailey Law Firm, PC is entitled to receive attorney fees and reimbursement of expenses incurred in this action

WHEREFORE, Plaintiff Dailey Law Firm, PC prays this Honorable Court enter an order providing the following relief:

Document received by the MI Wayne 3rd Circuit Court.

A. Enter an order to distribute the remaining funds among the various Defendant/Claimants pursuant to MCL 500.3112 or in the alternative order the following relief:

B. That this Honorable Court enter an order for the safe keeping of the remaining funds held in the Dailey Law Firm, PC IOLTA account by either requiring payment into the Court or by requiring the funds be held in the Dailey Law Firm, PC IOLTA account pending final resolution of all liens against the proceeds of the settlement referred to above.

B. That **Interpleading** Plaintiff then be discharged from any further liability to the **Interpleaded** Defendants in this matter, including but not limited to responsibility for costs, interest, or attorney fees above.

C. That the **Interpleaded** Defendants in this matter then be required to **interplead** their respective claims to these proceeds within 30 days of their receipt of service;

D. That Interpleading Plaintiff be awarded costs and reasonable attorney fees pursuant to MCR 3.603(E).

DAILEY LAW FIRM, PC


BY: /S/ BRIAN THOMAS DAILEY
Brian T. Dailey (P39945)
Attorneys for Plaintiff
63 Kercheval Avenue, Suite 215
Grosse Pointe Farms, Michigan 48236
T: (313) 640-1111
F: (313) 640-9999
Brian@DaileyLawyers.com

Date: June 11, 2021

Document received by the MI Wayne 3rd Circuit Court.

## PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record at their respective addresses.

☐ U.S. Mail      ☐ Fax
☐ Hand Delivery      ☐ Overnight Carrier
☐ Certified Mail      X E-File and Serve

*/s/Amanda Allen*
Amanda Allen

Document received by the MI Wayne 3rd Circuit Court.

# EXHIBIT "C"

## CLIENT SETTLEMENT ACCOUNTING        November 12, 2020

Ingram vs. Frankenmuth Mutual Insurance Co.

Settlement Funds:

Frankenmuth Mutual Insurance Company

| | |
|---|---:|
| Cash Proceeds From Frankenmuth | $600,000.00 |
| Indemnification/payment: | |
| American Surgical Centers | $ 36,213.45 |
| Synergy Spine/Orthopedic Surgery Center LLC | $ 49,892.00 |
| Anesthesiologists of Detroit | $ 3,510.00 |
| Executive Case Management | $ 7,531.00 |
| TOTAL SETTLEMENT | $697,146.45 |
| | |
| Case Expenses | $ 2,404.68 |
| Net Proceeds after Expenses | $694,741.77 |
| Attorney Fees (1/3 Contingent) | $231,580.59 |
| Final Net Proceeds after atty fee and expense | $463,161.18 |
| Value of Indemnification Reduced | ($97,146.45) |
| Net Cash Proceeds Remaining | $366,014.73 |

Lien Payments:

| | |
|---|---:|
| Red Eye Transportation | $ 6,500.00 |
| (Total Balance was $13,425.00) | |
| Life Skills Village (total was $57,948.00) | $45,000.00 |
| | |
| Net Cash Settlement Funds Remaining | $314,514.73 |

Lien from CIGNA Litigation:

| | |
|---|---|
| Expenses | $11,000.00 |
| Attorney Fees | $148,379.33 |

Funds Remaining for Payment of Bills      $155,135.40

Unresolved Provider Liens: List Attached      $277,505.47

Reimbursement Rate:

$155,135.40/$277,505.47 = .559

$125,000.00/$277,505.47 = .450

# EXHIBIT "D"

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

DAILEY LAW FIRM, PC,

Plaintiff,

v.

Case No. 21-007081-CZ
Hon. Adel A. Harb

JODY INGRAM; INTEGRATED COUNSELIING
SERVICES; SUMMIT PSYCHIATRIC SERVICES;
TOTAL TOXICOLOGY; MED TRUST L.L.C.; OPEN MRI OF LIVONIA;
AMERICAN SPECIALTY PHARMACY D/B/A ASP
CARES; MI IMAGING; PAIN ASSOCIATES OF
MICHIGAN; CRAIG PEPPLER, D.O.; HENRY FORD
HEALTH SYSTEM; BLUE CROSS BLUE SHIELD
OF MICHIGAN; HEALHCARE IMAGING PARTNERS;
KRANS REHAB, L.L.C.; SPECTRUM REHABILITATION;
ASSOCIATED ORTHOPEDICS OF DETROIT; MICHIGAN
SPINE AND PAIN; MICHIGAN NEURO OPTHALMOLOGY;
BINSON'S HOME HEALTHCARE; LABCORP;
PERFORMANCE ORTHO; METRO DETROIT
ENDOCRINOLOGY; MICHIGAN CRNAS STAFFING,
LLC; SUSAN NELSON,

Defendants.

---

| | |
|---|---|
| DAILEY LAW FIRM, PC<br>BRIAN T. DAILEY (P39945)<br>WILLIAM DANAHER SAVAGE (P82146)<br>ERIC C. HOORT (P84656)<br>Attorneys for Plaintiff<br>63 Kercheval Ave., Ste. 215<br>Grosse Pointe Farms, MI 48236<br>(313) 640-1111<br>Brian@DaileyLawyers.com<br>Eric@DaileyLawyers.com | GREEN & GREEN, PLLC<br>JONATHAN A. GREEN (P51461)<br>Attorney for Defendant, Michigan Spine<br>and Pain<br>30300 Northwestern Hwy., Ste. 250<br>Farmington Hills, MI 48334<br>(248) 932-0500<br>jgreen@greenandgreenpllc.com |
| ROBERT S. DRAZIN (P23707)<br>RAVID AND ASSOCIATES, P.C.<br>Attorney for Defendant Ingram<br>23855 Northwestern Hwy.<br>Southfield, MI 48075<br>(248) 948-9696 / (248) 948-5055 Fax<br>bobd@drazinpc.com | DYLAN E. STEC (P82291)<br>Attorney for Blue Cross Blue Shield<br>600 East Lafayette Blvd., Suite 1925<br>Detroit, MI 48226<br>(313) 763-8239 / (877) 277-1143 Fax<br>dstec@bcbsm.com |

1

ELIZABETH A. DOWNEY (P37036)
ELIZABETH A. DOWNEY, PLLC
Attorney for Defendants Craig Peppler,
D.O. and Pain Associates of Michigan
30445 Northwestern Hwy., Suite 250
Farmington Hills, MI 48334
(248) 539-7407/ (248) 419-3593
attylizdowney@aol.com

PHILIP A. JAFFE (P25997)
Attorney for Defendant Open MRI of Livonia
P.O. Box 25092
West Bloomfield, MI 48325
(248) 224-1463/ (248) 593-3574 Fax
Pjaff50@aol.com

PETER L. ARVANT (P52809)
STARK REAGAN
Attorney for Defendant Total Toxicology
1111 W. Long Lake Ave., Suite 202
Troy, MI 48098
(248) 641-9955 / (248) 641-9921 Fax
parvant@starkreagan.com

TIM SULOLLI (P58798)
GOODMAN ACKER, P.C.
Attorney for Krans Rehab
17000 W. 10 Mile Road, 2nd Floor
Southfield, MI 48075
(248) 483-5000
tsulolli@goodmanacker.com

KEVIN S. GREEN (P67515)
BASHORE GREEN LAW GROUP
Attorney for Michigan CRNA Staffing, LLC
17 S. Saginaw Street
Pontiac, MI 48342
(586) 803-0500 / (586) 803-0501 Fax
kevin@bglaw.com

BRUCE K. PANZER (P39913)
BRUCE K. PANZER, PC
Attorney for Michigan Neuro
15200 E. Jefferson Ave., Suite 104
Grosse Pointe Park, MI 48230
(313) 822-6097
bruce@panzerlaw.com

ZIYAD IHSAN HERMIZ (P72236)
VARNUM, LLP
Attorney for MI Imaging
260 Brown Street, Suite 160
Birmingham, MI 48009
(248) 567-7800
zihermiz@varnumlaw.com

## ORDER GRANTING DEFENDANT INGRAM'S MOTION TO INTERPLEAD FUNDS AND OTHER RELATED RELIEF

At a session of said Court held this 5/12/2023 _____

Present: Hon Adel Harb

This matter having come before the Court pursuant to Defendant Ingram's Motion

to Interplead Funds; briefs having been filed, and oral argument having been heard, and

the Court being otherwise informed as to the premises:

2

RECEIVED by MCOA 6/2/2023 10:08:51 PM

**IT IS HEREBY ORDERED** that Plaintiff Dailey Law Firm, PC and Third-Party Defendant Brian T. Dailey shall pay interplead the total sum of six hundred thousand dollars ($600,000.00), as set forth below:

**IT IS HEREBY FURTHER ORDERED** that said funds shall be delivered to Attorney Robert S. Drazin at his above-listed address in certified funds no later than 5:00 p.m. on May 22, 2023.

**IT IS HEREBY FURTHER ORDERED** that said funds shall thereafter be deposited into an escrow account to be created by Mr. Drazin for the purpose of holding these funds, and kept in said account until further order of the Court.

**IT IS HEREBY FURTHER ORDERED** that Mr. Drazin, as Counsel for Defendant Ingram, shall file notice to this Court upon receipt of the funds, and shall further file notice upon placing the funds have been deposited into an escrow account, and provide information to this Court as to the name of the bank and last 4 digits of the account number.

**IT IS HEREBY FURTHER ORDERED** that no withdrawals shall be taken from said escrow account, until so ordered by this Court.

This is not a final order and does not close this case.

/s/ Adel A. Harb   5/12/2023
_____
Hon. Adel Harb

RECEIVED by MCOA 6/2/2023 10:08:51 PM

# EXHIBIT "E"

```
1                    STATE OF MICHIGAN

2        IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

3
        DAILEY LAW FIRM, P.C.
4
                   Plaintiff,        Case No. 21-007081-CZ
5        vs.

6        JODY INGRAM, et. al,

7                   Defendants.
         --------------------------/
8

9                   Zoom proceedings taken in the

10       above-entitled matter before HONORABLE ADEL HARB,

11       Third Judicial Circuit Court Judge, Detroit, Michigan,

12       on June 16, 2023.

13
         APPEARANCES:
14

15       FOR PLAINTIFF:        MR. BRIAN DAILEY
                               63 Kercheval Ave,  Ste 215
16                             Grosse Pointe Farms, MI 48236

17       FOR MI Spine:         MR. JONATHAN GREEN
                               30300 Northwestern Hwy #250
18                             Farmington Hills, MI 48334

19       FOR JODY INGRAM:      MR. ROBERT DRAZIN
                               23855 Northwestern Hwy
20                             Southfield, MI 48075

21       FOR PEPPLER:          MS. ELIZABETH DOWNEY
                               30445 Northwestern Hwy, #250
22                             Farmington Hills, MI 48334

23       FOR M1 IMAGING:       MS. JAILAH EMERSON
                               480 Pierce St., Ste 300
24                             Birmingham, MI 48009

25
```

RECEIVED by MCOA 7/11/2023 1:11:58 PM

```
 1      APPEARANCES CONTINUED:

 2
        FOR MI NEURO
 3       OPHTHALMOLOGY:        MR. JOSH HAVENS
                               15200 E. Jefferson Ave #104
 4
        FOR BCBS:              MR. DYLAN STEC
 5                             600 E. Lafayette Blvd. #1925
                               Detroit, MI 48226
 6
        FOR MRI LIVONIA:       MR. PHILIP JAFFE
 7                             P.O. Box 25092
                               W. Bloomfield, MI 48325
 8
        FOR KRANS REHAB:       MR. TIMOTHY SULOLLI
 9                             17000 W. 10 Mile Rd. 2nd Fl
                               Southfield, MI 48075
10
        FOR CRNA STAFFING:     MR. IAN COOTE
11                             17 S. Saginaw St., Flr 2
                               Pontiac, MI 48342
12

13

14

15

16

17

18

19      Shelee Beard
        Official Court Reporter
20

21

22

23

24

25
```

RECEIVED by MCOA 7/11/2023 1:11:58 PM

# T A B L E   OF   C O N T E N T S

WITNESS                                                                 Page

N/A

# E X H I B I T S

NUMBER                        ADMITTED

N/A

RECEIVED by MCOA 7/11/2023 1:11:58 PM

```
 1                              Detroit, Michigan

 2                              June 16, 2023

 3                        -  -  -

 4              THE CLERK:  Calling 21-007081-CZ

 5              THE COURT:  Good morning.

 6              MR. DAILEY:  Brian Dailey on behalf

 7         of Plaintiff, Dailey Law Firm.

 8              MR. HAVENS:  Josh Havens on behalf of

 9         Defendant, Michigan Neuro Ophthalmology.

10              MR. DRAZIN:  Bob Drazin on behalf of

11         Defendant, Jody Ingram.

12              MS. EMERSON:  Jailah Emerson on

13         behalf of Defendant, M-1 Imaging.

14              MR. COOTE:  Ian Coote here for

15         Defendant, CRNA Staffing.

16              MR. SULOLLI:  Tim Sulolli appearing

17         on behalf of Krans Rehab.

18              MR. GREEN:  Jonathan Green on behalf

19         of Michigan Spine and Pain.

20              MR. JAFFE:  Philip Jaffe on behalf of

21         Open MRI of Livonia.

22              MR. STEC:  Dylan Stec for Blue Cross.

23              MS. DOWNEY:  Elizabeth Downey on

24         behalf of Craig Peppler, D.O. and Pain Associates

25         of Michigan.
```

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1          THE COURT:  Is that everyone?

2          MS. DOWNEY:  I believe so, your

3     Honor.

4          THE COURT:  All right.  Today is the

5     time and date scheduled for a show cause.

6          Counsel.

7          MR. DAILEY:  Your Honor, I'm not

8     aware of a show cause order being entered.  This

9     is a motion for an order to show cause.  So I

10    don't think the Court, unless I missed it, I

11    apologize, but I'm not aware of any order being

12    entered yet requiring me to show cause.  This is

13    a motion asking the Court to require me to show

14    cause.  If the Court enters that order to show

15    cause that would implicate issues of civil

16    contempt for which this Court has the authority

17    to impose fine of $7,500 or incarceration for up

18    to 93 days depending upon whether or not the

19    Court finds that the failure to follow the order

20    is subject to the show cause for the willful

21    failure.

22          I'm telling the Court -- I'm asking

23    this Court to adjourn this hearing so I can have

24    counsel.  I don't have counsel.  I attempted to

25    get intervention from the court of appeals; they

RECEIVED by MCOA 7/11/2023 1:11:58 PM

         1          have denied that intervention because there is no
         2          harm as yet.  I intend to go back to the court of
         3          appeals depending on what this Court does.
         4                    Given the fact that this Court has
         5          the power to deprive me of liberty and property,
         6          I am demanding that I be allowed to have counsel.
         7          I don't have counsel.  I've not been able to find
         8          counsel.  I would ask the Court to adjourn this
         9          for a period sufficient to allow me to do that.
        10          That's the first thing.  The second thing is I'm
        11          still under a doctor's order not to participate
        12          in hearings.  That is an order that goes through
        13          August of 2023 due to a virus that I had, a lung
        14          infection in April.  I do want to indicate to the
        15          Court that as I mentioned earlier in the earlier
        16          hearing, I'm unable to adhere to the Court's
        17          order because I don't have the money to do so.
        18          It's not a willful violation, Judge.  It's a
        19          violation, if at all, based upon an inability to
        20          provide the funds.  And that's because the fees
        21          on this case were earned in 2018 and distributed
        22          with Ms. Ingram's permission, knowledge and
        23          notice which then reduced the fund to somewhere
        24          in the neighborhood of $370,000.  And then there
        25          were payments made to medical providers that had

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1          valid liens for services rendered, transportation
2          company, which then reduced it to probably in the
3          neighborhood of $300,000.  Then there was further
4          reduction in 2020 after I had been successful in
5          a litigation for Ms. Ingram to restore her
6          long-term disability benefits.  I met with them
7          and provided to them an accounting to explain how
8          to work, were the fees were, all the fees
9          distributed to Dailey law firm were supported by
10         a valid contingent fee agreement signed by the
11         client and called for contingencies that were
12         paid.  That then further reduced the fund to
13         $155,000 approximately.  That all took place more
14         than two years ago.  In the case of the no-fault
15         fee, it was close to four years, actually five
16         years ago.
17                  So there is no willful violation of
18         the order here, Judge.  This order is an order
19         that is impossible for me to adhere to because
20         the funds had been distributed prior to today
21         with permission of Ms. Ingram.  And I note Ms.
22         Ingram is not here on Zoom call and would be an
23         important witness for the Court to make a
24         determination as to whether or not there were a
25         prior (inaudible) and approved distributions.

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1          I'd ask the Court to adjourn this so

2    I can obtain counsel.  I have a right to counsel

3    under sixth amendment because this Court has the

4    ability to deprive me of my property and also

5    liberty depending on what the Court finds.  I'm

6    reminding the Court that I have an illness that

7    prevents me -- I've been ordered not to

8    participate in hearings like this; I shouldn't

9    be.

10          THE COURT:  Wait.  What hearings are

11    you allowed to participate in if you're not

12    allowed to participate in hearings like this?

13    Which ones are you allowed by your doctor to

14    participate in?

15          MR. DAILEY:  My doctor told me to

16    stay out of hearings and stay out of trials.  So

17    I've done my best.

18          THE COURT:  Those are your doctor's

19    orders to stay out of trial, but not to stay out

20    of your office?

21          MR. DAILEY:  Because of the nature of

22    the illness, Judge, affecting my vocal cords, the

23    doctor is treating me for my vocal cords and

24    damage to my vocal cords as a result of it.  He

25    told me to stay out of hearings where I have to

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1      speak at length and to stay out of trials.  I

2      have a trial in Chicago I got to go and adjourn

3      next week.

4             I'm not required to stay out of my

5      office; I can still work.  I've been called on to

6      participate in hearings and trial.  Not every

7      Judge has afforded me the ability to avoid

8      hearings.  Some Judges have made me go forward no

9      matter what.  I have a duty to my client so I

10     have to do that even though it's deleterious to

11     my health and my welfare.  There's nothing I

12     could do.

13            I do tell every Judge ahead of time

14     about my condition.  I can show the Court the

15     doctor's orders if the Court would like.  I'd

16     hate to do that in front of these attorneys.  If

17     the Court would join me in a break out room to

18     show you, I'd be happy to do that.  I've asked

19     the doctor to sign an affidavit.  I think he has.

20     I haven't picked it up yet.  He's at Henry Ford

21     Hospital.  That's one issue.

22            The other issue is because this

23     Court, depending upon the finding it makes, has

24     the ability and authority to deprive me of

25     liberty and property, I'm entitled to an attorney

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1     to represent me, and I don't have one.  So I'm

2     asking this Court to adjourn this to allow me to

3     do so.

4               THE COURT:  All right.  Anybody want

5     to respond?

6               MR. DRAZIN:  If I may, your Honor,

7     there's a lot to respond to, but I'll be brief.

8     I represent Jody Ingram and anything he said

9     about Jody Ingram's agreement to what has

10     happened is not correct.  She never agreed to the

11     disbursement.  She was improperly advised.  So

12     any statements regarding Jody Ingram that Mr.

13     Dailey says is incorrect.

14               Also, I originally filed my motion,

15     your Honor, in October of 2022.  It has

16     continually been adjourned because of Mr.

17     Dailey's request for adjournment because of

18     illness and/or because he needs an attorney.

19     When we last heard this motion, it was on a

20     Monday, I believe, Mr. Dailey made a comment to

21     you that he was meeting that evening with an

22     attorney.  That was two months ago, a month ago,

23     whenever that was.  We are all accustomed to be

24     getting all these motions and hearing the same

25     from Mr. Dailey that he's ill and that he needs

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1          to hire an attorney.  It's not that hard for an

2          attorney to find an attorney.  So I ask you to

3          ignore that and go ahead with the motions that

4          are before you.

5                    When we had the last motion, you were

6          aware Jody Ingram had filed a bar grievance

7          against Mr. Dailey.  You asked Mr. Dailey what is

8          the status of that bar grievance.  His response

9          was it has been two years; he hasn't heard

10         anything.  And the inference he was setting forth

11         was that, therefore it must not be accurate.  If

12         you wish me to comment on that response, I'd be

13         glad to, your Honor.

14                   MR. DAILEY:  Your Honor, I can

15         comment on that.  That's true I did tell you that

16         at the last hearing because that's what the state

17         of affairs was at that time.  After that, I

18         received a subpoena from the Attorney Grievance

19         Commission asking for information related to the

20         distributions from the $600,000 settlement and

21         that is something I'm working on right now; it's

22         not yet due.  I'll have it turned in to the

23         Attorney Grievance Commission by the time that

24         it's due.  That is a new development, but there

25         was a significant long period of time that I went

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1    without hearing a single thing from the grievance

2    commission about that.  I think just given a

3    subpoena does not mean that it is going to any

4    higher level.  They're just investigating.

5                By the way, Judge, Michigan Rules of

6    Professional Conduct and the rules that govern

7    the operation of the Attorney Grievance

8    Commission requires that all of that remain

9    confidential.  Mr. Drazin has violated that rule

10   twice by bringing to the Court's attention the

11   fact that Ms. Ingram filed that against me.  And

12   she did it, I might add, in connection with an

13   attorney who was representing her before we

14   decided not to represent her.

15               THE COURT:  Didn't you kind of open

16   the door because you said you had not heard

17   anything for two years; isn't that really

18   disclosing confidential information if you bring

19   that point up; didn't you just open that door

20   when you said that?

21               MR. DAILEY:  Judge, I didn't raise

22   that issue in the last hearing.  That was raised

23   by Mr. Drazin in the last hearing, so I

24   responded.  I'm trying to be forthright and

25   forthcoming to this Court.  The Court has

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1        significant duties and responsibilities here

2        which I perceive the Court attempting to meet

3        with great professionalism, and I appreciate

4        that.  It's my duty to provide information to the

5        extent I can.  It doesn't mean I have to agree

6        and Mr. Drazin can continually berate me as he

7        has in the hearings.

8             The last time he told me I stole her

9        money.  That's not true.  I didn't steal

10       anything.  Everything I've done is according to

11       the Rules of Professional Conduct and the

12       Michigan Court Rules.  I have contingency

13       agreements that have been in place since 2016 and

14       '17 signed by the client with notice and sat down

15       with me in terms of the ARISA claim, which I

16       think is the biggest issue in terms of most of

17       these lawyers here, there's an ethics opinion

18       that supports my fees that were paid to me; they

19       were paid to me and they all know that.

20           THE COURT:  Mr. Dailey, we keep going

21       in circles here.  All I want you to do is put

22       back the money; that's what I ordered you to do.

23           MR. DAILEY:  And I can't because I

24       don't have it.

25           MR. SULOLLI:  Your Honor, there's

1        been no good-faith attempt for Mr. Dailey to pay

2        anything.  He didn't even put the money in that

3        he told you and told us he had, the $260,000.  He

4        simply chose to ignore your order.  There's no

5        good-faith effort.  If Mr. Dailey at least had

6        paid that amount, I would get some argument here

7        in terms of what he's trying to same.  He didn't

8        even do that at a minimum.

9              MR. DAILEY:  Your Honor, if I may,

10       when we were at the last hearing, I did ask the

11       Court to allow me to do that and the Court said

12       no.

13             THE COURT:  It wasn't 255; what was

14       the amount you stated at that time?

15             MR. DAILEY:  $155,000.

16             THE COURT:  That's a difference of

17       $100,000 from what you stated.  I want that clear

18       because when you did suggest that, I said that

19       was not good enough.

20             MR. DAILEY:  Right.

21             THE COURT:  It was not 255,000.

22             MR. DAILEY:  Thank you Judge, for

23       pointing that out.  I appreciate that.

24             THE COURT:  Somebody else want to --

25       go ahead counsel.

RECEIVED by MCOA 7/11/2023 1:11:58 PM

```
 1                    MR. HAVENS:  Just not this Court
 2           originally ordered Mr. Dailey to interplead the
 3           funds back in February.  We're four months out.
 4           Every time we come it's the same story, same song
 5           and dance.  I'll just note again that $155,000
 6           your Honor did order him to interplead $600,000.
 7           He did indicate at all times he could interplead
 8           $155,000.  I don't think the Court told him you
 9           can't interplead $155,000.  I think we'd all
10           agree if there was any showing of good faith
11           whatsoever and this wasn't willful, he would at
12           least interplead what he does have.  He's saying
13           he can't comply with the Court's order.  You'd
14           think that for somebody who's under court order
15           they would comply to the extent that they can.
16                    To Mr. Dailey's point, we're here
17           today asking the Court to order -- order Mr.
18           Dailey to come forth and show cause why he should
19           not be held in contempt.  For that kind of
20           hearing it's pretty straight forward.  The
21           Court's got an order he hasn't complied with.
22           It's a relative routine matter that the Court
23           would issue that order.  And if he needs time to
24           find an attorney to appear and argue why he
25           shouldn't be held in contempt, that's a different
```

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1      matter than what we're here for today, which is

2      asking the Court to issue an order for him to

3      come to court at a later date and show cause.

4               MR. DAILEY:  Your Honor, I just want

5      to point out that, and I want to remind all

6      counsel that when I did the analysis of the

7      attorneys fees or the payment of attorney fees on

8      ARISA claims, my contingency fee agreement says

9      that I can do one or two things.  I can take my

10     fees out of any lump sum that is provided, but if

11     there's no lump sum and I have a fund of money

12     over which I have a possessory lien, which she

13     gave me in my fee agreements, then I can take

14     one-third of the present value of the total

15     lifetime payments.

16              I hired an accountant to figure out

17     what was the one-third value and total -- the

18     present value of the total lifetime payments, and

19     I'm looking at taking one-third of that.  I

20     decided I didn't want to do that.  So I already

21     reduced my fees on the ARISA claims to one-third,

22     which she entitled me to, to just 20 percent,

23     Judge.

24              It's not like I'm not trying to work

25     with these people.  And the other, Judge, because

1       I think it's really important, you take a look at

2       all of the bills that's been submitted by all of

3       these providers, they add up to not much more

4       than $155,000.  That's at full amount, which no

5       medical provider, no medical provider ever gets.

6       They always have to reduce it in order to take

7       into consideration the attorney fees that were

8       paid in order to create that fund.  And if this

9       goes according to the way it should go and the

10      way it normally goes, then every single one of

11      these providers that were reduced by one-third

12      would recognize attorney fees Ms. Ingram paid, we

13      would be done with this within that $155,000.

14              In addition to that, Judge --

15              THE COURT:  You can argue in mirror.

16      I don't want to hear about that.  All I want to

17      hear about is I ordered the money be put back in

18      place.  You can make that argument at the

19      appropriate time, but you are in violation of my

20      order to put the money back.  You keep wanting to

21      go into what should have been paid off or paid

22      on, or whatever.  I don't want to hear that.

23              MR. DAILEY:  I understand.

24              THE COURT:  All I want to hear is

25      that I ordered you to put the money back.  You

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1          have either refused, or whatever you want to

2          describe it as; you don't have the money; the

3          money is gone, whatever description you have.  I

4          ordered you to put the money back and you didn't.

5          That's all I'm looking at today.

6                    MR. DAILEY:  I want to be clear.

7          I've not refused, absolutely not.  I would not

8          refuse to follow the Court's order.  I can't

9          follow the order; it's an impossible order for me

10         to follow.  I don't have the resources to do so.

11         I'm not refusing to follow your order, Judge.  In

12         fact, I've never refused an order of you.  I've

13         shown up at every hearing.  I've produced what

14         you told me to produce that was in my power to

15         produce.  I've done everything I'm supposed to

16         do.

17                   THE COURT:  Except pay the money,

18         which is what I want you to do.  You've done

19         everything but pay the money back.  You keep

20         telling me you're doing everything that I ordered

21         you to do.  All I want you to do is one thing;

22         put money back.  I don't care about everything

23         else.  That doesn't matter right now.  We'll deal

24         with that issue at the appropriate time.  You

25         didn't even put an extra dollar from the amount

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1      you say you owe.

2                    MR. DAILEY:  I don't understand, your

3      Honor.

4                    THE COURT:  Not even a dollar more,

5      right?

6                    MR. DAILEY:  I don't understand what

7      you're saying.

8                    THE COURT:  What number are you

9      saying you still have in the bank?

10                   MR. DAILEY:  155,000.

11                   THE COURT:  Did you come to this

12     Court and say, well, I don't have the 600; I have

13     another 100,000 or 200,000 to put back?

14                   MR. DAILEY:  I don't have another

15     100,000 to put back.

16                   THE COURT:  Okay.

17                   MR. DAILEY:  The thing is, it is not

18     sufficient for you to find a violation to order

19     me to show cause.  You have to find a willful

20     violation.  There's no evidence here in relation

21     to that accept my evidence and my testimony I

22     don't have the money.  There's nobody that

23     testified or can testify that there's a willful

24     violation of your order.  I'm testifying --

25                   THE COURT:  That's your opinion, Mr.

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1      Dailey.

2                MR. DAILEY:  I understand.

3                THE COURT:  We'll see.

4                MR. DAILEY:  I'd like to have an

5      evidentiary hearing, Judge, on that issue.

6                THE COURT:  Who else?

7                MR. HAVENS:  I would just note I

8      don't now if we're here today to argue what

9      willful and what's not.

10               THE COURT:  We're not, so I don't

11     want to go into that.

12               MR. HAVENS:  I think there would be a

13     willful violation to an extent, which would be to

14     the extent he's capable of paying back, which he

15     willfully hasn't?

16               MR. DAILEY:  I disagree with that,

17     Judge, and I object to those comments in view of

18     the fact that you yourself just remarked that I

19     offered to do that and was told that wasn't good

20     enough by this Court.  So for Mr. Haven to

21     continue arguing that point I think is

22     disingenuous and improper.

23               THE COURT:  Go ahead, Mr. Green.

24               MR. GREEN:  I think at this point we

25     know that the order hasn't been complied with

RECEIVED by MCOA 7/11/2023 1:11:58 PM

```
 1          maybe the remedy at this point would be to

 2          appoint a receiver in the interim to gain

 3          compliance with the Court's order separate and

 4          apart from any issues about contempt.  I

 5          understand Mr. Nathanson is here.  He has another

 6          matter apparently before the Court, but he is

 7          experienced as a receiver.  He might be somebody

 8          the Court would consider at this point.  Really I

 9          have nothing further to add other than that.

10                    MR. DAILEY:  Your Honor, may I

11          respond.

12                    THE COURT:  Go ahead.

13                    MR. DAILEY:  I think you need make to

14          a decision as to whether or not there was a

15          willful violation before you take any remedial

16          action.  I need an evidentiary hearing and

17          counsel on that issue; that's the second thing.

18          The third thing is Mr. Nathanson is here because

19          he's watching this hearing because he and I are

20          involved litigation right now where we have

21          motions up in front of Judge Gibson.  Mr.

22          Nathanson has filed a request for investigation

23          against me as a result of that litigation.  He

24          clearly is a biased individual.  He's not

25          qualified to serve in capacity of receiver.
```

RECEIVED by MCOA 7/11/2023 1:1:58 PM

1          There's no basis upon which to appoint a receiver

2          because this Court has not made a decision as to

3          whether or not there's a willful violation.  As I

4          understand it, the Court is going to hold another

5          hearing to determine if there's a willful

6          violation at which I want to be represented by

7          counsel.

8                    THE COURT:  You keep saying you want

9          to be represented by counsel.  What's stopping

10         you from doing that?  Isn't that something you

11         said you were working on doing last time?

12                   MR. DAILEY:  I did.  I've spoken with

13         a number of attorneys, and I have been unable to

14         find one who feels qualified to handle this case.

15         And I'm still looking.  I'm doing the best I can.

16         The attorney I told you I was meeting with after

17         the last hearing, I did.  They were not willing

18         to represent me on it.  So I'm doing the best I

19         can.

20                   THE COURT:  Let me ask you this; how

21         many attorneys have you talked to since the last

22         hearing?

23                   MR. DAILEY:  Five.

24                   THE COURT:  From the five you were

25         unable to retain any of them.

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1          MR. DAILEY:  That's correct.  It's

2     not because I can't retain them, it's because

3     they were not willing to be retained.  There's

4     not a lot of people, far as I can tell, with

5     experience and comfort in civil contempt

6     proceedings.  I can give you in camera the names

7     of the attorneys I contacted, Judge.

8          THE COURT:  I'm okay not knowing

9     right now.

10          Anybody else?  Ms. Downey.

11          MS. DOWNEY:  If the Court is

12     intending to hold a hearing at a later date to

13     determine whether or not the noncompliance was

14     willful or not willful, I'd request that we have

15     an opportunity to have forensic accountants

16     investigate what assets and liability the firm

17     and Mr. Dailey actually has so we're in position

18     to argue from a basis of fact as to whether there

19     was or was not an ability to comply.  That's all

20     I have.

21          MR. DAILEY:  Your Honor, that sounds

22     like a collection action.  There's never ever a

23     basis upon which to institute collection

24     procedures before there's a finding or before

25     there's a judgment.  I would object to that.

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1          MR. DRAZIN:  Your Honor, if I may,
2     Mr. Dailey is telling the Court repeatedly he
3     doesn't have the funds to obey your order.  The
4     only way to make that determination would be
5     appoint00 a receiver.  My understanding is Ms.
6     Downey talked to Plante Moran who has people well
7     experienced in this area and glad to serve.  I've
8     spoken with another attorney same kind of
9     experience and would be glad to serve.  I would
10    ask the Court if you order a receiver to comment
11    on the truthfulness of Mr. Dailey that he has no
12    money, that that be done at the sole expense of
13    Mr. Dailey.
14          MR. DAILEY:  Your Honor, I can show
15    the Court and I can show counsel proof of the
16    distributions that have been made and to whom
17    they've been made from the funds of money that
18    was received in the settlement.  Mr. Sulolli's
19    partner received approximately $50,000 of the
20    funds with permission from Ms. Ingram early on
21    because Mr. Goodman had a valid lien for Life
22    Skills Village.  He presented it early on.  I
23    talked to my client about it.  My client approved
24    it.
25          My point is you don't need a forensic

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1          accountant for me to show where the money went.

2          The money I have in my trust account belongs to

3          other clients in addition to Ms. Ingram or these

4          providers to the extent of $155,000. So I can

5          within seven days put together the accounting

6          showing what the distributions were and with the

7          back up showing checks and wire transfers to the

8          extent they exist. In the nature of a collection

9          action there's been no judgment made here. I'm

10         asking the Court to not appoint that.

11                 A receiver would have far greater

12         powers than necessary here. There's just an

13         accounting that's due. I did an accounting.

14         Nobody ever asked me for further detail. I'm

15         happy to provide it. I'm more than happy to show

16         where the funds had gone.

17                      THE COURT: Mr. Green.

18                      MR. GREEN: Thank you, your Honor.

19         The more I'm hearing, the more I'm thinking a

20         receiver is a good idea. He's an arm of the

21         Court. He can enforce compliance with this

22         Court's order or be that third party to tell the

23         Court what can and cannot come from the estate.

24         I think for our purposes it's probably the best

25         way to go. Again, we're not relying on argument

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1        of counsel.  He's an arm of the Court, whether

2        it's Mr. Nathanson or someone else.  I've got a

3        couple other names I can thing of.

4             THE COURT:  If I consider it, I

5        certainly want somebody who's not connected to

6        this case or any of the parties involved.

7             MR. GREEN:  One name that comes to

8        mind is John Polderman.  I think that's probably

9        the best way to approach this issue.  I know he

10       does quite a few of these things.

11            MR. DAILEY:  Your Honor, wouldn't it

12       be better to start out with an accounting that

13       has details showing copies of checks and

14       distributions and wire transfers and transfers?

15       I can show --

16            THE COURT:  I'm thinking it may be a

17       good start and spot for a receiver.  It may be a

18       good spot for a receiver to look at.

19            MR. DAILEY:  Your Honor, what I'm

20       suggesting is the Court allow me to put that

21       together and submit it to all counsel.  Then if

22       they have a problem with what I submitted, I'm

23       sure they won't because they'll be all documents

24       from the bank unquestionable and show to the

25       penny what's left and what's been distributed on

RECEIVED by MCOA 7/11/2023 1:11:58 PM

```
 1          Jody Ingram's behalf.  I think it's better to
 2          start with that because I don't think we would
 3          need to have a receiver.
 4                    If the Court wants a receiver after I
 5          submit that, then that's something the Court
 6          should consider.  But right now nobody ever asked
 7          me for that detail.
 8                    THE COURT:  I think we're a little
 9          beyond that right now.  I don't speak on behalf
10          of anybody.  I'm saying as far as I'm concerned,
11          I think we're a little beyond that.
12                    Who else wants to jump in and say
13          anything?
14                    MR. HAVENS:  I concur with the
15          request for a receiver.  I understand what Mr.
16          Dailey is suggesting but it's not as if all
17          counsels are here alleging this $600,000 is still
18          sitting in his IOLTA Trust Account.  We have no
19          doubt that he made himself to the tune of
20          $450,000.  I don't think that's really in
21          dispute.  It's a question about whether he
22          complied with this Court's order.  I think an
23          accounting by a neutral third party is the best
24          way to get us, as Ms. Downey said, on a factual
25          footing in that regard.
```

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1          MR. DAILEY:  My response just is all

2     I'm telling you is based upon the last comment

3     that I heard, They've already assuming you made a

4     finding of willful violation of your order.

5     They're already going to collection procedures

6     which is inappropriate, unsupportable in the law.

7          MR. DRAZIN:  Your Honor, if I may.

8          THE COURT:  Go ahead.

9          MR. DRAZIN:  The request for the

10    appointment of a receiver isn't solely directed

11    toward any disbursement Mr. Dailey made.  It's

12    based upon whether Dailey's statement he can't

13    afford to put the money in the account is correct

14    or not.  And that means the receiver has to go

15    beyond just the money Mr. Dailey computed Ms.

16    Ingram was entitled to.  Well, I'll be quiet.

17          MR. DAILEY:  Again, Judge, they're

18    arguing now as if you've already found I

19    willfully violated your order.  You haven't found

20    that as far as I know.  That's collections

21    procedures, which are never ever appropriate

22    until there's a finding of something to collect,

23    until there's a judgment or an order finding

24    there's a debt.

25          I understand that you ordered me to

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1    pay back $600,000.  I've told you a million times

2    that I would adhere to your order if I could, but

3    I've already distributed funds from that fund.

4    So what I have is $155,000.  I've offered last

5    time to pay that as the court order; the Court

6    didn't think that was good enough.  I've done

7    everything I can do.  And to put a receiver on to

8    do a creditor exam, which is what they're asking

9    for, is inappropriate and it's unsupported.

10                I would ask that the Court schedule

11    an evidentiary hearing, make a determination

12    after that evidentiary hearings as to whether it

13    was a willful violation and fashion what ever

14    remedy the Court think is appropriate.

15                THE COURT:  It not about collection.

16    It's about you telling the Court you don't have

17    the money to pay to put back into the account; is

18    it not?

19                MR. DAILEY:  That is collections.

20                THE COURT:  How's that collections?

21                MR DAILEY:  Because what you're doing

22    here is taking money -- what you're attempting to

23    order me to take money that's already been paid

24    to me and put it back in the court four years

25    later; that is collection.  In other words, it's

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1          tacit to a finding that my fees were not

2          appropriate.  There's been no finding to support

3          that.  It is collections.  Those funds have

4          already been paid to me by permission of my

5          client pursuant to the contingency agreement

6          supported by Michigan Court Rules, the ethics

7          opinion.  That's what you're doing.  That's why

8          I'm asking the Court to hold an evidentiary

9          hearing before you fashion any remedial relief.

10              THE COURT:  Somebody else wanted to

11         say something?

12              MR. SULOLLI:  Mr. Dailey is entitled

13         to make a claim.  What he's entitled (inaudible)

14         the money put in the fund.  That's why you

15         ordered $600,000 to be put in.  It doesn't

16         distinguish Mr. Dailey's ability to argue he's

17         entitled to X amount of dollars and that's the

18         evidentiary hearing.  For Mr. Dailey to suggest

19         let's have an evidentiary hearing and let me give

20         you an accounting, how do we know if that

21         accounting is correct if we don't have an

22         independent party to look at his financial and

23         determine whether, in fact, he's accurate in

24         terms of his inability to pay and whether or not

25         that was willful or not.  How do we not establish

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1            that if we don't have an independent party come

2            in and look at his financials?

3                 MR. DAILEY:  The way they will know

4            is by looking at what I provided in terms of back

5            up and the detail showing where the $600,000

6            went.  His partner --

7                 THE COURT:  What you want me to do is

8            go through this process only to come back in four

9            to six months and be where we're at today.

10                MR. DAILEY:  No, Judge, I don't.  I

11            want you to hold an evidentiary hearing on all

12            issues here before making any remedial decisions.

13            And do it as quickly as you can.  Do it in two

14            weeks; do it in a week.  Give me the time I need

15            in order to present these issues to the Court.

16            I'm sure the Court will be satisfied that I've

17            been honest, forthright and professional, that

18            I'm entitled to the fees that I took, I was paid.

19            That's what I'm asking for.  I'm asking you to

20            put the cart behind the horse not the other way

21            around.  What they want to do is have you start

22            collection procedures and creditor hearings

23            before you even determine if that's a necessary

24            issue.

25                The $50,000 that was paid to Barry

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1            Goodman, Mr. Sulolli's partner, would have to

2            come back into the court, too. Why would I have

3            to make up $50,000 that somebody else got with

4            permission from my client in 2018?

5                   THE COURT: Mr. Havens, you wanted to

6            say something?

7                   MR. HAVENS: Yes. To the extent it's

8            on the table about whether or not the Court has

9            power to order a receiver, I think the law is

10           clear, I've done research while sitting here. I

11           turn the Court's attention to MCL 600.2926 which

12           circuit court judges in the exercise of their

13           equitable powers may appoint receivers when cases

14           allow by law. I don't think there's any law in

15           this circumstance that disallows it. Again, I

16           think Mr. Dailey is -- I think it's him putting

17           the cart before the horse that is our argument

18           this is some kind of situation where willfulness

19           is presumed. We don't even get there until we

20           have an accurate factual footing. That what a

21           receiver would do.

22                  MR. DAILEY: Your Honor, the receiver

23           would do far more than that. Unless the Court is

24           going --

25                  MR. HAVENS: The same statute I

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1       quoted says the Court has the inherent power to

2       define and limit the duties of the receiver, so

3       to the extent Mr. Dailey believes there's a risk

4       that a receiver would go too far, this Court can

5       express concerns.  And this Court can

6       specifically define the role and duties and

7       limitations of the receiver in this situation if

8       one were to be appointed.

9             MR. DAILEY:  Your Honor, if the

10      defendant counsel wants to put together a name or

11      two names of accountants they would propose as

12      witnesses, I can provide those accountants the

13      documentation they would need in order to

14      determine what it is they're looking for in terms

15      of the distribution and the diminution of this

16      fund.  What they keep asking for is tantamount to

17      a creditor's exam.  With all due respect --

18             THE COURT:  I don't get that.  I

19      don't know why you keep going to this creditor

20      exam and collection when a receiver is mentioned.

21      I don't know why you keep wanting to --

22             MR. DAILEY:  Here's why, Judge.  The

23      reason why is because the funds that they want me

24      to pay back that you ordered me to pay back, the

25      fund that have already been distributed by

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1          permission of Jody Ingram.  $50,000 of it was

2          distributed to Tim Sulolli's partner, Barry

3          Goodman, because he presented a valid lien.

4                    Now what you're telling me to do is

5          go to Barry Goodman and tell Barry Goodman to cut

6          a check for $50,000 back into the Court.  I

7          brought this to the Court's attention last time,

8          and the Court said, no, I'm not going to make him

9          do that.  You pay it.  So it's already been taken

10         out of the $600,000.  This is a taking from Brian

11         Dailey without adequate support legally to do so;

12         that's what this is.  I am quite positive if they

13         want to hire an independent accountant to look at

14         the documentation I'm proposing to provide to

15         them, they'll be more than satisfied that the

16         funds have been distributed pursuant to

17         permission from Ms. Ingram.

18                   There's no need to appoint a

19         receiver.  I'm not suggest the Court doesn't have

20         the authority to do that, but there has to be a

21         need for it, and there is no need for it.

22                   THE COURT:  If you don't think

23         there's a need for it after all these hearings

24         and all these claims, I must be missing

25         something.

RECEIVED by MCOA 7/11/2023 1:11:58 PM

```
 1              MR. DAILEY:  Not to say you're
 2      missing anything, Judge.
 3              THE COURT:  I must be because if any
 4      case -- I'll be honest with you.  I thought about
 5      a receiver even before it was mentioned because
 6      if any case probably needs a receiver it's this
 7      case.
 8              MR. DAILEY:  I respectfully disagree,
 9      Judge.  I think it's a fairly simple case to show
10      what happened to the $600,000.
11              THE COURT:  You keep saying that but
12      obviously that hasn't been the case.
13              Mr. Havens, go ahead.
14              MR. HAVENS:  I think Mr. Dailey
15      already made the distinction and we already know,
16      let me prove to you that I paid myself $450,000.
17      We know we paid himself $450,000.  The question
18      then is where is that money.  He said he doesn't
19      have it.  He can't pay it back.  Where is it?  To
20      the extent he can't pay it back I think we all
21      deserve that factual footing to know exactly what
22      he can pay back.
23              THE COURT:  I'll give you the last
24      word, Mr. Dailey.
25              MR. DAILEY:  I tell you exactly where
```

RECEIVED by MCOA 7/11/2023 1:11:58 PM

```
1        it went.  It went to rent.  It went to health
2        insurance.  It went to malpractice insurance.
3        It's funds that were put into an office that I
4        earned legitimately pursuant to contingency
5        agreements approved and signed by my client,
6        received for the work called for in those
7        agreements.  That's where it went.  Everything
8        else is taking money out of my pocket.  That is
9        not appropriate.  This is not a collection
10       action.  That's it, Judge.  I made my argument.
11                  I just really want to make one last
12       argument.  I'm entitled to counsel in a hearing
13       involving contempt.  I'm asking the Court to
14       allow me to do that, to have counsel.
15                  THE COURT:  Anybody that has not said
16       anything wants to say anything before --
17                  I know somebody mentioned the name of
18       Holderman (sic).  Did somebody say Holderman?
19                  MR. DRAZIN:  It's Polderman; P as in
20       Paul.
21                  THE COURT:  Okay.  Polderman.  I'm
22       going to appoint -- is John the first name?
23                  MR. HAVENS:  Correct.
24                  THE COURT:  I'm going to appoint him
25       as a receiver.  I think this case needs a
```

RECEIVED by MCOA 7/11/2023 1:11:58 PM

```
 1          receiver.  We keep going in circles as far as
 2          what the arguments are.  And we'll come back.
 3          I'm going to go ahead and sign the Order to Show
 4          Cause today.  We'll come back in 30 days or so
 5          hopefully with the receiver in attendance to see
 6          what is going on.
 7                    MR. DAILEY:  Can I ask what you're
 8          allowing the receiver to do.  Is it just related
 9          to the $600,000; are you allowing him to see my
10          personal assets and finances?  I think you need
11          to define that.
12                    THE COURT:  Let's start with him just
13          seeing regarding the $600,000.  I'm not going to
14          give him a blank check just yet.  We'll deal with
15          as far as the $600,000 is concerned.
16                    MR. DRAZIN:  Your Honor --
17                    MR. DAILEY:  I'm not finished, Mr.
18          Drazin.
19                    Thank you very much, Judge, for that.
20          We'll submit an order.  My other question is, in
21          the last hearing we submitted an order and the
22          Court rejected it telling us to follow the court
23          rules.  We need that order entered.  It was an
24          order denying motion for summary disposition
25          limiting Blue Cross Blue Shield's claim.  I'd
```

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1          like to know how do you want me to submit that

2          order.

3                    THE COURT:  That was granted last

4          time, was it not?  I think Mr. Dailey isn't that

5          something we addressed last time?

6                    MR. DAILEY:  You did grant it, but

7          didn't enter an order.  We need an order.  Your

8          court indicated that they were not going to enter

9          the order I submitted.  I was just wondering how

10         to get it entered.

11                   THE COURT:  Hold on.  Eric or Debra.

12                   THE LAW CLERK:  We can do July 28th

13         at 9:30.

14                   THE COURT:  No, not the date.  I need

15         to find out what happened.

16                   THE CLERK:  On the order I would have

17         to do an investigation.

18                   THE COURT:  We'll look into that

19         today, Mr. Dailey.

20                   MR. DAILEY:  Who should I call back

21         to find out about that order?

22                   THE COURT:  We'll be in touch.  Did

23         you get a copy of that order, Mr. Stec?

24                   MR. STEC:  Yes, sir.  It was limited

25         to (inaudible) I agree to that.

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1          MR. DAILEY:  The order that I

2     submitted, Judge, was more than just that.  I was

3     a whole bunch of things that this Court ordered.

4     I can re-submit it if you want.

5          THE COURT:  Well, make sure Mr. Stec

6     gets a copy of it first.

7          MR. DAILEY:  I'll make sure everybody

8     does.  I'll submit it through the MiFile.

9          THE COURT:  I'll take a look at it.

10          MR. DRAZIN:  Your Honor, if I may, is

11     Mr. Polderman being appointed at attorney

12     Dailey's expense?

13          MR. DAILEY:  I object to that, Judge.

14          THE COURT:  It is at your expense,

15     Mr. Dailey.

16          MR. DAILEY:  It's at my expense?

17          THE COURT:  Yes.

18          MR. DAILEY:  May I ask the Court the

19     basis upon which I'm required to pay for their

20     expert?

21          THE COURT:  Go ahead, Mr. Green.

22          MR. GREEN:  The receiver is an arm of

23     the Court.  He's not anybody's expert.  He does

24     not represent the interest of the parties.  He is

25     there as an arm of the Court.  For that purpose,

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1        as I understand and correct me, your Honor, if

2        I'm wrong, he's there to enforce the Court's

3        order, to get the Court's order complied with

4        that $600,000 is to be placed into escrow.

5                MR. DAILEY:  Your Honor, there's no

6        basis upon which to support me having to pay the

7        cost.

8                THE COURT:  The basis that I have is

9        simply I want him to basically help me enforce

10       the order that I signed already.  I'm ordering

11       that you pay for the receiver.

12               MR. DAILEY:  Your Honor, I'm

13       objecting.  I'm asking the Court to --.

14               THE COURT:  You can objection all you

15       want, Mr. Dailey.  I'm telling you it's at your

16       expense.

17               MR. DAILEY:  I understand.

18               THE COURT:  Anything else?

19               Eric, give me a date; what's the day

20       that we have?

21               THE CLERK:  July 28th at 9:30.

22               MR. DAILEY:  Your Honor, my

23       disability goes through August 12th.  Can we put

24       it after?

25               THE COURT:  Your disability as to

RECEIVED by MCOA 7/11/2023 1:11:58 PM

```
1           what?  This is the doctor who told you cannot be
2           at hearings or trials?
3                    MR. DAILEY:  He told me to avoid
4           hearings and trials.  To the extent that I can't
5           adhere to his order, I'd like to.  After today's
6           hearing, my voice is going to be shot.  Every
7           time I do something like this, it delays me
8           getting better.  So I'm asking this Court to put
9           it at the end of August so I can get through
10          that.
11                   MR. SULOLLI:  Your Honor, this is the
12          same attorney who argued a few minutes ago we can
13          have an evidentiary hearing in two weeks.
14                   MR. DAILEY:  Your Honor, I'm planning
15          on bringing counsel with me.
16                   THE COURT:  You can bring one July
17          28th.
18                   MR. DAILEY:  I'm asking the Court for
19          accommodation for my health condition.
20                   THE COURT:  Mr. Dailey, I can
21          appreciate your health concerns, but the 28th
22          will give you enough time I think.  This is six
23          weeks away from today.
24                   MR. DAILEY:  Okay, Judge.  I'm just
25          trying to do what my doctor told me.
```

RECEIVED by MCOA 7/11/2023 1:11:58 PM

```
1                    THE COURT:  I understand and
2          appreciate what you're saying.  We'll see you on
3          the 28th at --
4                    -- what time do we have, Eric?
5                    THE CLERK:  9:30.
6                    MR. DAILEY:  Will this be by Zoom,
7          Judge?
8                    THE COURT:  We'll keep you posted.  I
9          think I might have everybody come in for that.
10         We're starting to get people back in person.
11         We'll keep you posted.  If it's going to be in
12         person, we'll let you guys know.
13                   MS. EMERSON:  Your Honor, I also have
14         a motion before the Court today.  It's our motion
15         to assert a claim against Dailey Law as well as a
16         third-party complaint against Brian Dailey.
17                   MR. DAILEY:  We would resist that,
18         your Honor.  Long time passed to bring a
19         counterclaim.  It would be a statute of
20         limitation issue.  I object to any amendment to
21         bring in counterclaims.
22                   MS. EMERSON:  Your Honor, there is no
23         statute of limitations issues pursuant to MCR
24         2.118(A)(2), leave to amend shall be freely
25         granted as justice requires.  Alternatively, we
```

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1    should be allowed to amend our answer to assert a
2    counterclaim and third party complaint to conform
3    to the pleadings in this case based upon the
4    information that has arisen with respect to Mr.
5    Dailey's failure to interplead funds as required
6    by this Court.  As a reminder, Mr. Dailey filed
7    this case in 2021 asking this Court to determine
8    how funds should be distributed to providers.
9    Thereafter, he refused to interplead any money.
10              He has admitted he has over $150,000
11   that are a part of the settlement proceeds that
12   he has not even interplead into this court
13   despite the fact he filed this lawsuit requesting
14   that amounts be distributed.  There's no
15   prejudice.  This information has recently come
16   about at the last hearing.  At that last hearing
17   status conference, the Court ordered several
18   parties, including my client M-1 Imaging to amend
19   our answers to attach liens showing that we did,
20   in fact, have proper claim in this case.
21              Based upon the recent court order of
22   amendment we believe there's no prejudice.
23   There's no bad faith as we found this information
24   out recently and continues to develop.  It's
25   clear based upon this case being pending for two

RECEIVED by MCOA 7/11/2023 1:11:58 PM

```
1          years and Mr. Dailey failed to interplead any
2          funds, it's our assumption he will not do so.
3          For that reason we'd like to assert a
4          counterclaim against Dailey Law Firm and third
5          party complaint against Brian Dailey.
6                    We've attached a copy of our amended
7          answer which includes the counter complaint and
8          third-party complaint to our motion; it's Exhibit
9          B.  We request that the Court enter that Exhibit
10         B attached to our motion and otherwise we rest
11         and rely on our motion as filed with this court.
12         Thank you.
13                   MR. DAILEY:  Your Honor, I
14         respectfully object and ask the Court to deny
15         that relief.
16                   THE COURT:  Based on what?
17                   MR. DAILEY:  It's not timely.  This
18         has been in place since 2021.  There's no
19         counterclaim against Brian Dailey individually.
20         Brian Dailey individually has no responsibility
21         whatsoever.  If anything, it's Dailey Law Firm
22         and Dailey Law Firm doesn't have any
23         responsibility except $155,000.  I understand
24         there are different opinions on that, but that is
25         my position.  And there is no reason for a
```

RECEIVED by MCOA 7/11/2023 1:11:58 PM

1             counterclaim against attorney Brian Dailey.  This

2             is all Dailey Law Firm, and Dailey Law Firm can

3             still assert a statute of limitations.  In

4             addition to that Dailey Law Firm has never been

5             involved in a contractual relationship with any

6             of these parties.  It's always been Ms. Ingram

7             not Dailey Law Firm or Brian Dailey.  There's no

8             basis upon which to allow amendment for

9             counterclaims.

10           MS. EMERSON:  Your Honor, pursuant to

11             MCR 2.118(b)(1) amendments are routinely granted

12             to conform to the pleadings in the case or

13             discovery in the case.  We recently discovered he

14             continuously fails to interplead funds he had

15             admitted he has.  We think based upon that we

16             have a basis to assert a counterclaim regardless

17             it seems like he's arguing to the merits of our

18             counterclaim and third-party complaint.  We

19             believe under Michigan Court Rule we have basis

20             to file those claims.  Again, those amendments

21             are granted freely as justice requires.  We

22             believe justice requires an amendment based on

23             the facts that have developed in this case.

24           MR. DAILEY:  Your Honor, briefly,

25             amendments are granted routinely; I agree.  But

RECEIVED by MCOA 7/11/2023 1:11:58 PM

```
 1          it doesn't breathe life in to a statute of
 2          limitations that's expired.  It doesn't give
 3          liability where there is no contractual liability
 4          to begin with.  It doesn't create a cause of
 5          action.  There is no cause of action.  This would
 6          be a futile amendment.  They need to amend their
 7          answer (inaudible) which is what this Court
 8          ordered when we were before you.  In terms of
 9          suing Brian Dailey or Dailey Law Firm on any
10          claim, there is no claim.  Dailey Law Firm and
11          Brian Dailey never was in any contractual
12          relationship or agreement with any of these
13          parties under any circumstances with one
14          exception, and that is Jody Ingram.  And Jody
15          Ingram signed my contingency fee agreements
16          approving what I did.  Nobody else has a
17          contractual against me individually or Dailey Law
18          Firm.  I would ask the Court to deny that relief.
19                  THE COURT:  I will decide that later
20          today.  Anything else?
21                  MR. DAILEY:  That's it, Judge.
22                  THE COURT:  Anything else from anyone
23          else?  You all have a good weekend.
24                  (Whereupon proceedings concluded.)
25                          -   -   -
```

RECEIVED by MCOA 7/11/2023 1:11:58 PM

```
1    STATE OF MICHIGAN )

2                     )  SS

3    COUNTY OF WAYNE   )

4

5

6              R E P O R T E R' S   C E R T I F I C A T E

7

8              I, Shelee Beard, CSR-5493, do hereby

9    certify that I have transcribed the **ZOOM** proceedings

10   had in the above-entitled matter at the time and place

11   hereinbefore set forth and that the foregoing is a

12   true and correct transcript of proceedings.

13

14

15

16                    /s/   Shelee Beard
                      Shelee D. Beard, CSR-5493
17                    770 Coleman A. Young Municipal Center
                      Detroit, MI  48226
18                    (313) 224-0409

19

20

21

22

23

24

25
```

RECEIVED by MCOA 7/11/2023 1:11:58 PM

# EXHIBIT "F"

DAILEY LAW FIRM, PC,

      Plaintiff/Counter-Defendant

v.

MICHIGAN SPINE AND PAIN,                Case No. 21-007081-CZ
      Defendant/Counter-Plaintiff         Hon. Adel Harb

AND

JODY INGRAM; INTEGRATED COUNSELING
SERVICES; SUMMIT PSYCHIATRIC SERVICES;
CAPS CONSULTING, L.L.C.; TOTAL TOXICOLOGY;
MED TRUST L.L.C.; OPEN MRI OF LIVONIA;
AMERICAN SPECIALTY PHARMACY D/B/A ASP
CARES; MI IMAGING; PAIN ASSOCIATES OF
MICHIGAN; CRAIG PEPPLER, D.O.; HENRY FORD
HEALTH SYSTEM; BLUE CROSS BLUE SHIELD
OF MICHIGAN; HEALTHCARE IMAGING PARTNERS;
KRANS REHAB, L.L.C.; SPECTRUM REHABILITATION;
ASSOCIATED ORTHOPEDICS OF DETROIT; MICHIGAN
SPINE AND PAIN; MICHIGAN NEURO OPTHALMOLOGY;
BINSON'S HOME HEALTHCARE; LABCORP;
PERFORMANCE ORTHO; METRO DETROIT
ENDOCRINOLOGY; MICHIGAN CRNAS STAFFING,
LLC; SUSAN NELSON; ATI PHYSICAL THERAPY,

      Defendants

AND

MICHIGAN SPINE AND PAIN, a DBA of
MICHIGAN REHABILITATION PHYSICIANS, PLC

      Counter/Third Party Plaintiff

v.

BRIAN T. DAILEY,

      Third Party Defendant

1

21-007081-CZ FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   7/13/2023 12:03 PM   Carlita McMiller

**THE DAILEY LAW FIRM, PC**
Brian T Dailey (39945)
Eric C Hoort (P84656)
William D Savage (P82146)
*Attorneys for Plaintiff*
36700 Woodward Ave., Suite 107 Bloomfield
Hills, MI 48304
P: 313-640-1111 I
F: 313-640-9999

**Stephen M. Kelley, P.C.**
Elizabeth Downey (P37036)
*Attorney for CRAIG PEPPLER, DO*
19501 East Eight Mile Rd.
St. Clair Shores, MI 48080
Office (586) 563-3500
Cell (248) 835-5591
ldowney@kelleyattys.com

**GREEN & GREEN, PLLC**
Jonathan A. Green (P51461)
*Attorneys for Michigan Spine & Pain* 30300
Northwestern Highway, Suite 250
Farmington Hills, MI 48334-3475
248-932-0500

**ASSISTANT GENERAL COUNSEL BCBS
MICHIGAN**
Amerique Philyaw Dockery (P79496)
600 Lafayette Blvd., Mail Code 1925
Detroit, MI 48221
313-653-7006

**BRUCE K. PAZNER, PC**
Bruce K. Panzer (P39913)
*Attorney for Michigan Neuro*
15200 E. Jefferson Ave, Suite 104
Grosse Pointe Park, MI 48230-2055
313 822 6097

**Simon PLC Attorneys & Counselors**
John W. Polderman (P65720)

**STARK REAGAN**
Peter L. Arvant (P52809)
*Attorney for Defendant Total Toxicology*
1111 W. Long Lake Avenue Suite 202
Troy, MI 48098
T: 248-641-9955
F: 248-641-9921

**DRAZIN & ASSOCIATES**
Robert S. Drazin (P23707)
*Attorney for Jody Ingram*
23855 Northwestern Highway
Southfield, MI 48075
248-948-9696

**VARNUM, LLP**
Ziyad Ihsan Hermiz (P72236)
*Attorney for Ml Imaging*
260 Brown Street, Suite 160
Birmingham, MI 48009-6222
248-567-7800

Phillip A Jaffe (P25997)
*Attorney for Open MRI of Livonia*
P.O. BOX 25092
West Bloomfield, MI 48325-0902
248 224 1463

**GOODMAN ACKER, P.C.**
Tim Sulolli (P58798)
*Attorney for Krans Rehab*
17000 W. 10 Mile Road, 2nd Floor
Southfield, MI 48075
(248) 483-5000

2

Court Appointed Receiver
363 W Big Beaver Rd., Ste. 410
Troy, MI 48084
(248) 720-0290
jpolderman@simonattys.com

_____/

**RECEIVER'S VERIFIED EX-PARTE MOTION FOR AN ORDER REQUIRING BRIAN
DAILEY TO SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CIVIL
CONTEMPT**

NOW COMES the Court Appointed Receiver, John Polderman ("Receiver"), and states as

follows:

A. Background

1.      On June 26, 2023, this Court entered an Order Appointing Receiver ("Order") (See

Exhibit A, Order).

2.      The Order incorporated the provisions of MCL 554.1011 et. seq:

> AUTHORITY OF RECEIVER
>
> IT IS HEREBY FURTHER ORDERED that the Receiver is hereby granted all
> powers and authority conferred by statutes and case law, including but not limited to MCL
> 554.1011 et. seq., to control, sell, encumber, take possession of, lease or liquidate said
> personal, real, mixed and business assets of Brian T. Dailey, Individually, and the Dailey
> Law Firm, PC in order to gain compliance with the Court's orders of February 27, 2023
> and May 12, 2023.

3.      MCL 554.1023 provides in pertinent part that an owner shall:

3

> **554.1023 Duties of owner.**
> Sec. 13. (1) An owner shall do all of the following:
> (a) Assist and cooperate with the receiver in the administration of the receivership and the discharge of the receiver's duties.
> (b) Preserve and turn over to the receiver all receivership property in the owner's possession, custody, or control.
> (c) Identify all records and other information relating to the receivership property, including a password, authorization, or other information needed to obtain or maintain access to or control of the receivership property, and make available to the receiver the records and information in the owner's possession, custody, or control.
> (d) Except as may be otherwise ordered by the court for cause, within 7 days after the entry of the order appointing the receiver, deliver to the receiver a list containing the name and address of all creditors and other known interested parties of the receivership estate.

4.     Despite the Order, Brian Dailey, individually, has failed to turn over any information, identify all records relating to the receivership property, assist and cooperate in the administration or provide any property to the Receiver or make available any records to the Receiver.

5.     These (in)actions were and are a knowing and willing violation of the Order and are a contempt of court.

### B. Requested Relief

WHEREFORE, the Receiver respectfully requests that this Court grant the following relief:

A.  Enter an Order imposing non-monetary sanctions of incarceration against Brian Dailey pursuant to MCR 2.313, MCR 2.114, all other applicable Court Rules and this Court's inherent authority;

B.  Initiate civil contempt proceedings against Brian Dailey;

C.  Order that Brian Dailey cure his civil contempt by preparation and production of all documents requested in the Order;

D.  Impose a monetary sanction against Brian Dailey for payment of the fees and costs incurred by the Receiver in connection with this hearing.

4

E.  Award such other relief as the Court deems just and proper under the circumstances; and

F.  Entry of the Proposed Order attached as Exhibit B.

Respectfully submitted,

**SIMON PLC ATTORNEYS AND COUNSELORS**

*/s/ John W. Polderman*
John W. Polderman (P65720)
Court Appointed Receiver

## VERIFICATION

I declare that the factual statements above are true to the best of my information, knowledge and belief.  My affidavit attached hereto as Exhibit C is being submitted to the Court in further support of this Motion and pursuant to MCR 3.606(A).  I believe this Motion and my attached Affidavit constitute a proper showing to initiate civil contempt proceedings against Brian Dailey.

*/s/ John W. Polderman*
John W. Polderman

Respectfully submitted,

**SIMON PLC ATTORNEYS AND COUNSELORS**

*/s/ John W. Polderman*

John W. Polderman (P65720)
Court Appointed Receiver

5

**BRIEF IN SUPPORT OF THE RECEIVER'S EX-PARTE MOTION
FOR ORDER TO SHOW CAUSE**

Brian Dailey is in present violation of this Court's order which requires him to, generally, to turnover documents and property to the Receiver. The Receiver is requesting incarceration for an indefinite amount of time until Brian Dailey prepares and turns over the documentation required in the Order.

A. Present Failure to Comply with a Court Order is Civil Contempt

A court may find persons who have violated a court order guilty of either civil or criminal contempt. *State Bar v Cramer*, 399 Mich 116, 126-128 (1976). Michigan courts have, as an inherent power, the power at common law to punish all contempts of court. This contempt power inheres in the judicial power vested in the Court of Appeals, and the circuit and probate courts. See, generally, *In re Huff*, 352 Mich 402; 91 NW2d 613 (1958).

Granted, it is not always easy to distinguish between civil and criminal contempt, and Michigan courts have struggled to separate the two.[1] The Michigan Supreme Court has distinguished between civil and criminal contempt as follows:

> If the contempt consists in the refusal of a party to do something which he is ordered to do for the benefit or advantage of the opposite party, the process is civil... The order in such a case is not in the nature of a punishment, but is coercive, to compel him to act in accordance with the order of the court. If, on the other hand, the contempt consists in the doing of a forbidden act, injurious to the opposite party, the process is criminal, and conviction is followed by fine or imprisonment, or both; and this is by way of punishment. In one case the private party is interested in the enforcement of the order, and, the moment he is satisfied, the imprisonment ceases. On the other hand, the State alone is interested, in the

---

[1] "The sui generis nature of contempt proceedings has often obfuscated the distinction between criminal and civil contempt. The confusion between criminal and civil contempt has resulted partly from the fact that all contempts may be said to be criminal in nature because they permit imprisoning a contemnor for willfully failing to comply with an order of the court. Hence, legal authors and courts have stated that all contempts are "quasi-criminal" or "criminal in nature." As one court aptly stated, "[a] contempt proceeding occupies what may be termed the twilight zone between civil and criminal cases . . . ." *In re Contempt of Dougherty*, 429 Mich. 81, 90-91, 413 N.W.2d 392, 395, (Mich. 1987)

enforcement of the penalty, it being a punishment which operates *in terrorem*, and by that means has a tendency to prevent a repetition of the offense in other similar cases." *People ex rel Attorney General v Yarowsky*, 236 Mich 169, 171-172; 210 NW 246 (1926), quoting *State v Knight*, 3 SD 509; 54 NW 412 (1893).]

B. A Remedy for Civil Contempt Can Involve Coercion and Compensation

However, the foregoing test which distinguishes between refusing to do an act commanded, which would permit a coercive remedy, and doing an act forbidden, allowing only punishment for the completed act of disobedience, affords only a general test to determine the character of the punishment. What this test fails to recognize is that there are two types of civil contempt sanctions, coercive and compensatory. *Dougherty* at 97. The *Dougherty* court went on to explain that:

In order to determine whether a coercive sanction is available to remedy contemptuous behavior, it may be necessary to look beyond whether the contemnor refused to do an act commanded, or has done an act forbidden. Certainly, when the contemnor is ordered to engage in a certain act, and fails to do so… the court may use a coercive sanction.

However, the converse, that the doing of an act forbidden does not permit a coercive sanction, is not always true. It may be that a contemnor, who has done that which is prohibited by court order, may be properly subjected to a coercive sanction. In such a case, as in all cases where a coercive sanction is appropriate, the proper focus is whether there is some act that can be coerced by the sanction so that the contemnor's performance of the act will put him into compliance with the underlying order.
…

What is apparent … is that a coercive sanction is proper where the contemnor, at the time of the contempt hearing, is under a present duty to comply with the order and is in present violation of the order. Where the contemnor is not in present violation of the order, there is no need to coerce compliance, since, of course, there is already compliance. An example may be helpful. A court enjoins a defendant from striking. The defendant strikes and a contempt hearing is held. At the hearing defendant is under duty to obey the order and, if he is still on strike, is presently violating the order. Therefore, a coercive sanction, such as a $ 100 fine for each day he remains on strike, is entirely proper.

However, where there is only a past duty to obey the court order, or a present duty, but only a past violation of the order, a coercive sanction is not permissible. It is not a proper sanction because there is nothing to coerce. In fact, defendant is, at the time of the hearing, either in actual compliance with the order, or under no present duty to comply. In such a

7

case the court is limited to imposing a criminal sanction, after a properly conducted criminal contempt proceeding, or issuing a civil contempt order compensating the complainant for actual losses. *Id*. at 98-100 (internal citations omitted).

C. Civil Contempt Can Involve Incarceration for an Indefinite Period of Time

Coercive sanctions may involve imprisonment. "[I]mprisonment for civil contempt is properly ordered 'where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character.'" *In re Contempt of Dougherty*, 429 Mich at 93. Unlike criminal contempt cases where the court cannot imprison the contemnor for more than 93 days, there is no corresponding limitation "in those cases where the commitment is for the omission to perform an act or duty which is still within the power of the person to perform[.]" MCL 600.1715(2). "[A] commitment for the omission to perform an act or duty that is within the power of the party to perform is the classical case of civil contempt that permits the use of a coercive sanction." *In re Contempt of Dougherty*, 429 Mich at 91-92.

In this case Brian Dailey is in present violation of the Court's order which directed him to cooperate and provide information and documents regarding his personal finances. The Receiver requests that this Court find him in civil contempt and enter a coercive sanction of incarceration until such time as he complies. While incarceration is a severe remedy, Brian Dailey has repeatedly failed to comply with the orders of this Court. His contempt has affected the dignity of this Court, cost the receivership estate additional fees and expenses, as well as impaired the rights of the creditors. Incarceration until there is compliance with the orders of the Court is the only remedy for these actions.

WHEREFORE, the Receiver requests that this Court enter an order requiring Brian Dailey to personally appear and show cause as to why he should not be held in civil contempt of

8

court and incarcerated for failure to comply with the orders of this Court.

<div align="right">

Respectfully submitted,

**SIMON PLC ATTORNEYS AND COUNSELORS**


*/s/ John W. Polderman*
John W. Polderman (P65720)
Court Appointed Receiver

</div>

Dated: July 13, 2023

# EXHIBIT A

Deborah Royal

6/26/2023 2:34 PM

Cathy M. Garrett    WAYNE COUNTY CLERK

21-007081-CZ    FILED    IN MY OFFICE

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

DAILEY LAW FIRM, PC,

    Plaintiff/Counter-Defendant

v.

MICHIGAN SPINE AND PAIN,                 Case No. 21-007081-CZ
      Defendant/Counter-Plaintiff

                                            Hon. Adel Harb

AND

JODY INGRAM; INTEGRATED COUNSELING
SERVICES; SUMMIT PSYCHIATRIC SERVICES;
CAPS CONSULTINC, L.L.C.; TOTAL TOXICOLOGY;
MED TRUST L.L.C.; OPEN MRI OF LIVONIA;
AMERICAN SPECIALTY PHARMACY D/B/A ASP
CARES; MI IMAGING; PAIN ASSOCIATES OF
MICHIGAN; CRAIG PEPPLER, D.O.; HENRY FORD
HEALTH SYSTEM; BLUE CROSS BLUE SHIELD
OF MICHIGAN; HEALHCARE IMAGING PARTNERS;
KRANS REHAB, L.L.C.; SPECTRUM REHABILITATION;
ASSOCIATED ORTHOPEDICS OF DETROIT; MICHIGAN
SPINE AND PAIN; MICHIGAN NEURO OPTHALMOLOGY;
BINSON'S HOME HEALTHCARE; LABCORP;
PERFORMANCE ORTHO; METRO DETROIT
ENDOCRINOLOGY; MICHIGAN CRNAS STAFFING,
LLC; SUSAN NELSON; ATI PHYSICAL THERAPY,

    Defendants

AND


MICHIGAN SPINE AND PAIN, a DBA of
MICHIGAN REHABILITATION PHYSICIANS, PLC,

    Counter/Third Party Plaintiff
v.

BRIAN T. DAILEY,

    Third Party Defendant

Brian T Dailey (39945)
Eric C Hoort (P84656)
William D Savage (P82146)
**THE DAILEY LAW FIRM, PC**
*Attorneys for Plaintiff*
36700 Woodward Ave., Suite 107 Bloomfield Hills, MI 48304
P: 313-640-1111 | F: 313-640-9999

**STARK REAGAN**
By: Peter L. Arvant (P52809)
*Attorney for Defendant Total Toxicology*
1111 W. Long Lake Avenue Suite 202
Troy, MI 48098
T: 248-641-9955
F: 248-641-9921

Elizabeth Downey
**ELIZABETH A. DOWNEY, PLLC**
*For CRAIG PEPPLER, DO*
30445 Northwestern Highway, Suite 250
Farmington Hills, MI 48334
248-539-7407

Robert S. Drazin (P23707)
**DRAZIN & ASSOCIATES**
*Attorney for Jody Ingram*
23855 Northwestern Highway
Southfield, MI 48075
248-948-9696

Jonathan A. Green (P51461)
**GREEN & GREEN, PLLC**
*Attorneys for Michigan Spine & Pain* 30300
Northwestern Highway, Suite 250
Farmington Hills, MI 48334-3475
248-932-0500

Ziyad Ihsan Hermiz (P72236)
**VARNUM, LLP**
*Attorney for M1 Imaging*
260 Brown Street, Suite 160
Birmingham, MI 48009-6222
248-567-7800

Amerique Philyaw Dockery (P79496)
**ASSISTANT GENERAL COUNSEL BCBS MICHIGAN**

600 Lafayette Blvd., Mail Code 1925
Detroit, MI 48221
313 653 7006

Phillip A Jaffe (P25997)
*Attorney for Open MRI of Livonia*
P.O. BOX 25092
West Bloomfield, MI 48325-0902
248 224 1463

Bruce K. Panzer (P39913)
**BRUCE K. PAZNER, PC**
*Attorney for Michigan Neuro*
15200 E. Jefferson Ave, Suite 104
Grosse Pointe Park, MI 48230-2055
313 822 6097

Tim Sulolli (P58798)
**GOODMAN ACKER, P.C.**
*Attorney for Krans Rehab*
17000 W. 10 Mile Road, 2nd Floor
Southfield, MI 48075
(248) 483-5000

_____/

## ORDER APPOINTING COURT APPOINTED RECEIVER

At a session of said Court held on ___6/26/2023_____,
in the County of Wayne, State of Michigan

Present: Hon. Adel Harb

This matter having come before the Court pursuant to Defendant Ingram's Motion

for Entry of Order compelling Plaintiff Dailey Law Firm, PC and Third party Defendant

Brian Dailey, individually to show cause why they should not be held in contempt of Court

for failure to comply with Court orders dated February 27, 2023, and May 12, 2023, both

of which require Dailey and the Dailey Law firm to interplead the sum of Six Hundred

Thousand Dollars ($600,000.00) into an escrow account created by Robert S. Drazin,

said account to be under the control of the Court (hereinafter referred to as "the Court's

Orders"); Dailey and the Daily Law firm having failed to comply with this Court's orders

3

regarding the same, by failing to interplead any funds; a request having been made by Defendants in this matter for the appointment of a Receiver for purposes of gaining compliance with this Court's orders, and the Court being otherwise informed as to the premises:

IT IS HEREBY ORDERED that JOHN W. POLDERMAN, ESQ., 363 West Big Beaver Rd., #410, Troy MI 48084 ("Receiver"), is hereby authorized to act with full powers over the interests in personal, real, mixed and business assets ("assets") of Brian T. Dailey, Individually, and the Dailey Law Firm, PC. wherever said assets are situated, for purposes of enforcement of this Court's Orders of February 27, 2023 and May 12, 2023.

<u>AUTHORITY OF RECEIVER</u>

IT IS HEREBY FURTHER ORDERED that the Receiver is hereby granted all powers and authority conferred by statutes and case law, including but not limited to MCL 554.1011 et. seq., to control, sell, encumber, take possession of, lease or liquidate said personal, real, mixed and business assets of Brian T. Dailey, Individually, and the Dailey Law Firm, PC in order to gain compliance with the Court's orders of February 27, 2023 and May 12, 2023.

IT IS HEREBY FURTHER ORDERED that the Receiver shall deposit into a fiduciary checking account any and all monies, cash, funds, etc. from the liquidation of the personal and interests in business assets of Brian T. Dailey, Individually, and the Dailey Law Firm, PC, and that the Receiver shall not disburse said without an Order of this Court.

IT IS HEREBY FURTHER ORDERED that the Register of Deeds shall accept a certified copy of this Order for recording, against any real property in which the Receiver

4

determines that Brian T. Dailey, Individually, and the Dailey Law Firm, PC has an interest in.

IT IS HEREBY FURTHER ORDERED that responsibility for the Receiver's costs and fees are solely the responsibility of Brian T. Dailey, Individually, and the Dailey Law Firm, PC.

IT IS HEREBY FURTHER ORDERED that the Receiver, while exercising his duties, is deemed a ministerial officer of this Court whose jurisdiction over the assets named in this Order shall be the same as the Court itself. *See Cohen v Bologna,* 52 Mich App 149; 216 NW2d 586 (1974). No action, suit, proceeding, claim, or demand arising from, in connection with, or relating to any of the assets and/or in the course of acting in such court-appointed capacity shall be pursued against the Receiver by any party or non-party without an allegation that the Receiver has acted in bad faith and without first obtaining leave of this Court. *See In re Motion to Sue Receiver of Venus Plaza Shopping Center,* 228 Mich App 357; 579 NW2d 99 (1998).

<u>THE RECEIVERSHIP ESTATE</u>

IT IS HEREBY FURTHER ORDERED that the Receiver shall be empowered, but not obligated to:

(a)     Preserve, hold, and manage all receivership assets, and perform all acts necessary to preserve the value of those assets, to prevent any loss, damage, or injury;

(b)     Prevent the withdrawal or misapplication of funds;

(c)     Initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings in state, federal, or foreign court necessary to preserve or increase the assets of either party or to carry out her duties pursuant to this Order;

5

(d)     Choose, engage, and employ realtors, attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

(e)     Issue subpoenas to obtain documents and records pertaining to the receivership, and conduct discovery in this action on behalf of the receivership estate; and

(f)     Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of this Court, or exercising the authority granted by this Order.

<u>RESTRAINT ON TRANSFER OF PROPERTY</u>

IT IS HEREBY FURTHER ORDERED that except as otherwise ordered by this Court, the Brian T. Dailey, Individually, and the Dailey Law Firm, PC and any and all persons acting in concert with him or on his behalf, are restrained and enjoined from directly or indirectly transferring, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, dissipating, converting, withdrawing, or otherwise disposing of the assets, except as otherwise ordered by this Court. This includes disbursement of any settlement fund proceeds for any ongoing litigation for cases being handled by the Brian T. Dailey, Individually, and the Dailey Law Firm, PC, excepting the client's share and/or any lienholders.

IT IS HEREBY FURTHER ORDERED that Brian T. Dailey, Individually, and the Dailey Law Firm, PC and all persons or entities who receive notice of this Order by personal service or otherwise, are restrained and enjoined from directly or indirectly destroying, mutilating, erasing, altering, concealing, or disposing of, in any manner,

6

directly or indirectly, any documents that relate to the business practices or business or personal finances of Brian T. Dailey, Individually, and the Dailey Law Firm, PC

<u>BOND OF RECEIVER</u>

IT IS HEREBY FURTHER ORDERED that pursuant to MCR 2.622(C)(1) and (G), bond shall be a personal bond based upon consideration of the following, but not limited to, the following:

1.      The value of the receivership estate, if known;

2.      The amount of cash or cash equivalents expected to be received into the receivership estate;

3.      The amount of assets in the receivership estate on deposit in insured financial institutions or invested in US treasury obligations;

4.      Whether the assets in the receivership estate cannot be sold without further order of the Court;

5.      If the Receiver is an entity, whether the Receiver has sufficient assets or acceptable errors and omissions insurance to cover any potential losses or liabilities of the receivership estate;

6.      The extent to which any secured creditor is under-secured;

7.      Whether the receivership estate is a single parcel of real estate involving few trade creditors; and

8.      Whether parties have agreed to a nominal bond.

<u>RECEIVER'S LIEN</u>

IT IS HEREBY FURTHER ORDERED that the Receiver shall be authorized to record a claim of interest against any real and/or personal property in which Brian T. Dailey, Individually, and the Dailey Law Firm, PC retains a fee simple interest in and the

7

recordation of the Receiver's claim of interest shall constitute notice of the Receiver's lien for any of the Receiver's unpaid fees and costs.

<u>RETENTION OF JURISDICTION</u>

IT IS HEREBY FURTHER ORDERED that the balance of any Judgment or orders of this Court previously entered shall remain in full force and effect and this Court retains jurisdiction of this matter for all purposes.

IT IS SO ORDERED.

/s/ Adel A. Harb   6/26/2023
_____
CIRCUIT COURT JUDGE

# EXHIBIT B

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

DAILEY LAW FIRM, PC,

      Plaintiff/Counter-Defendant

v.

MICHIGAN SPINE AND PAIN,               Case No. 21-007081-CZ
      Defendant/Counter-Plaintiff        Hon. Adel Harb

AND

JODY INGRAM; INTEGRATED COUNSELING
SERVICES; SUMMIT PSYCHIATRIC SERVICES;
CAPS CONSULTING, L.L.C.; TOTAL TOXICOLOGY;
MED TRUST L.L.C.; OPEN MRI OF LIVONIA;
AMERICAN SPECIALTY PHARMACY D/B/A ASP
CARES; MI IMAGING; PAIN ASSOCIATES OF
MICHIGAN; CRAIG PEPPLER, D.O.; HENRY FORD
HEALTH SYSTEM; BLUE CROSS BLUE SHIELD
OF MICHIGAN; HEALTHCARE IMAGING PARTNERS;
KRANS REHAB, L.L.C.; SPECTRUM REHABILITATION;
ASSOCIATED ORTHOPEDICS OF DETROIT; MICHIGAN
SPINE AND PAIN; MICHIGAN NEURO OPTHALMOLOGY;
BINSON'S HOME HEALTHCARE; LABCORP;
PERFORMANCE ORTHO; METRO DETROIT
ENDOCRINOLOGY; MICHIGAN CRNAS STAFFING,
LLC; SUSAN NELSON; ATI PHYSICAL THERAPY,

      Defendants

AND

MICHIGAN SPINE AND PAIN, a DBA of
MICHIGAN REHABILITATION PHYSICIANS, PLC

      Counter/Third Party Plaintiff

v.

BRIAN T. DAILEY,

      Third Party Defendant

_____/

**THE DAILEY LAW FIRM, PC**
Brian T Dailey (39945)
Eric C Hoort (P84656)
William D Savage (P82146)
*Attorneys for Plaintiff*
36700 Woodward Ave., Suite 107 Bloomfield
Hills, MI 48304
P: 313-640-1111 I
F: 313-640-9999

**Stephen M. Kelley, P.C.**
Elizabeth Downey (P37036)
*Attorney for CRAIG PEPPLER, DO*
19501 East Eight Mile Rd.
St. Clair Shores, MI 48080
Office (586) 563-3500
Cell (248) 835-5591
ldowney@kelleyattys.com

**GREEN & GREEN, PLLC**
Jonathan A. Green (P51461)
*Attorneys for Michigan Spine & Pain* 30300
Northwestern Highway, Suite 250
Farmington Hills, MI 48334-3475
248-932-0500

**ASSISTANT GENERAL COUNSEL BCBS
MICHIGAN**
Amerique Philyaw Dockery (P79496)
600 Lafayette Blvd., Mail Code 1925
Detroit, MI 48221
313-653-7006

**BRUCE K. PAZNER, PC**
Bruce K. Panzer (P39913)
*Attorney for Michigan Neuro*
15200 E. Jefferson Ave, Suite 104
Grosse Pointe Park, MI 48230-2055
313 822 6097

**Simon PLC Attorneys & Counselors**
John W. Polderman (P65720)
Court Appointed Receiver
363 W Big Beaver Rd., Ste. 410
Troy, MI 48084
(248) 720-0290

**STARK REAGAN**
Peter L. Arvant (P52809)
*Attorney for Defendant Total Toxicology*
1111 W. Long Lake Avenue Suite 202
Troy, MI 48098
T: 248-641-9955
F: 248-641-9921

**DRAZIN & ASSOCIATES**
Robert S. Drazin (P23707)
*Attorney for Jody Ingram*
23855 Northwestern Highway
Southfield, MI 48075
248-948-9696

**VARNUM, LLP**
Ziyad Ihsan Hermiz (P72236)
*Attorney for MI Imaging*
260 Brown Street, Suite 160
Birmingham, MI 48009-6222
248-567-7800

Phillip A Jaffe (P25997)
*Attorney for Open MRI of Livonia*
P.O. BOX 250902
West Bloomfield, MI 48325-0902
248 224 1463

**GOODMAN ACKER, P.C.**
Tim Sulolli (P58798)
*Attorney for Krans Rehab*
17000 W. 10 Mile Road, 2nd Floor
Southfield, MI 48075
(248) 483-5000

jpolderman@simonattys.com

_____/

## **EX-PARTE ORDER TO SHOW CAUSE**

At a session of said court, held in the Courthouse,
In the City of Detroit, County of Wayne, State of Michigan

On:_____

Hon._____

This matter having come before the Court on the Receiver's Verified Ex-Parte Motion for

an Order to Show Cause and with the Court being fully informed of the premises:

**IT IS ORDERED** that Brian Dailey shall personally appear on ___, 2023, at _____ p.m.

at the courtroom of the Hon. Adel Harb  to show cause as to why he should not be held in civil

contempt for failure comply with the provisions of the Court's Order Appointing Receiver.

**IT IS FURTHER HEREBY ORDERED** that pursuant to MCR 2.107(B)(1)(b), a copy

of the Motion and Order shall be served on Brian Dailey via first class mail to: 77 Oxford Road,

Grosse Pointe Shores, Michigan and via email at briandailey@daileylawyers.com.

_____
Hon. Adel Harb

# EXHIBIT "G"

*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

VHS OF MICHIGAN, INC., doing business as
DETROIT MEDICAL CENTER,

        Plaintiff/Counterdefendant-Appellee,

v

JAY JUAN-JARMAINE JONES,

        Defendant/Counterplaintiff,

and

DAILEY LAW FIRM, PC,

        Defendant/Counterplaintiff-Appellant.

UNPUBLISHED
May 12, 2022

No. 355953
Wayne Circuit Court
LC No. 19-014180-CK

---

Before: JANSEN, P.J., and CAVANAGH and RIORDAN, JJ.

PER CURIAM.

    Defendant/Counterplaintiff, Dailey Law Firm, PC (Dailey),[1] appeals as of right the trial court's order granting summary disposition to plaintiff/counterdefendant, VHS of Michigan, Inc. (VHS), doing business as Detroit Medical Center, under MCR 2.116(C)(10). We affirm.

---

[1] Defendant/Counterplaintiff Jay Juan-Jarmaine Jones is not a party to this appeal.

-1-

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

Jay Juan-Jarmaine Jones was injured in an automobile accident. Jones retained Dailey under a contingency fee agreement to help him obtain insurance coverage. Dailey assisted Jones with accessing coverage under the Michigan Assigned Claims Plan (MACP). MACP assigned coverage to Citizens Insurance Company of the Midwest (Citizens).

As part of his treatment for his injuries, Jones received two magnetic resonance imaging (MRI) tests from VHS's subsidiary, Detroit Medical Center (DMC) Sinai Grace Hospital. VHS sent Citizens two invoices for the MRIs, totaling $10,592. Citizens sent Dailey two checks to pay for the MRIs, totaling $9,532.80, which reflected a reduced rate negotiated by Citizens and VHS (the "Citizens checks"). The checks were made payable to, "Sinai Grace Hospital and Dailey Law Firm PT." Dailey deposited the checks to its Interest on Lawyers Trust Account (IOLTA), but did not remit any payment to VHS.

VHS requested Dailey remit payment, but Dailey refused, stating it intended to retain one-third the total amount. According to Dailey, this amount reflected the attorney fees negotiated under the contingency agreement with Jones. VHS filed the complaint giving rise to this appeal, claiming, in part, Dailey unlawfully converted the funds for its own use. Later, VHS moved for summary disposition under MCR 2.116(C)(8), (9), and (10), arguing it was entitled to the entire amount of funds from the Citizens checks and Dailey was responsible for treble damages arising from its conversion. The trial court granted VHS's motion for summary disposition, awarding VHS damages totaling $9,532.80 against Jones, and treble damages totaling $28,598.40 against Dailey. Dailey moved for reconsideration, which the trial court denied. This appeal followed.

## II. CONVERSION

Dailey argues the trial court erred in granting VHS's motion for summary disposition on the basis of conversion because there was no evidence Dailey used the funds from the Citizens checks for its own use. We disagree.

### A. STANDARD OF REVIEW

This Court reviews de novo the grant or denial of a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Again, VHS moved for summary disposition under MCR 2.116(C)(8), (9), and (10). However, the trial court did not specify the specific subsection under which it granted summary disposition. To grant or deny summary disposition under MCR 2.116(C)(8) or (9), a trial court may not look beyond the pleadings. *Maiden*, 461 Mich at 119-120; *Village of Dimondale v Grable*, 240 Mich App 553, 565; 618 NW2d 23 (2000). MCR 2.116(C)(10), meanwhile, requires the parties to go beyond the pleadings and present other evidence either establishing or invalidating a genuine dispute of material fact. *AFSCME v Detroit*, 267 Mich App 255, 261; 704 NW2d 712 (2005). In this case, the trial court granted summary disposition after reviewing "the entirety of the record," which included exhibits supporting the parties' arguments. Therefore, summary disposition was granted on the basis of MCR 2.116(C)(10). See *Kefgen v Davidson*, 241 Mich App 611, 616; 617 NW2d 351 (2000).

The moving party has the initial burden to support its claim for summary disposition under MCR 2.116(C)(7) or (10) by affidavits, depositions, admissions, or other

-2-

documentary evidence. The burden then shifts to the nonmoving party to demonstrate a genuine issue of disputed fact exists for trial. To meet this burden, the nonmoving party must present documentary evidence establishing the existence of a material fact, and the motion is properly granted if this burden is not satisfied. Affidavits, depositions, and documentary evidence offered in support of, and in opposition to, a dispositive motion shall be considered only to the extent that the content or substance would be admissible as evidence. [*AFSCME*, 267 Mich App at 261 (citations omitted).]

The evidence should be considered "in the light most favorable to the party opposing the motion." *Maiden*, 461 Mich at 120. "Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law." *Id.*

"Issues of statutory interpretation are questions of law that this Court reviews de novo." *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Mich*, 492 Mich 503, 515; 821 NW2d 117 (2012).

The primary goal of statutory interpretation is to ascertain the legislative intent that may reasonably be inferred from the statutory language. The first step in that determination is to review the language of the statute itself. Unless statutorily defined, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used. We may consult dictionary definitions to give words their common and ordinary meaning. When given their common and ordinary meaning, the words of a statute provide the most reliable evidence of its intent. [*Id.* (quotation marks and citation omitted).]

## B. LAW AND ANALYSIS

Michigan recognizes two types of conversion—statutory conversion and common-law conversion. *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc*, 497 Mich 337, 344; 871 NW2d 136 (2015). VHS's motion for summary disposition argued Dailey committed statutory conversion when it deposited the two-party Citizens checks into its IOLTA. The requirements for statutory conversion are codified at MCL 600.2919a(1), which states, in part: "(1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees: (a) Another person's stealing or embezzling property or converting property to the other person's own use." In contesting VHS's motion for summary disposition, Dailey made two arguments. First, Dailey argued its actions did not amount to a conversion. Second, Dailey contended it did not deposit the Citizens checks into its IOLTA for its "own use." We consider each argument in turn.

The statutory scheme does not define the term "conversion." "When a statute does not define a term, we will construe the term according to its common and approved usage." *Nelson v Grays*, 209 Mich App 661, 664; 531 NW2d 826 (1995). "A legal term of art, however, must be construed in accordance with its peculiar and appropriate legal meaning." *Brackett v Focus Hope, Inc*, 482 Mich 269, 276; 753 NW2d 207 (2008). Therefore, we employ the common-law definition of the term "conversion."

Under the common law, "conversion is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins Co v Allstate Ins Co*, 439 Mich 378, 391; 486 NW2d 600 (1992). To sustain its claim of statutory conversion, VHS was required to show Dailey wrongfully exerted domain over the Citizens checks. See *id.* In support of its contention Dailey wrongfully exerted domain over the Citizens checks, VHS pointed to MCL 440.3110(4) of the Uniform Commercial Code (UCC), MCL 440.1101 *et seq.*, which articulates the rights of parties to an instrument, including checks. See *Hoerstman Gen Contracting, Inc v Hahn*, 474 Mich 66, 72; 711 NW2d 340 (2006) ("A check is a negotiable instrument entered into between the maker and the payee."). Specifically, MCL 440.3110(4), states:

> (4) If an instrument is payable to 2 or more persons alternatively, it is payable to any of them and may be negotiated, discharged, or enforced by any or all of them in possession of the instrument. If an instrument is payable to 2 or more persons not alternatively, it is payable to all of them and may be negotiated, discharged, or enforced only by all of them. If an instrument payable to 2 or more persons is ambiguous as to whether it is payable to the persons alternatively, the instrument is payable to the persons alternatively.

As noted, the Citizens checks were payable to DMC Sinai Grace Hospital, VHS's subsidiary, *and* Dailey. With respect to MCL 440.3110(4), the second circumstance is present: "If an instrument is payable to 2 or more persons not alternatively, it is payable to all of them and may be negotiated, discharged, or enforced only by all of them." See *Pamar Enterprises, Inc v Huntington Banks of Mich*, 228 Mich App 727, 733; 580 NW2d 11 (1998) ("When the word 'and' separates the names of two payees on an instrument, the instrument is payable jointly and not alternatively."). In other words, when an instrument is payable to two or more payees the instrument may only be acted upon by "all" the payees. Consequently, in this circumstance, a court may find a conversion where only one payee acts on an instrument. See MCL 440.3420(1); see also *Trail Clinic, PC v Bloch*, 114 Mich App 700, 705; 319 NW2d 638 (1982) ("Checks are considered to be the property of the designated payee and may be the subject of a suit for conversion.").[2]

In support of its contention Dailey converted the Citizens checks, VHS presented copies of the Citizens checks showing they were payable to VHS's subsidiary, Sinai Grace *and* Dailey. Further, VHS offered the trial court the e-mail correspondence between Dailey's counsel, Brian Dailey, and VHS's counsel in which attorney Dailey stated: "I have received some payments for [Jones] and have deposited all to Dailey Law Firm, PC IOLTA. I do not have record of any checks made payable to DMC. The checks I have received from Citizens are made payable to Sinai Grace and Dailey Law Firm, PC."

Because VHS, as the moving party, presented evidence showing the Citizens checks were payable to *both* VHS and Dailey, and because VHS offered evidence showing only Dailey acted

---

[2] While we recognize cases decided before November 1, 1990 are not binding on this Court, they may be considered for their persuasive value. MCR 7.215(J)(1); see also *Auto-Owners Ins Co v Martin*, 284 Mich App 427, 444 n 4; 773 NW2d 29 (2009).

on the Citizens checks, the burden then shifted to Dailey to "demonstrate a genuine issue of disputed fact exists for trial" regarding Dailey's alleged conversion. *AFSCME*, 267 Mich App at 261. In response to VHS's motion for summary disposition, Dailey only offered one exhibit— copies of the front of the Citizens checks including Dailey's deposit slip purportedly showing Dailey's deposit of the Citizens checks into its IOLTA. Evidence of the Citizens checks with the deposit slip to the IOLTA did not bolster Dailey's contention it did not convert the Citizens checks. Indeed, Dailey's evidence effectively furthered VHS's contention Dailey wrongfully exerted domain over the Citizens checks. Again, an instrument payable to "2 or more persons not alternatively" requires action by "all" parties. MCL 440.3110(4). By offering evidence showing only its acts with respect to the Citizens checks, Dailey *supported* VHS's argument there was no genuine dispute of fact as to its conversion of the Citizens checks. Therefore, the trial court did not err in finding that Dailey converted the Citizens checks.

Even so, Dailey argued it did not convert the Citizens checks because it intended to only keep a portion of the funds. There are two problems with this argument. First, while Dailey argued its *intent* was to only keep a portion of the funds, Dailey *actually* kept all the funds. Indeed, it is undisputed by the parties Dailey has never disbursed any funds to VHS from the Citizens checks and Dailey admits in its pleadings to this Court *all* the funds from the Citizens checks remain in its IOLTA. Moreover, Dailey's argument it intended to only keep a portion of the funds did not effectively refute VHS's argument Dailey converted the funds. Again, once the burden shifts to the nonmoving party, the nonmoving party must present some *documentary* evidence establishing a genuine dispute of fact. *AFSCME*, 267 Mich App at 261. Dailey presented to the trial court no documentary evidence to this effect. Consequently, Dailey failed to meet its burden as the nonmoving party and there was no error on this basis.

The next question is whether there was a genuine dispute of material fact as to whether Dailey converted the Citizens checks for its "own use." The phrase " 'to the other person's own use' under MCL 600.2919a(1)(a) requires a showing that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Aroma Wines & Equip, Inc*, 497 Mich at 340. Our Supreme Court admits the definition of "own use" is "broad." *Id*. at 359. Thus, to support its motion for summary disposition VHS needed to present some evidence Dailey's retention of the Citizens checks for "some purpose personal to the defendant's interests." *Id*.

Again, VHS's motion for summary disposition included the e-mail correspondence between attorney Dailey and VHS's counsel. In this correspondence, attorney Dailey stated:

> I am not sure if you are requesting that Dailey Law Firm, PC forfeit its attorney fee on these payments. If that is your inquiry Dailey Law Firm, PC declines to forfeit its attorney fee on these payments. Please reply to all attaching the bills to which these payments apply and I will process a payment to your client the amount remaining in Dailey Law Firm, PC IOLTA after deduction of the 1/3 Attorney Fee.

Attorney Dailey's statement, he intended to keep a "deduction of the 1/3 Attorney Fee" is evidence Dailey intended to keep at least some of the money for its interests. *Id*. As discussed, once VHS

presented this evidence, the burden then shifted to Dailey to present evidence it did not intend to keep the Citizens checks for its own interest. See *AFSCME*, 267 Mich App at 261.

To refute VHS's argument that keeping the Citizens checks was not for its own interest, Dailey pointed to the rules of professional responsibility governing attorney conduct. Specifically, Dailey argued "Michigan Rule of Professional Conduct 1.15 requires that I deposit all disputed funds into the IOLTA trust account." Again, the only *evidence* Dailey offered were the copies of the fronts of the Citizens checks and a deposit slip purporting to show the deposit of the funds into Dailey's IOLTA. Construing this evidence in a light most favorable to Dailey, all Dailey's proffered evidence shows is the deposit of all the funds into its account. See *Maiden*, 461 Mich at 120.

Dailey acknowledged VHS is entitled to two-thirds of the funds. However, the rules of professional conduct state: "When two or more persons (one of whom may be the lawyer) claim interest in the property, it shall be kept separate by the lawyer until the dispute is resolved. The lawyer *shall promptly* distribute all portions of the property as to which the interests are not in dispute." MRPC 1.15(c) (emphasis added). If Dailey wanted to effectively refute the claim the funds were not for its own use on the basis of MRPC 1.15, at the very least, Dailey should have presented some evidence showing its prompt remittance of two-thirds of the funds to VHS. By only presenting evidence of its deposit of *all* the funds to its IOLTA, Dailey's argument regarding its obligation under to the rules of professional responsibility did not refute VHS's argument Dailey intended to keep the funds for its own use.

In sum, VHS satisfied its burden showing documentary evidence Dailey converted the Citizens checks for its own use. MCL 600.2919a(1). Once the burden shifted, Dailey did not present sufficient documentary evidence refuting this assertion. Therefore, the trial court did not err in granting summary disposition on the basis of statutory conversion because there was not a genuine dispute of fact as to whether Dailey converted the Citizens checks for its own use.

## III. CHARGING LIEN

Dailey next argues it holds an attorney's charging lien over the funds received from the Citizens checks. By granting summary disposition in VHS's favor and awarding damages, Dailey contends the trial court effectively invalidated its right to be paid attorney fees. We disagree.

## A. STANDARD OF REVIEW

Generally, this Court reviews for an abuse of discretion issues involving the award of attorney fees. *Moore v Secura Ins*, 482 Mich 507, 516; 759 NW2d 833 (2008). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Id*. However, this issue also requires this Court to review issues of law for which its review is de novo. *Id*.

## B. LAW AND ANALYSIS

As an initial matter, we see fit to contextualize Dailey's arguments. Dailey argues the trial court effectively "obliterated" its right to collect attorney fees. That is not true. As to VHS's motion for summary disposition, the trial court simply found: (1) Jones was responsible for the medical costs billed by VHS; and (2) Dailey was responsible for treble damages because Dailey converted the Citizens checks under MCL 600.2919a(1). Nothing in the trial court's order precluded Dailey from collecting fees. What this order does do is circumscribe *from whom* Dailey may collect a fee. Dailey's arguments on appeal acknowledge, "Jones is responsible for paying his attorney fee from the amount recovered from Citizens pursuant to the agreement." Yet, Dailey's arguments on appeal appear to argue *VHS* was responsible for paying Dailey's attorney fee by accepting a reduction in the amount billed. That is, it seems Dailey believes the trial court erred by failing to reduce the amount owed to VHS by the one-third fee articulated in the contingency agreement between Jones and Dailey. As we discuss, while attorneys hold an equitable right to collect fees, medical providers are not obliged to reduce their amount charged to cover an insured's attorney fees.

"Michigan recognizes a common law attorney's lien on a judgment or fund resulting from the attorney's services." *Dunn v Bennett*, 303 Mich App 767, 778; 846 NW2d 75 (2014) (citation omitted). A "charging lien is an equitable right to have the fees and costs due for services secured out of the judgment or recovery in a particular suit." *George v Sandor M Gelman, PC*, 201 Mich App 474, 476; 506 NW2d 583 (1993). "The attorneys' charging lien creates a lien on a judgment, settlement, or other money recovered as a result of the attorney's services." *Id.*

> The [attorney's charging] lien exists as part of the court's inherent power to oversee the relationship of attorneys, as officers of the court, with their clients. It does provide a means of securing the legitimate interest of the attorney in payment for his services and expenses on behalf of the client, but it is subject to the control of the court for the protection of the client and third parties as well . . . . [*Souden v Souden*, 303 Mich App 406, 411; 844 NW2d 151 (2013) (quotation marks and citation omitted).]

Under the "American rule," "attorney fees are not ordinarily recoverable unless a statute, court rule, or common-law exception provides to the contrary." *Popma v Auto Club Ins Ass'n*, 446 Mich 460, 474; 521 NW2d 831 (1994). One such exception is the common-fund exception, which is applied on the basis of equity. *Id.* at 475.

> [The common-fund exception] generally only applies when a prevailing party creates or protects a common fund that benefits itself as well as others. In such a case, courts of equity have traditionally held that it is unfair to allow others to benefit at the expense of the prevailing party without contributing to the costs incurred in securing the common fund. [*Id.*]

Though not explicitly stated, Dailey's arguments on appeal essentially contend it is entitled to attorney fees under the common-fund exception. Indeed, Dailey argues it "has a right to be paid for its services from the amount recovered from Citizens pursuant to its contingency fee agreement with Jones." This is similar to Dailey's argument to the trial court which averred: "It is . . .

-7-

ridiculous and unjust for Dailey Law Firm to bear the time and expense of litigating [VHS's] bills without payment in return." In support of this argument, Dailey pointed to this Court's analysis in *Miller v Citizens Ins Co*, 288 Mich App 424, 426; 794 NW2d 622 (2010) (*Miller I*), aff'd in part, rev'd in part 490 Mich 905 (2011).

In *Miller I*, this Court used the common-fund exception to allow the plaintiff's attorney to collect fees from the medical payments made under the plaintiff's no-fault insurance coverage. *Id.* at 442. This Court reasoned the medical provider received benefits negotiated by the plaintiff's attorneys and "[i]t would be unfair to allow the [medical provider] . . . to benefit from the efforts of [the] plaintiff's attorneys without contributing to the costs incurred in securing insurance proceeds and the common fund." *Id.* at 438. In reaching this conclusion, this Court stated: "[the] plaintiff's attorneys were entitled to have part of their attorney fees deducted from the payment to be made to the [medical provider] for medical services provided . . . ." *Id.* at 442.

Despite Dailey's reliance on *Miller I*, in *Miller v Citizens Ins Co*, 490 Mich 905, 905 (2011) (*Miller II*), our Supreme Court rejected, in part, this Court's application of the common-fund exception in these circumstances, stating:

> This is an attorney fee dispute arising out of an action for benefits under the no-fault act, MCL 500.3101 *et seq.* As the Court of Appeals implicitly recognized, the [medical provider] is not liable for [the] plaintiff's attorney's fees under the no-fault act. We agree that [the] plaintiff is responsible for payment of her attorney fees consistent with the contingency fee agreement. Consistent with the common-law American rule, the no-fault act generally requires each party to pay its own attorney fees . . . . However, the Court of Appeals' reliance on the common-fund exception to the American rule was erroneous because no common fund was created.
>
> Of concern to this Court is that the circuit court's order, and the Court of Appeals' affirmance, could be mistakenly interpreted as extinguishing the [medical provider's] contractual right to payment for its services. We wish to make clear that this is not the case. No-fault benefits are "payable to or for the benefit of an injured person . . . ." MCL 500.3112. In this case, through settlement, the benefits were paid to [the] plaintiff, and her attorney asserted an attorney's charging lien over the settlement proceeds. Thus, the effect of this was only to settle claims as between the insurer, plaintiff, and her attorney. The circuit court's order of dismissal pursuant to the settlement agreement did not have the effect of extinguishing the [medical provider's] right to collect the remainder of its bill from plaintiff. Such a result could not have been achieved without an explicit waiver, or at least unequivocal acquiescence, by the [medical provider], which was not obtained. [*Id.*]

*Miller II* reiterates two principles discussed by the parties. *Miller II* acknowledged an attorney's right to collect attorney fees under a contingency agreement. *Id.* Even so, our Supreme Court concluded this right does not "extinguish[] the [medical provider's] contractual right to payment for its services." *Id.* That is, a medical provider is not obliged to reduce its costs to contribute to an insured's attorney fees. *Id.*

-8-

Again, the trial court's order did not preclude Dailey from recovering attorney fees. By awarding VHS the entire amount of funds from the Citizens checks, the trial court effectively restricted Dailey from recovering attorney fees from VHS. This order did not, however, prevent Dailey from receiving compensation for its efforts. As Dailey states, "Jones is responsible for paying his attorney fee from the amount recovered from Citizens pursuant to the agreement." To the extent Dailey believes it is owed attorney fees, Dailey's remedy is to file suit against Jones. Because the trial court's order did not limit Dailey's rights in this regard, there is no error for which reversal is warranted.

Dailey also presents several arguments which are abandoned on appeal. First, Dailey argues the "trial court invalidated its rights to the funds as a joint payee." Second, Dailey contends, VHS's motion for summary disposition "did not claim actual damages but skipped right to treble damages." Third, Dailey argues "VHS's remedy lies with the bank accepting the deposited checks." These arguments were not contained within the questions presented and are insufficiently briefed; therefore, they are abandoned on appeal. See MCR 7.212(C)(5); *Ketchum Estate v Dep't of Health & Human Servs*, 314 Mich App 485, 506-507; 887 NW2d 226 (2016); *English v Blue Cross Blue Shield of Mich*, 263 Mich App 449, 458; 688 NW2d 523 (2004) (citation omitted).

Affirmed.


/s/ Kathleen Jansen
/s/ Mark J. Cavanagh
/s/ Michael J. Riordan

-9-

# EXHIBIT "H"

State of Michigan

Attorney Discipline Board

**Grievance Administrator,**
**Michigan Attorney Grievance Commission,**

    Petitioner,

**Case No. 22-77-GA**

v

**Brian T. Dailey, P39945,**

    Respondent.

_____/

## Formal Complaint

## (Parties and Jurisdiction)

1.    Petitioner, Grievance Administrator, is authorized by MCR 9.109(B)(6) to prosecute this Formal Complaint by the Attorney Grievance Commission, which is the prosecution arm of the Supreme Court for the discharge of its constitutional responsibility to supervise and discipline Michigan attorneys.

2.    As a licensed Michigan attorney, Respondent Brian T. Dailey, P39945, is subject to the jurisdiction of the Supreme Court and the Attorney Discipline Board as set forth in MCR 9.104.

3.    Michigan attorneys have a duty to conduct themselves personally and professionally at all times in conformity with the standards imposed on members of the bar as a condition of the privilege to practice law.

4.     Respondent is a Michigan attorney who was licensed in 1987 and who resides or has his place of business in the County of Wayne.

## COUNT ONE – DAYA CASE

### (Factual Allegations)

5.     On or about early November of 2010, Respondent was retained to replace Plaintiff's counsel in *Christopher Daya v Onaissa Zahra Bacha and Fatima Bacha*, in Wayne County Circuit Court Case No. 09-029003-NI (*Daya*).

6.     On or about November 1, 2010, an Order Granting Plaintiff's Counsel Motion to Withdraw was entered by Hon. Robert L. Ziolkowski.

7.     On or about November 1, 2010, Respondent was ordered to reimburse Gursten, Christensen and Raitt, PC (Gursten) the full amount of costs totaling $5,495.15 that was paid to Respondent.

8.     Respondent initially agreed to reimburse Gursten per the order, but then refused to do so.

9.     After Gursten made repeated requests for payment from Respondent, a Motion to Show Cause was filed in Wayne County Circuit Court in 2012.

10.     On March 16, 2012, a Hearing on Motion to Show Cause and for Order of Garnishment was held before Judge Ziolkowski and Respondent was again ordered to repay Gursten $5,495.15 within 10 days.

11.     On March 20, 2012, a seven-day order was submitted to the court and on March 27, 2012, the Order Granting Motion to Show Cause and for Order of

2

Garnishment was entered ordering Respondent to repay Gursten $5,495.15 as ordered on March 16, 2012.

12.    Over the next two years, Respondent refused to make payment to Gursten as ordered on March 16, 2012 and as reflected in the written order dated March 27, 2012.

13.    On March 5, 2014, a Motion to Quash the November 1, 2010, Order Granting Plaintiff's Motion to Withdraw and reimburse Gursten, PC and the March 27, 2012, Order granting Motion to Show Cause for Order of Garnishment to reimburse Gurston, PC was filed and on March 6, 2014, a hearing on the Motion to Quash was held before Judge Ziolkowski in *Daya* to determine if the court would set aside the order of March 27, 2012, for the purpose of resolving the outstanding attorney fees and costs due to Gursten from Respondent.

14.    Judge Ziolkowski stated on the record that the Order Granting Motion to Show Cause and For Order of Garnishment entered on March 27, 2012 was valid and accurately reflected his rulings, and that they had not been followed by Respondent.

15.    On or about March 20, 2014, an order was entered by stipulation between Respondent and Paul Broschay, attorney for Mr. Daya, and Joshua Terebelo, attorney for Michigan Auto Law, that Gursten be paid $7,000 for the costs owed from the Order dated March 27, 2102, plus additional attorney fees pursuant to MCR 2.114 from the $10,000 in funds to be received by Respondent.

16.    Respondent did not pay the funds to Gursten as ordered.

3

## (Grounds for Discipline)

17.    By reason of the conduct described above in Count One of this Formal Complaint, Respondent has committed the following misconduct and is subject to discipline under MCR 9.104 as follows:

    a)    Failed to promptly pay or deliver any funds that a third person is entitled to receive, in violation of MRPC 1.15(b)(3);

    b)    knowingly disobeyed an obligation under the rules of a tribunal, in violation of MRPC 3.4(c);

    c)    engaged in conduct involving dishonesty, fraud, deceit or misrepresentation or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer, in violation of MRPC 8.4(b);

    d)    engaged in conduct that is prejudicial to the proper administration of justice, in violation of MRPC 9.104(1);

    e)    engaged in conduct that exposes the legal profession or the court to obloquy, contempt, censure, or reproach, in violation of MCR 9.104(2); and,

4

f)      engaged in conduct that is contrary to justice, ethics, honesty, or good morals, in violation of MCR 9.104(3).

## COUNT TWO – HERMIZ CASE
### (Factual Allegations)

18.    At all times relevant to this complaint, Respondent represented the Plaintiff in *Sultana Hermiz v Rahul Mahajan and Rakesh Mahajan*, Macomb County Circuit Court, Case No. 09-2170-NI (*Hermiz*).

19.    On or about September 9, 2011, an arbitration award was entered in *Hermiz* in the amount of $60,000.00.

20.    On or about September 9, 2011, Progressive Michigan Insurance issued check number 471535850 in the amount of $60,000.00 on a PNC Bank account for full and final settlement of claims.

21.    The check was jointly payable to Sultana Hermiz, The Dailey Law Firm, PC and Gursten, Koltonow, Gursten, Christensen & Raitt, PC only.

22.    On or about September 13, 2011, Sultana Hermiz signed an Invoice for Attorney Fees & Costs agreeing to client expenses for Gursten in the amount of $1,338.98.

23.    At all times relevant to this formal complaint and prior to 2012, Respondent maintained an IOLTA with Talmer Bank (f/k/a First Place Bank), titled DAILEY LAW FIRM PC IOLTA ACCOUNT, account number xxxxxx5575. (IOLTA Account #5575).

5

24.     On or about September 13, 2011, Respondent deposited Settlement Check No. 471535850 in the amount of $60,000.00 into IOLTA Account #5575.

25.     On September 13, 2011, Respondent drafted the following checks from his IOLTA Account #5575:

a)      Check No. 2108 payable to Dailey Law Firm PC in the amount of $4,368.98 for expenses;

b)      Check No. 2109 payable to Dailey Law Firm PC in the amount of $18,843.00 for his fee; and,

c)      Check No. 2110 payable to Sultana Hermiz for $37,087.35.

26.     Respondent's drafting of check numbers 2108, 2109 and 2110 from IOLTA Account #5575 totaled $60,299.33.

27.     Thereafter, Respondent did not pay Gursten for attorney fees ordered and Respondent did not hold Gursten's fees in his IOLTA Account #5575.

28.     At all times relevant to this formal complaint and prior to 2012, Respondent maintained a Business Account with Talmer Bank (f/k/a First Place Bank, titled DAILEY LAW FIRM, PC, Account Number xxxxxx5525 (Business Account #5525).

29.     On or about April 8, 2015, and only after settlement of *Daya,* did Respondent pay Gursten $1,338.98 with funds from his Business Account #5525 with Check No. 5525.

6

**(Grounds for Discipline)**

30. By reason of the conduct described above in Count Two of this Formal Complaint, Respondent has committed the following misconduct and is subject to discipline under MCR 9.104 as follows:

a) failed to promptly pay or deliver any funds that a third person is entitled to receive in violation of MRPPC 1.15(b)(3)

b) failed to hold disputed property separate from the lawyer's property until the dispute is resolved in violation of MRPC 1.15(c);

c) failed to hold property of clients or third persons in connection with a representation separate from the lawyer's own property, in violation of MRPC 1.15(d).

d) engaged in conduct involving dishonesty, fraud, deceit or misrepresentation or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer, in violation of MRPC 8.4(b);

e) engaged in conduct prejudicial to the administration of justice, in violation of MRPC 8.4(c) and MCR 9.104(1); and,

7

f)      engaged conduct that exposes the legal profession or the court to obloquy, contempt, censure, or reproach, in violation of MCR 9.104(2).

## COUNT THREE – STEVEN LEHTO

### (Factual Allegations)

31.    Attorney Steven Lehto, (Mr. Lehto) and Respondent entered into an agreement in or about 2010 whereby Mr. Lehto and Respondent would serve as co-counsel on lemon law cases in Michigan.

32.    Respondent agreed that Mr. Lehto would retain clients, work on files, and settle cases remotely while living in Florida and Respondent would attend court proceedings in Michigan when necessary.

33.    Respondent agreed that his firm, Dailey Law Firm, PC, would split the net value of any settlements, less costs which included 10 percent of the total fee to his associate, attorney Justin Grove, and the remaining balance would be split 50/50 between Mr. Lehto and Respondent.

34.    A retainer fee agreement was prepared to be used in conjunction with Michigan "Lemon Law" cases Mr. Lehto would have with Respondent.

35.    During the years of 2012-2013, Respondent received settlement funds for the following cases shared with Mr. Lehto:

a)      William Williamson –*William Williamson v Ford Motor Co, et al*, Wayne County Circuit Court Case

8

No. 12-001376-CP, filed February 1, 2012 and resolved January 22, 2013;

b) Renee Vives –*Renee Vives v Ford Motor Co. et* al, Wayne County Circuit Court Case No. 12-005256-CP, filed April 18, 2012 and settled March 7, 2013;

c) Tamera Malkowski – *Tamera Malkowski v Mazda Motor of America et al*, Wayne County Circuit Court Case No. 12-000274-CP, filed January 6, 2012 and settled March 6, 2013;

d) Rochelle Price – *Rochelle Price v Chrysler Group*, Oakland County Circuit Court Case No. 12-016342-CP, filed January 22, 2013 and settled September 12, 2013;

e) Catherine Kuban- *Catherine Kuban v Ford Motor Co. et al*, Wayne County Circuit Court Case No. 12-001917-CP, filed September 11, 2012 and settled April 29, 2013;

f) Frank Sorrentino – *Frank Sorrentino v General Motors et al*, St. Clair County Circuit Court Case No. 12-001917-CP, filed August 6, 2012 and settled March 27, 2013; and,

9

g) Milton Spokojny – *Milton Spokojny v Ford Motor Co. et al*, Wayne County Circuit Court Case # 12-007343-CP, filed May 31, 2012 and settled March 5, 2013.

36. Respondent deposited settlement funds from *William v. Ford Motor Co.* directly into his Dailey Law Firm, PC, Business Account #5525 on January 22, 2013, in the amount of $6,000.00.

37. On January 24, 2013, Respondent wire transferred $6,000.00 from his Business Account #5525 to his IOLTA Account #5575 to correct the earlier deposit.

38. On or about March 1, 2013, Mr. Lehto began attempting to contact Respondent by telephone for payment on the seven aforementioned cases and when unable to reach Respondent by telephone, Mr. Lehto also sent Respondent text messages and email messages seeking payment.

39. In March of 2013, Respondent told Mr. Lehto that payment to him was forthcoming but that Respondent was having trouble with funds and needed additional time to pay Mr. Lehto the money Respondent owed him.

40. Respondent has failed to pay Mr. Lehto the money Respondent owes Mr. Lehto to date.

**(Grounds for Discipline)**

41. By reason of the conduct described above in Count Three of this Formal Complaint, Respondent has committed the following misconduct and is subject to discipline under MCR 9.104 as follows:

10

a) failed to promptly pay or deliver any funds that a third person is entitled to receive, and failed to promptly render a full accounting regarding the funds, in violation of MRPC 1.15(b)(3);

b) engaged in conduct involving dishonesty, fraud, deceit or misrepresentation or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer, in violation of MRPC 8.4(b);

c) conduct that is prejudicial to the proper administration of justice, in violation of MRPC 8.4(c) and 9.104(1);

d) engaged in conduct that exposed the legal profession or the courts to obloquy, contempt, censure or reproach, in violation of MCR 9.104(2); and,

e) engaged in conduct that is contrary to justice, ethics, honesty, or good morals, in violation of MCR 9.104(3).

## COUNT FOUR – SUZANNE M. WICKETT

### (Factual Allegations)

42. On or about July 19, 2017, Suzanne M. Wickett (Ms. Wickett) was hired by Respondent to work as a bookkeeper in Respondent's law firm.

11

43.     Respondent was to pay Ms. Wickett by check for her services rendered to Respondent and Dailey Law Firm, PC.

44.     On or about August 22, 2017, Ms. Wickett deposited check #6115 in the amount of $1,1480.00 from Respondent's Business Account #5525 for wages.

45.     Respondent's check was retuned for nonsufficient funds.

46.     Respondent did not pay Ms. Wickett her wages for the weeks of September 1, 2017 and September 8, 2017.

47.     On September 15, 2017, Respondent promised Ms. Wickett that he would pay her back wages.

48.     Ms. Wickett's final day in Respondent's employment was September 15, 2017.

49.     On September 18, 2017, Ms. Wickett was instructed not to come to work at Dailey Law Firm, PC, and Ms. Wickett requested that Respondent pay her back wages as promised to her by Respondent on September 15, 2017.

50.     Thereafter, Ms. Wickett's requests for payment for her wages from Respondent were ignored by Respondent.

51.     On or about November 21, 2017, Ms. Wickett filed claim number 195406 with the Michigan Department of Licensing and Regulatory Affairs (LARA) associated with Respondent's failure to pay her wages.

52.     A Regulation Agent with LARA mailed Respondent a letter on December 18, 2017, advising that the investigation disclosed $2,210.00 was due to

Ms. Wickett and that Respondent was to pay this amount no later than December 21, 2017.

53.    Respondent did not pay the amount owed to Ms. Wickett by December 21, 2017.

54.    On January 31, 2018, LARA issued a Determination Order finding Respondent violated MCL 408.472(1), 408.475(2), 408.479(1)-(3) of the Payment of Wages and Fringe Benefits Act.

55.    The Determination Order required Respondent to pay Ms. Wickett $2,210 in gross wages, 10% a year interest of $.60 per day beginning November 12, 2017, until the determined amount was paid. Respondent was further assessed a civil penalty of $1,000 for his violation of the Act.

56.    Respondent appealed the LARA Determination Order.

57.    A hearing was held on May 4, 2018, before Administrative Law Judge David Cohen.

58.    Ms. Wickett, LARA representatives, and Respondent were present for the hearing.

59.    On June 4, 2018, Judge Cohen issued a decision affirming the LARA Determination Order and required Respondent to pay Ms. Wickett and submit payment to the State of Michigan.

60.    On September 18, 2018, LARA notified Ms. Wickett that payment had not been made in accordance with the Determination Order and that the matter

13

was referred to the Michigan Attorney General's Office (Attorney General) to collect the amount due to Ms. Wickett.

61.     The office of Attorney General engaged in collection efforts from Respondent to ensure that he paid the amount due to Ms. Wickett.

62.     On or about September 3, 2019, approximately one year after the amount due was sent to collections with the Attorney General and two years after Ms. Wickett's employment ended with Respondent, payment was finally received by Ms. Wickett from the State of Michigan in the amount of $2,462.00.

## (Grounds for Discipline)

63.     By reason of the conduct set forth in Count Four of this Formal Complaint, Respondent has committed the following misconduct and is subject to discipline under MCR 9.104 as follows:

a)      knowingly disobeyed an obligation under the rules of a tribunal, in violation of MRPC 3.4(c);

b)      engaged in conduct involving dishonesty, fraud, deceit or misrepresentation or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer, in violation of MRPC 8.4(b);

c)      engaged in conduct prejudicial to the administration of justice, in violation of MRPC 8.4(c) and MCR 9.104(1);

14

d)     engaged in conduct that exposed the legal profession or the courts to obloquy, contempt, censure or reproach, in violation of MCR 9.104(2); and,

e)     engaged in conduct that is contrary to justice, ethics, honesty or good morals, in violation of MCR 9.104(3).

## COUNT FIVE – DALEN HANNA

### (Factual Allegations)

64.    In or about 2017, Respondent employed Rodney Lloyd (Mr. Lloyd) as an assistant and made payments to Mr. Lloyd via business check.

65.    Mr. Lloyd would tender the checks from Respondent to Greenfield Super Market (GSM) in use of check cashing services offered by GSM.

66.    From November 17 to November 22, 2017, three checks that Respondent issued to Mr. Lloyd, totaling the sum of $2,600.00, were returned for Not Sufficient Funds that were cashed at GSM, each resulting in a $25 fee, for a total of $2,675.00

67.    GSM contacted Respondent and was promised by Respondent that the checks would be replaced after November 17, 2017.

68.    On or about December 8, 2017, Respondent issued Check No. 11341 from his Dailey Law Firm, PC Business Account #5525, payable to GSM in the amount of $2,675.00.

15

69. On or about December 12, 2017, Check No. 11341 was returned for Not Sufficient Funds.

70. Respondent's conduct for issuing a non-sufficient fund check in the amount of $2,675.00 is a violation of MCL 750.131.

71. GSM made further attempts to be paid by Respondent after Check No. 11341 was deemed Not Sufficient Funds by the bank, but Respondent did not respond to these further attempts of GSM for payment, from December of 2017 to August of 2018.

72. GSM then retained Dalen Patrick Hanna, P81533 (Attorney Hanna) to collect the funds that were owed by Respondent.

73. Attorney Hanna made several attempts to collect the funds Respondent owed GSM without litigation, from August to December of 2018.

74. On August 6, 2018, Attorney Hanna sent Respondent a Notice of Dishonored Check & Demand for Immediate Payment.

75. Respondent did not pay the amount owed to GSM.

76. On August 27, 2018, Attorney Hanna advised Respondent that he would be filing a lawsuit if Respondent did not pay the money he owed to GSM.

77. Respondent did not respond to Attorney Hanna's attempt to settle the matter prior to filing a lawsuit.

78. On December 14, 2018, Respondent filed a complaint for declaratory judgment in the matter captioned *Dailey Law Firm PC v Greenfield Super Market, Inc.*, 36th District Court, Case No. 18-179031-GC.

79.     On December 14, 2018, Attorney Hanna, on behalf of GSM, filed a Complaint against Respondent, in *Greenfield Supermarket, Inc., v Brian Thomas Dailey and Dailey Law Firm, PC*, 48th District Court, Case No. 18-34476-GCZ before the Hon. Diane D'Agostini.

80.     Respondent filed a motion to dismiss the civil case in the 48th District Court, which was denied on February 28, 2019, before Judge D'Agostini.

81.     On April 4, 2019, Judge D'Agostini granted Plaintiff's Motion for Sanctions Against Respondent and Defendant Dailey Law Firm, PC.

82.     Judge D'Agostini ordered sanctions be paid by Respondent pursuant to MCR 2.114(D), (E), and MCL 600.2591 in the amount of $1,500 within seven days of the entry of the order.

83.     In making her ruling, Judge D'Agostini stated that she found Respondent's defense "to absolutely be frivolous."

84.     On April 24, 2019, *Dailey v. Greenfield Supermarket* was dismissed with prejudice with no costs or fees to either party in the 36th District Court after Attorney Hanna filed a Motion for Summary Disposition on behalf of GSM.

85.     On May 2, 2019, a judgment was entered against Respondent and Dailey Law Firm PC, in the 48th District Court for $2,805, not including statutory interest, which was then served on the parties or their attorneys by first-class mail addressed to their last known addresses as defined by MCR 2.107(C)(3).

86.     To date, Respondent has not paid the sanction amount and the judgment amount entered to date in the 48th District Court case.

17

**(Grounds for Discipline)**

87.   By reason of the conduct described above in Count Five of this Formal Complaint, Respondent has committed the following misconduct and is subject to discipline under MCR 9.104 as follows:

a)   failed to promptly pay or deliver any funds that a third person is entitled to receive, in violation of MRPC 1.15(b)(3);

b)   asserted a frivolous to a proceeding, in violation of MRPC 3.1;

c)   knowingly disobeyed an obligation under the rules of a tribunal, in violation of MRPC 3.4(c);

d)   violated or attempted to violate the Rules of Professional Conduct, in violation of MRPC 8.4(a);

e)   engaged in conduct involving dishonesty, fraud, deceit or misrepresentation or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer, in violation of MRPC 8.4(b);

f)   engaged in conduct that is prejudicial to the proper administration of justice, in violation of MRPC 8.4(c) and MCR 9.104(1);

18

g) engaged in conduct that exposes the legal profession to obloquy, contempt, censure, or reproach, in violation of MCR 9.104(2);

h) engaged in conduct that is contrary to justice, ethics, honesty, or good morals, in violation of MCR 9.104(3); and,

i) engaged in conduct that violated a criminal law of a state or of the United States in violation of MCR 9.104(5).

## COUNT SIX – ARON ORTH
### (Factual Allegations)

88. On or about August 10, 2011, Maria Orth (Mrs. Orth) was involved in an automobile accident and suffered injuries as a result of this incident.

89. In 2013, Mrs. Orth retained Respondent for representation.

90. On April 7, 2014, Respondent filed a complaint in the matter captioned *Maria Orth v Bristol West Preferred Insurance Company*, Wayne County Circuit Court Case No. 14-004466-NI.

91. The case settled and a check in the amount of $175,000.00 was issued on March 27, 2015, jointly payable to Dailey Law Firm, PC and Maria Orth.

92. A deposit slip shows the settlement check was deposited into Respondent's IOLTA Account #5575 on April 7, 2015.

93. Mrs. Orth passed away on December 22, 2015.

19

94.     At the time of Mrs. Orth's death, Respondent had not disbursed all of the settlement funds.

95.     Mrs. Orth's family contacted Respondent for disbursement of the settlement funds to pay for her funeral expenses.

96.     Bank records from Respondent's IOLTA Account #5575 reflect that the following wire transfers were made to Mrs. Orth and/or Michael Orth (her spouse):

- 07/07/2015: $3,000

- 08/21/2015: $3,000

- 10/16/2015: $3,000

- 12/04/2015 $3,000

- 01/06/2016: $5,000

- 09/21/2016: $5,000

- 01/10/2017: $3,025

97.     There was a Medicaid lien on the settlement funds in the amount of $13,889.98.

98.     Additionally, the amount of $8,495.00 was owed to Plaintiff Investment Funding.

99.     Expenses in the case totaled $1,531.19.

100.    Payment from Respondent's IOLTA Account #5575 show that Plaintiff Investment Funding was paid in full on April of 2015.

20

101.     Attorney fees and expenses in the total amount of $29,622.68 were paid to attorney Scott Decius, an associate of Respondent's firm. The total attorney fee from the settlement was $57,827.94.

102.     Because Respondent did not disburse Mrs. Orth's settlement funds timely prior to her death, the settlement funds became a part of her probate estate.

103.     On or about January 4, 2016, Mr. Orth retained Respondent to file a probate court case for the estate of Mrs. Orth.

104.     Respondent's minimum fee was listed for $7,500, but his proposed retainer agreement is unsigned, and Respondent did not open a probate estate for Mrs. Orth.

105.     Respondent's fee agreement violated MCR 5.313 because the retainer agreement is unsigned.

106.     On January 5, 2016, Respondent wire transferred $7,500 from his IOLTA Account #5575 to his Business Account #5525, before an estate was opened.

107.     On January 6, 2016, Respondent disbursed additional settlement funds to Mr. Orth in the sum of $5,000. On September 21, 2016 Respondent disbursed additional settlement funds to Mr. Orth in the sum of $5,000 and on January 10, 2017, Respondent disbursed additional settlement funds to Mr. Orth in the sum of $3,025.00

108.     In or about February of 2017, the family of Maria Orth retained Anthony McClerklin, P74296, (Attorney McClerklin) to open and probate the Estate of Maria Orth.

21

109. On February 14, 2017, Attorney McClerklin commenced a probate action titled *Estate of Maria Orth*, Eaton County Probate Court, Case No. 17-52997-DE.

110. On August 4, 2017, Mr. Orth passed away.

111. On January 26, 2018, Maria Orth's son, Aron Orth, was appointed as the personal representative of her estate.

112. On September 17, 2017, Respondent's associate, Kyle Dupuy, filed a statement and proof of claim asserting an attorney fee in the amount of $10,795.00 for professional services rendered in the probate matter and for a Medicaid lien in the amount of $13,889.98. Respondent's fee was clearly excessive.

113. The statement filed by Respondent's firm includes an account statement that falsely stated that $7,500 of Respondent's fee was retained in his IOLTA Account #5575.

114. Respondent's IOLTA Account #5575 records show a wire transfer of the amount of $7,500.00 from Respondent's IOLTA to Respondent's Business Account #5525 on January 5, 2016.

115. On April 27, 2018, a Notice of Disallowance of Claim regarding Respondent's firm's request for the attorney fee was filed.

116. On June 26, 2018, Respondent filed a civil complaint against the Estate of Maria Orth, in *Dailey Law Firm PC v Michael Orth Individually as Personal Representative of the Estate of Maria Elidia Orth and Aaron Orth as*

22

*Personal Representative of the Estate of Maire Elidia Orth*, Wayne County Circuit Court, Case No. 18-007194-CK.

117.    In Respondent's first amended complaint filed on October 2, 2018, Respondent alleged breach of contract, unjust enrichment, and detrimental reliance, and sought declaratory and equitable relief.

118.    Respondent's amended civil complaint specifically alleged that Respondent was owed costs and fees in the amount of $10,795.

119.    Respondent further alleged in his civil complaint that he was attempting to disburse funds to the proper payees, including Medicaid and Medicare, but that the civil defendants had not given authority to disburse the funds.

120.    Respondent alleged that the liens to Medicaid and Medicare "are believed to be in an amount in excess of $25,000."

121.    On or about July 17, 2019, the parties to the civil complaint brought by Respondent negotiated a settlement and placed the settlement on the court's record.

122.    Under the terms of the settlement agreement Respondent was to pay the Medicare lien, leaving a settlement fund balance of $57,755.89.

123.    Respondent was to retain $17,000 as full and final settlement of Respondent's claim.

124.    A payment of $40,755.89 was owed to the estate within 24 hours of signature by the civil defendant.

125. On August 7, 2019, Respondent requested that Aron Orth sign the settlement agreement and release.

126. On August 12, 2019, a settlement agreement and release of claims was executed by Aron Orth, individually and as personal representative of the estate.

127. Thereafter, Respondent did not pay the estate or the Medicare lien.

128. On or about August 30, 2019, a motion to enforce settlement and compel payment of coasts and attorney fees was filed by the civil defendants and served on Respondent.

129. On September 6, 2019, Respondent issued checks payable to the estate and the Michigan Department of Community Health.

### (Grounds for Discipline)

130. By reason of the conduct set forth in Court Six of this Formal Complaint, Respondent has committed the following misconduct and is subject to discipline under MCR 9.104:

    a)    Neglected a legal matter, in violation of MRPC 1.1(c);

    b)    failed to act with reasonable diligence and promptness in representing a client, in violation of MRPC 1.3;

    c)    failed to promptly pay or deliver any funds that a third person is entitled to receive, in violation of MRPC 1.15(b)(3);

24

d)      knowingly disobeyed an obligation under the rules of a tribunal, in violation of MRPC 3.4(c);

e)      Charging or collecting, or attempting to charge or collect, clearly illegal or excessive fees in violation of MRPC 1.5(a) and MCR 5.313 (B).

f)      engaged in conduct involving dishonesty, fraud, deceit or misrepresentation or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer, in violation of MRPC 8.4(b);

g)      engaged in conduct that is prejudicial to the proper administration of justice, in violation of MRPC 9.104(1);

h)      engaged in conduct that exposed the legal profession of the courts to obloquy, contempt, censure or reproach, in violation of MCR 9.104(2); and,

i)      engaged in conduct that is contrary to justice, ethics, honesty or good morals, in violation of MCR 9.104(3).

## COUNT SEVEN – ARTHUR OROFINO

### (Factual Allegations)

131.    On or about November 29, 2016, Arthur Orofino (Mr. Orofino) was involved in an automobile accident.

132. On or about May 3, 2017, Mr. Orofino retained Respondent by contingent fee agreement for all claims arising from the automobile accident including first- and third-party claims.

133. On July 11, 2017, Respondent filed the matter captioned *Arthur Andrew Orofino v Travelers Indemnity Company*, Wayne County Circuit Court Case No. 17-101508-NF (*Travelers*).

134. On March 29, 2018, Respondent filed a case against the driver of the other automobile in a matter captioned *Arthur Orofino v Bassam Naoum*, Oakland County Circuit Court Case No. 2018-164734-NI (*Naoum*).

135. *Travelers* settled in June of 2018, for $80,000.

136. The $80,000 settlement check for Travelers was deposited into Respondent's IOLTA Account #5575 on July 12, 2018.

137. On June 11, 2019, approximately one year after receiving the settlement funds, Respondent drafted a distribution statement for Mr. Orofino to execute.

138. The no fault claims totaled just over $160,000. Respondent calculated his one-third fee on the amount of the no fault claims ($160,000), rather than on the settlement amount obtained ($80,000).

139. Also, on or about June 11, 2019, Respondent issued a check in the amount of $27,799.20 payable from his IOLTA Account #5575 to Mr. Orofino, from the *Travelers* settlement funds.

26

140. On June 12, 2019, Respondent deposited a settlement check for $110,000 representing the settlement funds for *Naoum*.

141. The $110,000 settlement check for Naoum was deposited in Respondent's IOLTA Account #5575 on June 12, 2019.

142. On July 3, 2019, Respondent's distribution statement for the $110,000 settlement in *Naoum* showed the net due to Mr. Orofino was $71,962.81 after deduction of costs and Respondent's one-third fee.

143. On July 3, 2019, Respondent issued check number 16154 from his Business Account #5525 to Mr. Orofino in the amount of $71,962.81.

144. Respondent's check number 16154 to Mr. Orofino was returned for nonsufficient funds on July 5, 2019.

145. Respondent issued Mr. Orofino a second check number 15360 from his IOLTA Account #5575.

146. Respondent dated this second check to Mr. Orofino as July 3, 2019.

147. The check dated July 3, 2019 was then negotiated on July 9, 2019.

148. Respondent issued the following additional checks from his IOLTA Account #5575 on behalf of Mr. Orofino: (1) check payable to Executive Case Management LLC for $3,829.37 on August 15, 2019; and (2) check payable to Equian LLC for $2,670.64 on October 9, 2019.

149. Respondent did not promptly pay all the providers with outstanding balances on behalf of Mr. Orofino.

27

150. As a result of Respondent not promptly paying all the providers on behalf of Mr. Orofino, creditors continue to pursue payment.

151. Respondent answered that he paid half of the outstanding bills for Mr. Orofino and has not provided an update on the remainder due.

### (Grounds for Discipline)

152. By reason of the conduct set forth in Count Seven of this Formal Complaint, Respondent has committed the following misconduct and is subject to discipline under MCR 9.104 as follows:

    a) failed to act with reasonable diligence and promptness in representing a client, in violation of MRPC 1.3;

    b) Respondent charged or attempted to charge a clearly excessive fee in violation of MRPC 1.5(a);

    c) failed to promptly pay or deliver funds that a third person is entitled to receive, in violation of MRPC 1.15(b)(3);

    d) engaged in conduct involving dishonesty, fraud, deceit or misrepresentation or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer, in violation of MRPC 8.4(b);

28

e)    engaged in conduct that is prejudicial to the proper administration of justice, in violation of MRPC 9.104(1);

f)    engaged in conduct that exposed the legal profession or the courts to obloquy, contempt, censure or reproach, in violation of MCR 9.104(2); and,

g)    engaged in conduct that is contrary to justice, ethics, honesty or good morals, in violation of MCR 9.104(3).

## COUNT EIGHT – STEPHANIE DALLAS

### (Factual Allegations)

153.    On or about February 21, 2019, Stephanie Dallas (Ms. Dallas) was involved in an automobile accident.

154.    On March 5, 2019, Ms. Dallas met with Robert Smith, an associate of Respondent's firm.

155.    Ms. Dallas informed Respondent's associate that she had completed an application for no fault benefits with her insurer AAA Auto insurance (AAA) but had not been notified if AAA would voluntarily pay her benefits.

156.    Ms. Dallas was encouraged to retain Respondent's firm to handle the first-party benefits.

29

157. On March 5, 2019, Ms. Dallas executed a contingent fee agreement with Respondent that would allow for Respondent to recover one-third of the proceeds after costs.

158. After Ms. Dallas signed the contingent fee agreement with Respondent, AAA decided to voluntarily pay her first-party benefits.

159. Respondent received the first-party benefit checks for Ms. Dallas and deducted one-third of the money for his fee.

160. Respondent did not pay providers for Ms. Dallas.

161. As a result of Respondent's not paying these providers, Ms. Dallas had to pay the providers in order to continue to receive treatment.

162. As a result of Respondent's failure to pay providers for Ms. Dallas, her credit score was negatively impacted, and collection agencies began collection efforts.

163. In or about the summer of 2019, Respondent received and held lost wage benefit checks for Ms. Dallas for multiple months.

164. On or about September 16, 2019, Ms. Dallas terminated representation with Respondent, and requested her complete file and an accounting of AAA's payments to Respondent.

165. Respondent did not provide Ms. Dallas with her file or an accounting as requested.

166. On or about September 25, 2019, Ms. Dallas retained new counsel, Craig Nemier, P26476, who sent a letter to Respondent requesting the file for Ms. Dallas and the AAA Accounting.

167. Respondent did not respond to Attorney Nemier's correspondence.

168. On or about October 3, 2019, Attorney Nemier sent Respondent a copy of his previous letter requesting the file and the AAA Accounting regarding Ms. Dallas by email to Respondent.

169. Respondent did not answer.

170. On October 17, 2019, Attorney Nemier left a voicemail message and sent another email to Respondent regarding Ms. Dallas.

171. Respondent still did not respond to Attorney Nemier.

172. On February 5, 2020, Attorney Nemier filed a civil case against Respondent and his law firm in the matter captioned *Stephanie Dallas v ACIA et al*, Oakland County, Case No. 200-170465-NF.

173. Respondent filed an answer and a counter-complaint on March 12, 2020.

174. On June 18, 2020, Attorney Nemier filed a motion for partial summary disposition.

175. On August 5, 2020, Hon. Martha Anderson granted partial summary disposition in a written opinion and order.

176. On August 17, 2020, the Court entered an order requiring Respondent within 10 days of the entry of the order to:

<ol type="a" start="1">
<li>Pay Ms. Dallas whatever money she was owed for past lost wages less any attorney fee claimed through the present;</li>
<li>Pay every provider all monies owed to them without deducting any attorney fee; and,</li>
<li>Provide Ms. Dallas and her attorney a complete accounting or all checks received and all payments made.</li>
</ol>

177. Respondent did not comply with the Court's order.

178. As a result of Respondent failing to comply with the order of Judge Anderson, a provider for Ms. Dallas, Affiliated Diagnostics (Count Nine herein), filed an ex-parte motion for order to show cause on September 10, 2020.

179. An order for Respondent to show cause was issued on September 15, 2020, providing a date for hearing of September 30, 2020.

180. Attorney Nemier filed a motion to be included in the show cause order of September 18, 2020.

181. Respondent issued a check to Ms. Dallas on September 29, 2020, in the amount of $172.73.

182. Respondent did not provide an accounting as ordered.

183. On October 23, 2020, Attorney Nemier filed a show cause motion regarding the failure to provide an accounting.

184.    A hearing was conducted on November 25, 2020, at the Court found that Respondent had not yet complied with the August 17, 2020 order.

185.    The Court warned Respondent to file his accounting by December 2, 2020.

186.    Respondent filed his accounting with the court on December 1, 2020.

## (Grounds for Discipline)

187.    By reason of the conduct set forth in Count Eight of this Formal Complaint, Respondent has committed the following misconduct and is subject to discipline under MCR 9.104 as follows:

a)    failed to act with reasonable diligence and promptness in representing a client, in violation of MRPC 1.3;

b)    failed to promptly comply with a client's reasonable request for information, in violation of MRPC 1.4(a);

c)    failed to explain a matter to client to the extent reasonably necessary to permit the client to make informed decisions about the representation, in violation of MRCP 1.4(b);

d)    failed to promptly pay or deliver funds that a third person is entitled to receive and failed to promptly

33

render a full accounting of such funds, in violation of MRCP 1.15(b)(3);

e)  knowingly disobeyed an obligation under the rules of a tribunal, in violation of MRPC 3.4(c);

f)  engaged in conduct involving dishonesty, fraud, deceit or misrepresentation or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer, in violation of MRPC 8.4(b);

g)  engaged in conduct that is prejudicial to the proper administration of justice, in violation of MRPC 8.4(c) and MCR 9.104(1);

h)  engaged in conduct that exposed the legal profession or the courts to obloquy, contempt, censure or reproach, in violation of MCR 9.104(2); and,

i)  engaged in conduct that is contrary to justice, ethics, honesty or good morals, in violation of MCR 9.104(3).

## COUNT NINE - AFFILIATED DIAGNOSTICS

### (Factual Allegations)

188.  Petitioner realleges, as if cited verbatim, the Factual Allegations from Count Eight of this Formal Complaint.

34

189. On or around April of 2019, Affiliated Diagnostics performed MRI services for Ms. Dallas related to her February 12, 2019 automobile accident.

190. AAA allowed payments for two bills submitted by Affiliated Diagnostics in the amounts of $30,925 and $2,317.

191. AAA issued a check for $ $30,925 on April 26, 2019, which was deposited into Respondent's IOLTA Account #5575 on May 1, 2019.

192. AAA issued a check for $2,317 on May 14, 2019, which was deposited into Respondent's IOLTA Account #5575 on May 21, 2019.

193. Respondent did not promptly disburse the funds from AAA to Affiliated Diagnostics.

194. Respondent claimed a one-third fee on these funds.

195. On September 16, 2019, Ms. Dallas terminated Respondent.

196. The civil suit filed by Attorney Nemier resulted in an order to pay every provider all monies owed to them without holding out any money for attorney fees within ten days of entry of the order.

197. On August 20, 2020, attorney John Betz, P24468, filed a demand for payment on behalf of Affiliated Diagnostics in *Dallas v ACIA*.

198. Due to Respondent's failure to comply with the August 17, 2020 order of Judge Anderson in the civil action, Affiliated Diagnostics filed an ex-parte show cause motion against Respondent.

199. The motion for an order to show cause was granted on September 15, 2020.

35

200. The Court scheduled an evidentiary hearing for September 30, 2020.

201. On September 29, 2020, Affiliated Diagnostics filed an acknowledgement of receipt of a check from Respondent in the total amount of $23,242.

### (Grounds for Discipline)

202. By reason of the conduct set forth in Count Nine of this Formal Complaint, Respondent has committed the following misconduct and is subject to discipline under MCR 9.104 as follows:

a) failed to promptly pay or deliver funds that a third person is entitled to receive, and failing to promptly render a full accounting regarding such funds, in violation of MRPC 1.15(b)(3);

b) knowingly disobeyed an obligation under the rules of a tribunal, in violation of MRPC 3.4(c);

c) engaged in conduct involving dishonesty, fraud, deceit or misrepresentation or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer, in violation of MRPC 8.4(b);

d) engaged in conduct prejudicial to the administration of justice in violation of MRPC 8.4(c) and MCR 9.104(1);

e) engaged in conduct that exposed the legal profession or the courts to obloquy, contempt, censure or reproach, in violation of MCR 9.104(2); and,

f) engaged in conduct that is contrary to justice, ethics, honesty or good morals, in violation of MCR 9.104(3).

## COUNT TEN – JULIUS HARDEN

### (Factual Allegations)

203. On October 27, 2017, Julius Harden (Mr. Harden) was injured in an automobile accident.

204. On or around November 15, 2017, Respondent entered into a contingent fee agreement with Mr. Harden.

205. Mr. Harden submitted a third-party automobile negligence claim against the other driver involved in the accident with Mr. Harden.

206. The other driver had insurance with GEICO in the amount of $20,000 per person and $40,000 per accident.

207. Respondent recovered $20,000 from the insurance company for Mr. Harden's claim.

208. On December 5, 2018, the $20,000 check was deposited into Respondent's IOLTA Account #5575.

209. On March 1, 2019, nearly 90 days later, Respondent issued check number 15284 in the amount of $12,835.96 payable to Mr. Harden.

37

210. On January 18, 2019, Respondent filed in Wayne County Circuit Court the case of *Julius Harden v Meemic Insurance Company*, Case No. 19-000859-NI, seeking underinsured motorist benefits.

211. On March 1, 2019, Respondent filed an amended complaint.

212. Between October 2017 and October of 2019, Mr. Harden's wife performed household services for Mr. Harden.

213. Mr. Harden submitted monthly household services statements directly to Meemic and would receive payment for these services directly from Meemic.

214. However, the checks issued by Meemic for September and October of 2019 for services were mistakenly sent to Respondent.

215. Respondent accepted the two checks from Meemic for household services, in the amounts of $380 and $320 respectively, and deposited same into Respondent's IOLTA Account #5575 on October 21, 2019, and November 8, 2019.

216. Respondent did not notify Mr. Harden that Respondent received the two household service checks, nor did Respondent obtain permission from Mr. Harden to deposit the funds from those two household service checks.

217. Mr. Harden, having not received the two household service checks, contacted Meemic and was informed the checks had been sent to Respondent.

218. Respondent asserted to Mr. Harden that the contingent fee agreement was never amended to provide for a contingent fee regarding the no fault PIP benefit claims, therefore an hourly fee was due.

38

219. Respondent told Mr. Harden if he distributed the funds received, Mr. Harden would not recover because the law firm had more hours worked collecting the PIP benefits than the $700 would cover.

220. Respondent refused to pay Mr. Harden the proceeds from the two household services checks.

221. The underinsured motorist claim against Meemic proceeded to arbitration, on November 19, 2019.

222. The arbitrators awarded underinsurance benefits in the amount of $22,500 in an arbitration award entered on November 20, 2019.

223. On November 26, 2019, Meemic issued a check in the amount of $22,500 to Respondent. This check was deposited into Respondent's IOLTA Account #5575 on December 6, 2019.

224. Meemic moved for summary disposition regarding any medical provider bills. Mr. Harden had a coordinated policy and, as such, the providers were to bill the medical insurer Blue Care Network.

225. On September 8, 2020, the motion for summary disposition was granted in Meemic's favor.

226. After more than 90 days without receipt of payment from Respondent, Mr. Harden retained attorney Jordan Altus, P82384, on March 17, 2021, to recover the proceeds from Respondent.

227. On March 26, 2021, Attorney Altus sent a demand letter to Respondent for payment of the money owed to Mr. Harden from the arbitration, and to Mrs. Harden for attendant care.

228. Respondent failed to reply to the demand letter.

229. Attorney Altus made continued attempts to contact Respondent and was unsuccessful.

230. In or about April of 2021, Respondent demanded that Mr. Harden sign a new contingent fee agreement.

231. Respondent prepared a new contingent fee agreement and settlement accounting dated April 14, 2021 and sent it to Attorney Altus.

232. Under the accounting prepared by Respondent, the total proceeds were $23,200. Expenses totaled $2,175.19 and attorney fees totaled $7,008.27.

233. As the parties negotiated a one-third contingent fee for all three checks involved, net proceeds owing to Mr. Harden totaled $14,016.72.

234. Attorney Altus returned the signed documents to Respondent.

235. Respondent then returned the accounting to Attorney Altus and asked that it be notarized resulting in further delay in disbursement to Mr. Harden. Attorney Altus complied with this additional request and returned the documents to Respondent on May 21, 2021.

236. Respondent refused to promptly disburse the funds to Mr. Harden upon receipt of the notarized accounting provided by Attorney Altus to Respondent.

40

237. On June 14, 2021, Attorney Altus filed a complaint in the Oakland County Circuit Court in *Julius Harden v Brian Dailey Law Firm*, Case 210188483-CZ.

238. Only after this litigation was initiated did Respondent issue a check dated June 18, 2021, in the amount of $14,016.72 for payment to Mr. Harden.

239. Respondent's failure to promptly turn over the proceeds to Mr. Harden caused Mr. Harden to expend money to recover the funds Mr. Harden was owed from Respondent.

240. Mr. Harden had a 50% contingency fee agreement with Attorney Altus to recover his funds from Respondent, resulting in Mr. Harden collecting less than he would have if he did not have to retain additional counsel.

### (Grounds for Discipline)

241. By reason of the conduct set forth in Count Ten of this Formal Complaint, Respondent committed the following misconduct and is subject to discipline under MCR 9.104 as follows:

 a) failed to act with reasonable diligence and promptness in representing a client, in violation of MRPC 1.3;

 b) failed to promptly comply with a client's reasonable requests for information, in violation of MRPC 1.4(a);

41

c)      failed to explain a matter to client to the extent reasonably necessary to permit the client to make informed decisions about the representation, MRPC 1.4(b);

d)      failed to promptly pay or deliver funds that a third person is entitled to receive, in violation of MRPC 1.15(b)(3);

e)      failed to promptly render a full accounting regarding such funds, in violation of MRPC 1.15(b)(3);

f)      engaged in conduct involving dishonesty, fraud, deceit or misrepresentation or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer, in violation of MRPC 8.4(b);

g)      engaged in conduct that is prejudicial to the proper administration of justice, in violation of MRPC 9.104(1);

h)      engaged in conduct that exposed the legal profession or the courts to obloquy, contempt, censure or reproach, in violation of MCR 9.104(2); and,

i)      engaged in conduct that is contrary to justice, ethics, honesty or good morals, in violation of MCR 9.104(3).

42

## COUNT ELEVEN – KENT S. SIEGEL

### (Factual Allegations)

242.    Respondent represented plaintiff in *Sherry Diehl v Citizens Insurance Co.*, in Wayne County Circuit Court Case No. 19-01466-NI filed on November 1, 2019.

243.    In March of 2021, an order for mediation was entered.

244.    On April 14, 2021, Kent S. Siegel, served as mediator in the pending civil case and the parties were required to pay fees associated with mediation.

245.    On June 28, 2021, Respondent paid his portion of the mediation fee with check number 39107 in the amount of $500.00 from his Business Account with TCF Bank ending in #0427.

246.    On July 1, 2021, Account #0427 was garnished $6,174.28 by "MI Garn."

247.    On July 7, 2021, Respondent's check number 39107 was returned for insufficient funds.

248.    On or about July 12, 2021, Respondent was notified by Mr. Siegel that check number 39107 for $500 was not honored and that payment was due.

249.    On July 12, 2021, Respondent falsely stated to Mr. Siegel that Respondent's bounced check was a "bank error" and that the check would be replaced.

250.    Respondent did not promptly send the funds he owed to Mr. Siegel.

251.    On or about July 26, 2021, after having not received the payment from Respondent, Mr. Siegel again contacted Respondent about the payment.

252.    During this conversation, on or about July 26, 2021, Respondent expressed surprise to Mr. Siegel that Mr. Siegel had not received the replacement check, despite knowing that he had not sent the replacement check to Mr. Siegel and at that time Account #0427 had a balance of less than $500.

253.    During the conversation on or about July 26, 2021, Respondent again promised Mr. Siegel he would send payment, assuring Mr. Siegel that he was overnighting another replacement check.

254.    Respondent did not send the funds owed to Mr. Siegel when promised on or about July 26, 2021.

255.    On August 5, 2021, having still not received a replacement check from Respondent, Mr. Siegel filed a Request for Investigation with the Attorney Grievance Commission relaying the bounced check and inaccurate representations of Respondent.

256.    On August 13, 2021, Respondent sent Mr. Siegel the funds he owed Mr. Sigel by wire transfer from Respondent's Bank Account with TCF ending in #0427.

### (Grounds for Discipline)

257.    By reason of the conduct described above in Count Eleven of this Formal Complaint, Respondent has committed the following misconduct as is subject to discipline under MCR 9.104 as follows:

44

a)    failed to promptly pay or deliver funds that a third person is entitled to receive, and failed to promptly render a full accounting regarding such funds, in violation of MRPC 1.15(b)(3);

b)    knowingly disobeyed an obligation under rules of the tribunal, in violation of MRPC 3.4(c);

c)    engaged in conduct involving dishonesty, fraud, deceit or misrepresentation or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer, in violation of MRPC 8.4(b);

d)    engaged in conduct that is prejudicial to the administration of justice, in violation of MRPC 8.4(c);

e)    engaged in conduct that is prejudicial to the proper administration of justice, in violation of MRPC 9.104(1);

f)    engaged in conduct that exposed the legal profession or the courts to obloquy, contempt, censure or reproach, in violation of MCR 9.104(2); and,

g)    engaged in conduct that is contrary to justice, ethics, honesty or good morals, in violation of MCR 9.104(3).

45

## COUNT TWELVE – FAILURE TO TIMELY ANSWER REQUEST'S FOR INFORMATION

### (Factual Allegations)

258.    The following requests for investigation were mailed to Respondent's address of record with the State Bar of Michigan in accordance with MCR 9.112(C)(1)(b), requiring his signed written Answer within twenty-one (21) days as follows:

| AGC File No. | Dated Mailed to Respondent | Complainant |
|---|---|---|
| 19-0376 | 02/19/2019 | Dalen Hanna |
| 19-0692 | 03/06/2019 | Aron Orth |
| 19-1187 | 05/13/2019 | Arthur Orofino |
| 19-2664 | 12/05/2019 | Samira Bazzi |
| 21-1780 | 10/27/2021 | Kent Siegel |

259.    On October 27, 2021, the request for investigation in AGC File No. 21-1780 was mailed and emailed to Respondent at the following address: briandailey@daileylawyers.com.

260.    Respondent failed to answer the Request for Investigation listed above in the time allowed and final notices enclosing a second copy of the Request for Investigation was served via certified mail on Respondent in accordance with MCR 9.112(C)(1)(b) as follows:

| AGC File No. | Certified Mailing Date | Complainant |
|---|---|---|
| 19-0376 | 03/24/2019 | Dalen Hanna |

46

| 19-0692 | 05/22/2019 | Aron Orth |
| 19-1187 | 07/18/2019 | Arthur Orofino |
| 19-2851 | 01/24/2020 | Samira Bazzi |
| 21-1780 | 11/30/2021 | Kent Siegel |

261.     The final notices also allowed Respondent an additional 10 days to answer the Request for Investigation.

262.     Respondent was granted an extension on April 19, 2019, in AGC File No. 19-0692 until May 5, 2019.  Respondent failed to comply with the extended deadline.

263.     On January 3, 2022, in AGC File No. 21-1780, Respondent was sent another copy of the Request for Investigation as a courtesy, via email.

264.     Counsel for Petitioner received a certified mail receipt on each of the aforementioned Requests for Information, confirming that the final notices were accepted at Respondent's address.

265.     Respondent failed to answer each Request for Investigation in the time allowed pursuant to MCR 9.112(C)(b), having provided untimely responses as follows:

| AGC File Number | Date Answer Received | Complainant |
|---|---|---|
| 19-0376 | 04/01/2019 | Dalen Hanna |
| 19-0692 | 06/03/2019 | Aron Orth |
| 19-1187 | 07/26/2019 | Arthur Orofino |

47

| 19-2851 | 02/03/202 | Samira Bazzi |
| 21-1780 | 03/11/2022 | Kent Siegel |

## (Grounds for Discipline)

266. By reason of the conduct described in Count Twelve of this Complaint, Respondent has committed the following misconduct and is subject to discipline under MCR 9.104:

a) failure to answer the Request for Investigation in conformity with MCR 9.113(A) and (B)(2), and in violation of MCR 9.104(7);

b) knowingly failed to respond to a lawful demand for information in violation of MRPC 8.1(a)(2);

c) engaged in conduct involving dishonesty, fraud, deceit or misrepresentation or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer, in violation of MRPC 8.4(b);

d) engaged in conduct that is prejudicial to the administration of justice, in violation of MRPC 8.4(c) and MCR 9.104(1);

e) engaged in conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach, in violation of MCR 9.104(2); and,

48

f)        engaged in conduct that is contrary to justice, ethics, honesty or good morals, in violation of MCR 9.104(3).

Wherefore, Respondent should be subjected to such discipline as may be warranted by the facts or circumstances of such misconduct, including any restitution owed.

Dated: October 7, 2022                 **MICHIGAN ATTORNEY**
                                            **GRIEVANCE COMMISSION**

**MICHAEL V. GOETZ, P41139**
**Grievance Administrator**
PNC Center
755 W. Big Beaver Rd., Suite 2100
Troy, MI 48084
(313) 961-6585

State of Michigan

Attorney Discipline Board

Grievance Administrator,
Michigan Attorney Grievance Commission,

    Petitioner,

v

Brian T. Dailey, P39945,

    Respondent.

_____/

Case No. 22-77-GA

## Discovery Demand

As permitted by MCR 9.115(F)(4), Petitioner makes the following demand for discovery:

    1)    Copies of all documentary evidence to be introduced at the hearing, or access to such documentary evidence so that it can be inspected and copied, in accordance with MCR 9.115(F)(4)(a); and,

    2)    The names and addresses of any persons to be called as witnesses at the hearing, in accordance with MCR 9.115(F)(4)(a)(i).

Under MCR 9.115(F)(4)(c), your failure to comply timely with the above demands may subject you to one or more of the sanctions set forth in MCR 2.313(B)(2)(a)-(c).

Dated:  October 7, 2022

                        */s/ Kenneth E. Frazee*
                        Kenneth E. Frazee, P51903
                        Senior Associate Counsel
                        Attorney Grievance Commission
                        PNC Center
                        755 W. Big Beaver, Suite 2100
                        Troy, MI 48084
                        (313) 961-6585

# EXHIBIT "I"

STATE OF MICHIGAN

# Attorney Discipline Board

## SUBPOENA

*Case Number: ADB CASE NO. 22-77-GA*

*County of Wayne ss.*

*IN THE NAME OF THE PEOPLE OF THE STATE OF MICHIGAN*

To:     John Betz
        175 2nd St.
        Belleville, MI 48111
        jbetz@att.net

You are hereby commanded and required to appear before Tri-County Hearing Panel #17, at the Office of

**the Attorney Discipline Board, 333 W. Fort St., Suite 1700, Detroit, MI 48226-3147,** on **TUESDAY,**

**AUGUST 8, 2023,** at **9:30 A.M.,** to give evidence in a matter pending before the Attorney Discipline Board

involving the conduct of **BRIAN T. DAILEY,** a Member of the State Bar of Michigan.

You are required to produce the following at hearing:

*Subpoenas of the Attorney Discipline Board shall not be used to obtain discovery not permitted by MCR 1985, 9.115 (F)(4).*

*A subpoena must be issued in the name and under the seal of the Board. It must be signed by a panel or board member, by the Administrator, or by the Respondent or the Respondent's attorney. A subpoenaed witness must be paid the same fee and mileage as a witness subpoenaed to testify in the Circuit Court. MCR 9.115 (I)(1).*

---

*Failure to comply with a Subpoena constitutes Contempt, which is punishable by the Circuit Court. MCR 9.115 (I)(2).*

---

# EXHIBIT "J"

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

Dailey Law Firm, P.C., a Michigan Professional
Corporation,

        Plaintiff,

        Civil Action No. 21-003134-CB
        Hon. Brian R. Sullivan

vs.

Lauren Sitto, an individual, Lauren M. Sitto &
Associates, PLLC, a Michigan professional limited
liability company, Kyle Ruscitti, an individual, and
Motor City Legal Funding, LLC, a Michigan limited
liability company,

**PLAINTIFF'S FIRST AMENDED
COMPLAINT**

        Defendants

and

Lauren Sitto, an individual, and Lauren M. Sitto &
Associates, PLLC, a Michigan professional limited
liability company,

        Counter-Plaintiffs and Third-Party
        Plaintiffs

vs.

Brian T. Dailey, an individual,

        Third-Party Defendant.

_____/

Michael P. Hindelang (P62900)
Jonathan N. Ajlouny (P82030)
Honigman LLP
Attorneys for Plaintiff/Third-Party Defendant
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
(313) 465-7412
mhindelang@honigman.com
jajlouny@honigman.com

Daniel J. McGlynn (P47678)
McGlynn Associates, PLC
Attorney for Defendants/Third-Party Plaintiffs
2075 W. Big Beaver Road
Suite 600
Troy, MI 48084
(248) 649-3554
dmcglynn@mcglynnassoc.com

Brian T, Dailey (P39945)
Eric C. Hoort (P84656)
Dailey Law Firm, P.C.
Attorney for Plaintiff/Third-Party Defendant
63 Kercheval, Suite 215
Grosse Pointe Farms, MI 48236
Ph. (313) 640-1111
F. (313) 640-9999
briandailey@daileylawyers.com
eric@daileylawyers.com
_____/

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### Preliminary Statement

1.      Sitto worked as an employee of Plaintiff, drawing a six-figure salary and receiving bonuses to serve as an attorney.  She took advantage of her position with Plaintiff to divert cases to herself, to divert settlement proceeds to her own account, and then, on her way out the door, engaged in efforts to delete data from Plaintiff's computer systems.

### The Parties, Jurisdiction, and Venue

2.      Plaintiff Dailey Law Firm, P.C. ("Dailey PC") is a Michigan Professional Corporation headquartered in Wayne County, Michigan and conducting business in Wayne County, Michigan.

3.      Defendant Lauren Sitto ("Sitto") is, upon information and belief, a resident of Oakland County, Michigan who conducts business in Wayne County, Michigan.

4.      Defendant Lauren M. Sitto & Associates, PLLC ("Sitto PLLC," collectively with Sitto, "Sitto Defendants") is, upon information and belief, a Michigan Professional Limited Liability Company headquartered in Oakland County, Michigan that conducts business in Wayne County, Michigan.

5.      Defendant Kyle Ruscitti ("Ruscitti") is, upon information and belief, a resident of Oakland County, Michigan who conducts business in Wayne County, Michigan.

1

6.     Defendant Motor City Legal Funding, LLC ("MCLF") is, upon information and belief, a Michigan limited liability company headquartered in Oakland County, Michigan that conducts business in Wayne County, Michigan.

7.     The actions and events giving rise to the claims set forth herein occurred primarily in Wayne County, Michigan.

8.     This matter involves claims in excess of $25,000.00 and jurisdiction and venue is otherwise proper in this County.

**9.**     All relevant documents discussed herein are in Defendants' possession, custody, or control.

### General Allegations

10.     Dailey PC is a law firm established in 1927 and currently specializing in personal injury litigation and criminal defense.

11.     In December 2017, Dailey PC chief executive officer Brian Dailey offered Sitto full-time employment with Dailey PC as an associate attorney.

12.     The offer was sent to Sitto's email, which Sitto accepted.  This offer is in Sitto's possession.

13.     Sitto was employed on the basis of a salary and a payment of a percentage of fees from cases resolved by Sitto for Dailey PC.

14.     During the course of her employment, Sitto requested – and Dailey PC agreed – to a change in those employment terms.

15.     The terms in effect since approximately December 28, 2019 were for Sitto to receive a six-figure salary and a discretionary bonus, but not a guaranteed portion of the fees she

2

obtained for Dailey PC (other than for cases referred to Dailey by Sitto as to which Sitto would still be entitled to a referral fee of 40% of the total fee earned).

<u>**Sitto's Abrupt Resignation**</u>

16.     On Friday February 12, 2021, Sitto sent Dailey an email tendering her immediate resignation from Dailey PC. (Ex. 1, Feb. 12, 2021 Resignation).

17.     While the lack of notice provided by Sitto's sudden departure caused some logistical concerns, such as the need to immediately replace Sitto as counsel of record in various matters, it quickly became apparent that Sitto's actions extended far beyond lacking professional courtesy.

18.     Shortly after Sitto's departure, Dailey began to unravel Sitto's actions, which she had concealed.

19.     First, Dailey discovered numerous files and client matters in Sitto's Dailey PC email account (the "<u>Email Matters</u>").

20.     The Email Matters were litigation matters which Sitto had not disclosed to Dailey PC.

21.     The files for the Email Matters were not stored on the Dailey PC computer systems as required by firm policy.

22.     The files for the Email Matters were not included in the Dailey PC docket management system, which ensured that all dates were properly placed on the firm calendar and all costs and time properly tracked.

23.     Instead, Sitto had been concealing the Email Matters from Dailey PC by retaining the clients through Sitto PLLC.

24.     Dailey subsequently discovered that a ***majority*** of the cases Sitto was handling were actually for Sitto PLLC, not Dailey PC. Yet, at the same time, Sitto continued to receive her full compensation, including her six-figure salary from Dailey PC.

25.     Further, Sitto was using Dailey PC resources for her hidden operation, using her Dailey PC email address, server, administrative resources, and office. Dailey even discovered that Sitto PLLC's filing and court fees were being charged to Dailey PC's credit card.

26.     However, Dailey quickly realized that Sitto had been taking even more serious wrongful actions.

27.     Dailey began finding evidence that Sitto has been intercepting settlement checks directed to Dailey PC for clients of Dailey PC (the "Settlement Matters"). (Ex. 2)

28.     Indeed, Dailey located emails where Sitto directed opposing counsel to ignore Dailey PC's liens and financial interests in the Settlement Matters, and to send checks payable to the client and Sitto PLLC. (Ex. 3, Email)

29.     Thus far, Dailey PC has discovered at least $458,850.00 in funds that Sitto diverted from Dailey PC to Sitto PLLC in connection with the Settlement Matters.

30.     Pursuant to Dailey PC's contingency fee arrangements in the Settlement Matters cases, but excluding recoverable expenses, Dailey PC was entitled to at least $136,420 in fees from these settlements.

31.     There is also evidence that Sitto was attempting to settle as many cases as she could immediately prior to her departure, on information and belief, in an effort to collect as many settlement payments as possible in order to direct them to herself and/or Sitto PLLC.

32.     For example, in one such case, Sitto sent opposing counsel an email on February 4, 2021, shortly before her departure, indicating that she would accept his settlement offer only if

4

opposing counsel could "get me the check within 10 days" and to "please make sure its payable to the Lauren M. Sitto & Associates firm." (Ex. 4, Redacted Emails).

33.     The last business day in this 10-day window was February 12, 2021 – the date of Sitto's resignation.

34.     Following Sitto's resignation, she contacted three out of the four Dailey PC paralegals who she had worked with and supervised.

35.     Without disclosing her resignation to the paralegal, Sitto instructed her to delete client data from the Dailey PC computer systems.

36.     Sitto misrepresented to the paralegal that these files were entirely personal files for Sitto, and did not disclose that they were client files.

37.     When the paralegal asked Sitto if she needed to save anything in the file before deleting it, Sitto denied that was necessary, and instructed her to proceed.

38.     Sitto also asked another paralegal if Dailey PC maintained cloud storage and if so, how it could be accessed.

### Sitto and Ruscitti's Actions Post-Complaint

39.     Plaintiff filed suit against Sitto and Sitto PLLC on March 5, 2021.

40.     Shortly after, Dailey PC's clients began receiving calls from Ruscitti and MCLF defaming Dailey and Dailey PC, and convincing them to terminate Dailey PC as their attorney.

41.     At least one client received a call from someone identifying themselves as MCLF's attorney.

42.     Sitto had no relationship with many of the clients that were contacted by Ruscitti and MCLF. However, Sitto had access to their contact information through DLF's servers.

43.     MCLF had a business relationship with DLF and provided funding for various DLF clients.

44.     While MCLF had access to some various confidential client information, such as names and contact information, MCLF and Ruscitti contacted many of DLF's clients with whom they were never given contact information of or were authorized to obtain from DLF.

45.     Thus, Ruscitti either hacked into DLF's computer system through Sitto's computer while she was working remotely or Sitto provided that information to Ruscitti and MCLF in furtherance of their conspiratorial goals of damaging DLF.

46.     On March 26, 2021, Plaintiff's counsel sent Defendants' counsel a letter indicating that they were aware of some of Defendants' improper and harmful communications and requested that they be ceased immediately.

47.     Defendants never responded to Plaintiff's March 26, 2021 letter or rectified their harmful actions.

## COUNT I – BREACH OF CONTRACT

### Lauren Sitto

48.     Plaintiff incorporates all allegations of the Complaint as if fully set forth herein.

49.     In December of 2017, Dailey PC provided Sitto a full-time employment offer to join the firm as an associate attorney.

50.     In consideration for Sitto's full time employment at Dailey PC, Sitto was provided, *inter alia*, a yearly salary, benefits, a percentage of all fees generated by her work, various computer and file management systems, an office, and administrative assistance.

51.     Sitto accepted Dailey PC's employment offer.

6

52. The terms of Sitto's employment with Dailey PC constitute a valid and enforceable contract.

53. Shortly after Sitto abruptly departed from Dailey PC on February 12, 2021, Dailey PC discovered that Sitto had not been working for Dailey PC full time, despite her contractual obligation and while continuing to collect her full salary.

54. In fact, Sitto was secretly diverting Dailey PC's clients to her own firm, Sitto PLLC, over the course of her employment.

55. Not only was Sitto taking Dailey PC's clients and failing to divert her full-time to Dailey PC, but Sitto was largely operating Sitto PLLC using Dailey PC's resources.

56. Sitto was operating Sitto PLLC largely out of her office provided by Dailey PC, using her Dailey PC email address, the Dailey PC server, and charging court and filing fees to Dailey PC's credit card, all while being paid a salary from Dailey PC.

57. Sitto's egregious actions set forth above constitute a breach of her employment contract.

58. Dailey PC has suffered damages as a result of Sitto's actions, which include, but is not limited to, a recoupment of Sitto's salary over the past three years.

WHEREFORE, Dailey PC respectfully requests that the Court enter judgment in its favor, and award Dailey PC its damages, including interest, costs, and attorneys' fees, as well as such other relief the Court deems appropriate.

## COUNT II – TORTIOUS INTERFERENCE

59. Plaintiff incorporates all allegations of the Complaint as if fully set forth herein.

60. Dailey PC had a contractual and business relationship with various third-party clients.

61.     Dailey PC also had contingency fee agreements with various clients.

62.     Defendants, through Sitto's employment and MCLF's contracts with Dailey PC's client, knew of these contracts, relationships, and fee agreements.

63.     Defendants tortiously, intentionally, and improperly interfered with Dailey PC's business relationship with clients as set forth above.

64.     Defendants' conduct was willful and intentional.

65.     As a proximate result of Defendants' tortious interference, Dailey PC has suffered damages in excess of $100,000.

WHEREFORE, Dailey PC respectfully requests that the Court enter judgment in its favor, and award Dailey PC its damages, including interest, costs, and attorneys' fees, as well as such other relief the Court deems appropriate.

## COUNT III – BREACH OF FIDUCIARY DUTY

### Lauren Sitto

66.     Plaintiff incorporates the allegations of all Paragraphs in its Complaint as though fully set forth herein.

67.     As an attorney employed with Dailey PC, Sitto was placed in a position of trust and confidence and owed Dailey PC a corresponding degree of fairness, honesty, and good faith.

68.     Dailey PC reposited its trust, confidence, and reliance on Sitto.

69.     Sitto, in her position of employment, therefore had fiduciary duties to Dailey PC, including, but not limited to, a duty to maintain the confidentiality of Dailey PC's confidential and proprietary information, a duty to refrain from competing with Dailey PC or assisting a competitor of Dailey PC during her employment at Dailey PC, and a duty to present business opportunities to Dailey PC that belonged to the company.

8

70. Sitto breached her fiduciary obligations by, *inter alia*:

    a. Diverting **at least** $116,583.33 in contingency fee payments from Dailey PC's clients to Sitto and/or Sitto PLLC;

    b. Secretly operating Sitto PLLC, a competing law firm, while employed full-time by Dailey PC;

    c. Using Dailey PC's resources to operate Sitto PLLC;

    d. Diverting clients of Dailey PC to Sitto PLLC;

    e. Deleting various client files of Dailey PC, in violation of Sitto's ethical and legal obligations; and

    f. Otherwise causing Dailey PC harm.

71. Dailey PC was damaged as a result of the foregoing breaches of fiduciary duties.

72. Sitto's actions also amount to a violation of Michigan's Faithless Servant Doctrine.

73. As a result, a forfeiture of all compensation paid to Sitto from Dailey PC is warranted.

WHEREFORE, Dailey PC respectfully requests that the Court enter judgment in its favor, and award Dailey PC its damages, including interest, costs, and attorneys' fees, as well as such other relief the Court deems appropriate.

## COUNT IV – UNJUST ENRICHMENT/QUANTUM MERUIT

### Sitto Defendants

74. Plaintiff incorporates all allegations of the Complaint as if fully set forth herein.

75. Dailey PC had contractual relationships with various clients, which were subject to contingency fee arrangements ranging from 25% to 33% of all settlement proceeds net of expenses incurred.

76. Dailey PC and its attorneys performed work for these clients.

77. Defendants took Dailey PC's clients to Sitto PLLC after Sitto's resignation.

9

78. Defendants received the benefits of the work performed by Dailey PC for these clients.

79. Defendants were not entitled to any of these benefits.

80. The benefits to Defendants were to the detriment of Dailey PC.

81. It would be inequitable for Defendants to retain the benefits of these transactions.

WHEREFORE, Dailey PC respectfully requests that the Court enter judgment in its favor, impose a constructive trust over the benefits received by Sitto and Sitto PLLC, and award Dailey PC its damages including interest, costs, and attorneys' fees, as well as such other relief the Court deems appropriate.

## COUNT V – VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT

### Lauren Sitto

82. Plaintiff incorporates all allegations of the Complaint as if fully set forth herein.

83. Sitto is prohibited from accessing a protected computer without authorization or in a manner that exceeds her authorization by the Computer Fraud and Abuse Act, 18 U.S.C. S 1030 ("CFAA").

84. Dailey PC's computerized system network is, and at all relevant times has been, used in interstate commerce and communication and is thus a "protected computer" under the CFAA.

85. When Sitto resigned from Dailey PC on February 12, 2020, Sitto lost any and all remaining authorization to access Dailey PC's protected computers.

86. Despite this, on February 14, 2020, Sitto contacted her former assistant at Dailey PC, concealing the fact that she had resigned from the firm, and asked her to access and delete various files on her behalf, that were located on Dailey PC's computer system.

10

87.    Sitto's access of Dailey PC's protected computer files after she lost authorization for such access violated the CFAA.

88.    Sitto intentionally, knowingly, and without authorization, accessed a proprietary computerized database in order to obtain valuable information in violation of 18 U.S.C. S 1030(a)(2)(C).

89.    When Sitto accessed the computer database, she intended to use the valuable information contained therein for illegal and unlawful purposes.

90.    Sitto's unauthorized access of Dailey PC's computerized network system caused losses and damage to Dailey PC in an amount to be determined at trial, and that exceeds $5,000.

91.    Dailey PC is entitled to injunctive relief under, and any and all actual or statutory damages provide by, the CFAA.

WHEREFORE, Dailey PC respectfully requests that the Court enter judgment in its favor, and award it all damages, including interest, costs, and attorneys' fees, as well as such other relief the Court deems appropriate.

## COUNT VI – STATUTORY AND COMMON LAW CONVERSION/EMBEZZLEMENT
### Sitto Defendants

92.    Plaintiff incorporates all allegations of the Complaint as if fully set forth herein.

93.    Defendants' actions of diverting settlement checks, intended for Dailey PC, to themselves (in amounts excess of $116,583) which were intended for Dailey PC constitutes theft, embezzlement, and/or conversion of property.

94.    Upon information and belief, Defendants received and/or possessed property belonging to Dailey PC which had been stolen, embezzled, and/or converted.

11

95.     Upon information and belief, Defendants had knowledge that the property was stolen, embezzled, or converted.

96.     Dailey PC was damaged as a result of these actions.

WHEREFORE, Dailey PC respectfully requests that the Court enter judgment in its favor, order the return of Dailey PC's property, award treble damages, costs, and attorneys' fees to Dailey PC, as well as such other relief the Court deems appropriate.

## COUNT VII – ACCOUNTING

### Sitto Defendants

97.     Plaintiff incorporates all allegations of the Complaint as if fully set forth herein.

98.     Defendants are in possession of various client files, information, and funds converted from Dailey PC.

99.     In light of Defendants' concealment of their actions and Sitto's efforts to destroy data that would establish Dailey PC's entitlement to funds, there is not an adequate remedy at law and Dailey PC is entitled to an accounting.

100.    Defendants are required to account to Dailey PC for the total and full amounts Sitto and Sitto PLLC embezzled and converted from Dailey PC, and any additional records, files, or proceeds that Sitto improperly took with her to Sitto PLLC.

WHEREFORE, Dailey PC respectfully requests a formal accounting of Sitto and Sitto PLLC's affairs, as present circumstances render such an accounting just and reasonable.

## COUNT VIII – DEFAMATION

### Ruscitti and MCLF

101.    Plaintiff incorporates all allegations of the Complaint as if fully set forth herein.

12

102.     As set forth above, Defendant negligently or with actual malice published false and defamatory statements regarding Plaintiffs to the general public.

103.     The statements Defendant made were not entitled to any privilege under Michigan law.

104.     The statements Defendant made purported to be statements of fact, not satire or the expression of opinion.

105.     The statements made by Defendant constitute defamation *per se*.

106.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have suffered, and will continue to suffer, economic injury, loss of goodwill, harm to their business reputations, loss of esteem and standing in the community, and loss of business opportunities.

107.     As a direct and proximate result of Defendant's unlawful actions, Plaintiffs have suffered damages in an amount to be determined at trial.

WHEREFORE**,** Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendants, and award Plaintiff monetary damages in the full amount to which it is entitled, plus attorney's fees, pre-judgment and post-judgment interest, and costs.  Plaintiff further requests that the Court grant any further relief as is just and appropriate.

## COUNT IX –AIDING AND ABETTING TORTIOUS INTERFERENCE

### Sitto, Ruscitti, and MCLF

108.     Plaintiff incorporates all allegations of the Complaint as if fully set forth herein.

109.     As set forth in Count II, Defendants are liable for their tortious interference with Dailey PC's clients and business relationships, for which Dailey PC has suffered damages.

110.     Sitto, Ruscitti, and MCLF also knowingly participated and provided substantial assistance to each other regarding their tortious interference.

13

111.    Plaintiff has suffered damages through Defendants' tortious interference, and Sitto, Ruscitti, and MCLF's knowing participation and substantial assistance therein is the proximate cause of such damages.

WHEREFORE, Dailey PC respectfully requests that the Court enter judgment in its favor, and award it all damages, including interest, costs, and attorneys' fees, as well as such other relief the Court deems appropriate.

## COUNT X – AIDING AND ABETTING DEFAMATION

### Sitto and MCLF

112.    Plaintiff incorporates all allegations of the Complaint as if fully set forth herein.

113.    As set forth in Count VIII, MCLF and Ruscitti slandered and defamed Dailey PC, for which Dailey PC has been harmed.

114.    Sitto and MCLF also knowingly participated in and provided substantial assistance to Ruscitti and MCLF in regard to their defamatory actions.

115.    Dailey PC has suffered damages as a direct and proximate result of Ruscitti and MCLF's defamatory actions.

WHEREFORE, Dailey PC respectfully requests that the Court enter judgment in its favor, and award it all damages, including interest, costs, and attorneys' fees, as well as such other relief the Court deems appropriate.

14

Respectfully submitted,

HONIGMAN LLP
Attorneys for Plaintiff


By:  /s/ Michael P. Hindelang
     Michael P. Hindelang (P62900)
     Jonathan N. Ajlouny (P82030)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
313.465.7412

Brian Thomas Dailey (P39945)
Dailey Law Firm, P.C.
63 Kercheval Avenue
Grosse Pointe Farms, MI  483236
(313) 640-1111
Attorneys for Plaintiff


Dated:  August 27, 2021

40605393.1